PETER THOMPSON
2988 Blackbird Drive
Bozeman, Montana, 59718
406-570-0268
thompson0089@msn.com
*Pro Se*

NOV 3 0 2018

Clerk, U.S. Courts
District Of Montana
Butte Division

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| PETER THOMPSON<br>                    Plaintiff,<br><br>          -vs-<br><br><br>THE CITY OF BOZEMAN,<br>ATTORNEYS, GREGG SULLIVAN, KYLA<br>MURRAY AND TIM COOPER;<br>CHIEF BUILDING OFFICIAL BOB RISK<br>POLICE OFFICERS: CAPTAIN JIM<br>VELTKAMP AND OFFICER MARK<br>CARPENTER.<br><br>CATTAIL CREEK COMMUNITY<br>ASSOCIATION(S) OF PHASE I, II AND<br>III & OF THE 2008 COMBINED<br>COVENANT ASSOCIATION; AND<br>CATTAIL CREEK COMMUNITY<br>ASSOCIATION INCORPORATED;<br>AND : (HOA ACTING AND FORMER<br>BOARD MEMBERS)<br><br>JAYMIE L. LARSEN<br>2845 N. 27TH AVE. #4<br>BOZEMAN, MT 59718<br><br>SUE GREENO<br>3321 BLACKBIRD DRIVE<br>BOZEMAN, MT 59718<br><br>PETER NOREEN<br>3313 BLACKBIRD DRIVE<br>BOZEMAN, MT 59718 | Cause No.<br><br><br><br><br><br>**TITLE 42 SECTION 1983, 1985, 1986, 1988<br>CIVIL RIGHTS COMPLAINT**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY<br>FOR ALL ISSUES SO TRIABLE** |

JAY BLASKE
3355 SORA WAY
BOZEMAN, MT 59718

NEIL RAMHORST
3348 WARBLER WAY UNIT A
BOZEMAN, MT 59718

JOE SANDS
PO BOX 11842
BOZEMAN, MT 59719

RANDY SULLIVAN
2944 BLACKBIRD DRIVE
BOZEMAN, MT 59719

DANIEL S MADISON
220 SACAJAWEA PEAK DR.
BOZEMAN, MT 59718

ROB PERTZBORN
518 N TRACY AVE
BOZEMAN, MT 59715

SANDRA (AKA SANDI) HAMILTON
4228 MARSALA AVE
MERIDIAN, ID 83642

LOLA JEFFERS
2775 MARLYN CT #4
BOZEMAN, MT 59718

JUSTIN TRIBITT
PO BOX 10053
BOZEMAN, MT 59719

SANDRA RUMMEL
2827 CATTAIL ST #1
BOZEMAN, MT 59718

JEREMY MAY
3095 CATKIN LANE
BOZEMAN, MT 59718

JOHN HANSEN
3143 CATTAIL STREET UNIT C
BOZEMAN, MT 59718

MELINDA MAZE-TALARICO
3147 CATKIN LANE
BOZEMAN, MT 59718

TYLER POWELL
3327 NORTH 27TH #15
BOZEMAN, MT 59718

TRAVIS MUNTER
3395 SORA WAY
BOZEMAN, MT 59718

SANDY FEENEY
2969 WARBLER WAY #4
BOZEMAN, MT 59718

SANDY SAUNDERS
2943 WARBLER WAY #3
BOZEMAN, MT 59718

DARRIN STROSNIDER
3020 A BLACKBIRD
BOZEMAN, MT 59718

CALLIE MILLER
3062 SUNDEW
BOZEMAN, MT 59718

AMY HANSON
3352 FEN WAY
BOZEMAN, MT 59718

JENNINGS LAW OFFICE; AND
WAYNE JENNINGS
517 S 22ND AVE #3
BOZEMAN, MT 59718

ABOVE AND BEYOND PROPERTY
MANAGEMENT; AND
EMPLOYEE DOE(S)
4055 VALLEY COMMONS DR UNIT E-2
BOZEMAN, MT 59718

WITTICH LAW;
AND ART WITTICH AND AMANDA
MENASCO
602 S FERGUSON AVE
BOZEMAN, MT 59718

SUSAN B SWIMLEY
1807 W DICKERSON STE. #B
BOZEMAN, MT 59715

MONTANA SECRETARY OF STATE
COREY STAPLETON
MONTANA CAPITOL BUILDING, RM 260
HELENA, MT 59620-2801

AMERICAN LAND TITLE COMPANY;
AND DOE(S) 1800 W KOCH ST # 1
BOZEMAN, MT 59715

AT YOUR SERVICE CLEANING & HOA
MANAGEMENT INC.; AND JAYMIE L.
LARSEN
2845 N. 27TH AVE. #4
BOZEMAN, MT 59718

SANDAN LLC
BOZEMAN, MT 59718

INTRINSIK ARCHITECTURE; AND ROB
PERTZBORN AND ALLISON GILLEY
111 N TRACY AVE
BOZEMAN, MT 59715

RICHARD T. EMBRY
ARIZONA

DEFENDANTS.

COMES Now Plaintiff, Peter Thompson, pro se, and for his Complaint against the Defendants states the following:

## INTRODUCTION

This is a civil rights and tort action complaint involving acts of conspiracy which seeks injunctive relief, declaratory judgement and money damages, brought by the Plaintiff Peter Thompson who is a victim of acts of institutional corruption, various forms and acts of, fraud, malice, coercion, abuse of process, deceit, malicious prosecution, tortious interference, breach of contract, breach of duty, intentional destruction of evidence, intentional infliction of emotional distress, violation of the covenant of good faith and fair dealing, breach of duty to be reasonable and conspiracy to commit all said acts. Plaintiff Peter Thompson is a victim of said acts at the hands of the acting members of Cattail Creek Community Associations of Phase I, II and III, the City of Bozeman, the State of Montana, the public benefit non-profit corporation of Cattail Creek Community Association, Sandan LLC, At Your Call HOA Management, Above and Beyond Management, Minnick Management Inc., Intrinsik Architecture, US Bank, American Land Title Company of Bozeman, Jennings Law Office, Wittich Law, Richard Embry and other individuals or entities whom have joined and or abetted and or acted as individuals involved in the illegal acts associated with the common interests of these individuals, entities and enterprises.

Injunctive relief, Declaratory judgement, nominal, compensatory and punitive damages (where allowed by law) are sought against all defendants on all counts.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

## JURISDICTION

This action arises under the Fourth and Fourteenth Amendments to the United States

Constitution, and under the Civil Rights Act of 1871, 42 U.S.C. sections 1983, 1985, 1986 and

1988. This Court has jurisdiction of this cause under 28 U.S.C. sections 1331 and 1343. Venue is

proper under 28 U.S.C. section 1391 in that the Defendants and Plaintiff resided in Montana

during time material to this complaint and the cause of action arises in the District of Montana.

## PARTIES

1.  The Plaintiff, Peter Thompson, ("Thompson") is an adult domiciled with his family in

Bozeman, Montana.

2.  The Defendant Sandra Hamilton is not currently domiciled in Gallatin County, Montana, but

for times material to this complaint Sandra Hamilton was domiciled in Gallatin County.

3.  The Defendant Richard T. Embry is not currently domiciled in Gallatin County, Montana,

current address is not known other than he is believed to live in Arizona.

4.  All other above captioned individuals and entity Defendants are of Gallatin County Montana.

### Complaint Overview

In 2008 Peter Thompson purchased a buildable lot in Cattail Creek Phase II Subdivision

to build a family home in an R2 area.  In 2010 Thompson was advised by the City of Bozeman

that the City regarded his lot as R1 and that Thompson could not buildout his planned basement

apartment without special permitting.  In 2011 the area property management company noticed

Thompson that he was violating covenants; Thompson then met with property management

company staff and noticed they were endeavoring to enforce covenants that were different than

the covenants Thompson purchased under.

Thompson requested a written explanation for various subjects discussed with the

management company, including *how the covenants were changed during his ownership without*

*his knowledge or consent.* Acting members of the local HOA retained counsel and threatened litigation that could result in the Thompson Family being precluded from living in their home and the HOA said their lawyer would answer Thompson's questions but never provided answers; while at the same time acting members of the HOA continued making voluminous complaints to the City of Bozeman regarding the Thompson residence. Thompson hired attorney Art Wittich to initiate a title insurance claim regarding the R2 vs R1 issue, to advise if the covenants could have been lawfully changed without Thompson's knowledge or consent and to comment on whose fault this mess was.

After receiving voluminous complaints from HOA members and keeping Peter Thompson from accessing documents to support his title insurance claim, the City of Bozeman breached construction permission agreements with Thompson in 2012, unlawfully revoked his certificate of occupancy in 2013 and then falsely swore an affidavit to support criminal charges against Thompson in 2014.

In 2015 Peter Thompson wrote the HOA regarding perceived issues resulting from interactions between the City and the HOA. Then both the HOA and the City brought litigation against Peter Thompson in 2015. The City providing notice of criminal charges within 24 hours of the acting HOA members serving Thompson with notice of civil complaint seeking an injunction to preclude Thompson and his family from living in their home. The City's criminal complaint relied on a straw man notice of complaint and perjured testimony to support their desired results. The HOA's civil complaint relied on forged articles of incorporation. The implied purpose of both complaints is to separate the Thompson family unit from their home as a means of stopping Peter Thompson from maintaining an actionable position against local special interests.

Throughout the course of defending criminal and civil litigation from 2015 to present, Peter Thompson has suffered numerous and ongoing civil rights violations as well as various acts of fraudulent concealment which evidence the pervasive influences of real-estate developers, their friends and enabling associates. The evidence will show that Bozeman has a long history of special real-estate interests which have resulted in institutional corruption of local government and courts and that these special interests have conspired against the Thompson family unit causing years of finical and emotional damages and deprivation of civil rights by associations, corporations and individual acting under color of law.

### Facts, Allegations and Law

1. The State of Montana, acting as Plaintiff, filed criminal charges against Peter Thompson in the matter of CR-14-00070.

2. On May 27, 2014, while acting under color of law in the name of the State of Montana, Bozeman City Attorney Kyla Murray swore an affidavit in support of criminal charges alleged against Peter Thompson in the matter of CR-14-00070.

3. The May 27, 2014 affidavit needed to provide the municipal court with an explanation of why Peter Thompson did not have a Certificate of Occupancy to support the 2014 charges against Thompson.

4. The Affidavit of Attorney Kyla Murray stated that on June 30, 2011 Peter Thompson had failed to comply with terms of a construction permission contract between Thompson and the City of Bozeman as follows: "The Defendant had failed to comply with life safety issues identified in the Agreement including a fire safety barrier between the downstairs and upstairs of the structure. Consequently, no Certificate of Occupancy was issued for the basement or the upstairs structure."

5. On June 30, 2011, then City code enforcement officer Paula Frojae made a routine electronic journal entry as follows:

"June 30, 2011 4:25:45 PM pfroaje.

Tim and I met Peter at his house today.  Peter met all the requirements that were in his contract to complete. I will go back to the house in one month."

6. On information and belief, Peter Thompson alleges that Bozeman Attorney Kyla Murray conspired with Bob Risk and Paula Frojae to commit fraud upon the court in the matter of CR-14-00070.  This as part of their ongoing civil rights conspiracy against the Thompson Family Unit, doing so under the direction and supervision of City Attorneys Gregg Sullivan and Tim Cooper.

7. In 2015, The City of Bozeman, acting by and through Police Captain Jim Veltkamp (badge #155), issued a notice to appear and complaint. Notice to appear and complaint were sent to Peter Thompson via US postal Service.  The Municipal Court assigned this complaint case number: TK-2015-03459, commonly referred to as TK-15-03459.  Captain Veltkamp was acting under color of law when he executed the sworn notice \ complaint statement.  Captain Veltkamp's sworn statement criminally charged Peter Thompson with violation of BMC 1.01.210 on the 28th day of May 2015 at 1400 hours.

8. TK-15-03459 needed to provide the municipal court with an explanation of the City's reasons for acting.  Bozeman City Attorney Kyla Murray while acting under color of law presented stare decisis to make a case that City Building officials have a duty to act and that they may revoke certificates of occupancy when there are serious safety concerns about a property.

9. In TK-15-03459 Bozeman City Attorney Kyla Murray while acting under color of law made written argument alleging serious safety concerns by stating that "Upon the last inspection by the

City there were apparent life safety issues in the unfinished home (unfinished electrical outlets located next to children's toys etc.)."

10.  At hearing on the 25th of August 2016, City Attorney Murray made oral argument that the City had to act on known safety concerns and she then solicited sworn testimony from Chief Building official Bob Risk regarding safety concerns for children relative to unfinished electrical outlets and life safety issues he witnessed upon the *last* inspection by the City.  Chief Building official Bob Risk was acting under color of law when he provided his sworn testimony at this August 2016 hearing.  Mr. Risk's sworn account of life safety issues was based on his site visit to the Thompson home made on February 23, 2012.  During this February 23, 2018 visit, Mr. Risk directed Mrs. Frojae to write a correction notice regarding the uncovered electrical outlets in the vicinity of children's toys.

11.  On March 26, 2012, then City code enforcement officer Paula Frojae made a routine electronic journal entry regarding the correction notice she had issued per Mr. Risk's site visit the previous February 23, 2012, Frojae's subsequent entry as follows:

"March 26, 2012  3:53:56 PM pfroaje.

Today I met Peter for the monthly inspection.  The

corrections from last month were all completed, regarding

the use of electrical outlets and switches had cover plates

installed."

12.  Subsequent to the what City Attorney Kyla Murray and Chief Building official Bob Risk had described in municipal court as "Upon the last inspection by the City there were apparent life safety issues in the unfinished home (unfinished electrical outlets located next to children's toys etc.)."  (Mr. Risks observations being based on his site visit of 2/23/2102) there were

reinspections by the City on 3/26/2012, 4/27/2012, 5/23/2012, 6/21/2012, 8/23/2012 and

11/01/2012. Subsequent to Mr. Risk's visit on 2/23/2012 where the City issued a correction

notice for safety concerns, there were in 6 subsequent visits without the City expressing any

ongoing concern for safety issues.

13. On information and belief, Peter Thompson alleges that Bozeman Attorney Kyla Murray and

Bozeman Chief Building official Bob Risk conspired to deceive the Municipal Court regarding

"life safety issues in the unfinished home" as part of their ongoing civil rights conspiracy against

the Thompson Family Unit, doing so under the direction and supervision of City Attorneys

Gregg Sullivan and Tim Cooper. This alternatively plead as Fraud Upon the Court and

conspiracy to commit because the City failed to fulfill their duty to produce impeaching

evidence, acting in furtherance of the conspiracy.

14. On information and belief, Peter Thompson alleges that Doe(s) conspired with Bozeman

Police Captain Jim Veltkamp to make a straw man complaint against Peter Thompson without

probable cause; and that Bozeman Police officer Mark Carpenter joined this conspiracy and that

Doe(s) of the Bozeman City attorney's office then joined this conspiracy. Subsequently all

conspirators ended up acting in furtherance of the City's ongoing civil rights conspiracy against

the Thompson Family Unit, doing so under the direction and supervision of City Attorneys

Gregg Sullivan and Tim Cooper. All involved acting under the color of law.

15. On information and belief, Peter Thompson alleges that officer Mark Carpenter normally

prints and signs his own reports as originals and that his first true, unedited report in the matter

of TK-15-03459 was disregarded and that Doe(s) provided direction on editing his report and or

used his computer to alter Carpenter's original report after it was first completed on 6/10/2015.

16. Carpenter's report is attached as Exhibit 1. Carpenter's report states that on May 26, 2015,

he was tasked by Captain Jim Veltkamp to see " If Peter Thompson and his family were living at 2988 Blackbird Dr illegally and if he was, I was to issue a citation for occupying a residence without a certificate of occupancy."

17. On May 27, 2015 Carpenter reports he visited the Thompson residence but found no one home to speak with and that he left his card in the door.

18. On May 28, 2015 Carpenter reports that he received an email from Thompson in response to leaving his card on the Thompson residence door and that he was invited to email and or contact Thompson via phone at either of two phone numbers provided.

19. On May 29, 2015 Carpenter reports that he advised Thompson that Carpenter had a citation for Thompson and that Thompson could receive service of this citation on a weekday at the police department.

20. At hearing on August 25, 2016 Carpenter testified that *he* filed out the citation but that *he* did not execute the citation. After Carpenter filled out the notice of complaint he brought the document to Captain Jim Veltkamp and the Captain then executed the sworn notice of complaint which officer Carpenter had filled out.

21. Officer Carpenter's report states that on May 29, 2018 after Carpenter had advised Thompson he had a citation to issue, he and Thompson then exchanged emails and phone contact thru June 3, 2015. By June 3, 2015 Carpenter and Thompson had made "a deal" that Carpenter would postal mail the citation to Thompson and Thompson would sign the citation and email a copy back to Carpenter. This "deal" due to schedule conflicts with Thompson working out of state during the week and Carpenter not willing to meet Thompson on a weekend when he was in state.

22. Carpenter reports that after he made the June 3, 2018 deal with Thompson to sign and return

a copy of the citation executed by Captain Jim Veltkamp, that Carpenter then contact Chief Building official Bob Risk to make sure there was no valid Certificate of Occupancy for 2988 Blackbird drive and that Carpenter then decided to also speak with Thompson's neighbor's to ascertain if the Thompson family was living in the house.

23.  Carpenter reports contact with neighbor's on June 5, 2018, several neighbors stating the Thompson family was living there and then Carpenter received an email from Chief Building official Bob Risk on this same day stating that "yes occupancy was still an issue and that it was in the city attorney's hands and that building department was not working on the case at all.". Carpenters report then leaves a space big enough for a signature, but does not sign his report and then close as follows:

"My report is complete. Mark Carpenter 6/10/15"


24. The City of Bozeman's discovery CD in TK-15-03459 included a call for service report.  See Exhibit 2.  The City of Bozeman Police Department is alleged to be a complaint based response agency.  The Call For Service report which TK-15-03459 is alleged to be a byproduct of, states that officer Mark Carpenter received a call for service complaint of a nuisance from the City Attorney at 2988 Blackbird Drive (this implies City Attorney Gregg Sullivan) on June 10, 2015 at 10:38 AM and that Carpenter was then dispatched on June 10, 2015 to follow up on the complaint of the City Attorney.

25.  The City of Bozeman's discovery CD in TK-15-03459 included the word document from which the filed copy Officer Carpenter's report was printed from.  This electronic document evidences that a full copy of carpenters report was 3 pages and that 3 page of the filed version was blank, page 4 of Exhibit one is a screen shot of the properties tab of the carpenter report. The properties tab shows that the report as created on 6/10/2015 at 9:44 AM and that total editing

time was 14 minutes. Of these 14 minutes of total editing time, the last modification to the report was made on 6/11/2015 at 7:47 AM.

26. On information and belief Peter Thompson alleges that Captain Jim Veltkamp and fellow Police Officer Mark Carpenter are not sufficiently trained to know how to determine if someone is living in a residence with a valid certificate of occupancy because neither police department workers ever asked Peter Thompson to see a copy of his certificate of occupancy. Rather the complaint filled out by Carpenter and executed by Veltkamp was first executed and then a weeks long investigation was initiated to support the issued citation with the investigation yielding nothing more than hearsay statements to support the previously executed notice of complaint.

Competently trained officers enforcing compliance with certificate of occupancy requirements would be sufficiently trained to know that once issued, a certificate of occupancy is a conclusive document which is binding and conclusive upon all government actors,  see MCA § 50-60-107 Certificate of occupancy, ie, if Veltkamp or Carpenter had asked to see Thompson's certificate of occupancy and it was shown to them, Veltkamp and Carpenter would be required by law to respect the binding and conclusive document or produce a order from a court of competent jurisdiction that set aside the issued certificate of occupancy.

In this case, an email from Chief Building Official Bob Risk which states "occupancy was still an issue and that it was in the city attorney's hands and that building department was not working on the case at all" does not rise to the level of lawfully required probable cause to execute a citation in a matter where the alleged defendant has not even been asked to show a copy of the original issued certificate of occupancy. In the time line of our circumstances, probable cause for Captain Jim Veltkamp to execute the complaint did not exist at the time of execution of the complaint on May 28, 2015 and after a weeks long investigation which "ended"

on June 10, 2015 the investigation failed to produce any evidence to support probable cause to issue the previously executed complaint of Captain Jim Veltkamp.

Captain Veltkamp's complaint has caused and continues to cause years of emotional distress, financial damages and civil rights violations against Peter Thompson and his family. 27. Though there have been a series of motions to dismiss TK-15-03459 for lack of a speedy trial, the case remains open and live as we approach the year 2019. So far, the City of Bozeman has been unable to obtain findings of fact or conclusions of law from the Honorable Judge Carl Seel to support the City's complaint.

However, recently appointed district court judge, the honorable Rienne H. McElyea came from a private practice law firm whose client list includes the City of Bozeman and the Developer of the local subdivision where Thompson's property is located and she presided over the civil complaint of the acting HOA members against Thompson.

It follows that the Bozeman City Attorney's Gregg Sullivan and Tim Cooper and Chief Building official Bob Risk have had a series of meetings with attorney Wayne Jennings representing the acting members of the local HOAs (Cattail Creek Community Associations) and in the civil complaint (DV-15-636) against Thompson Mr. Jennings has established findings of fact and conclusions of law in Judge McElyea's courtroom concisely as the City has endeavored but thus far failed to obtain in the Municipal Courtroom of Judge Seel.

On information and belief Peter Thompson alleges Wayne Jennings and the acting members of the local HOA have conspired with the City of Bozeman and its employees to violate Peter Thompson's civil rights.

28. On information and belief, Peter Thompson alleges a long running series of meetings and communications between City of Bozeman employees and the acting members of the local HOA

in the matter of DV-15-636. These meetings culminating in the conspiratorial purpose of

obtaining findings of fact and conclusions of law unnecessary to DV-15-636 but findings of fact

and conclusions that are particularly beneficial to the City's criminal complaint TK-15-03459.

Thus the Plaintiff in DV-15-636 aids and abets the ongoing Civil Rights conspiracy of the City

against Peter Thompson and his family.

29.  Bozeman City workers, principally City Attorney Gregg Sullivan and Chief Building official

Bob Risk, met and collaborated with acting members of HOA's by and thru Wayne Jennings via

phone, emails and in person meetings on the following days: 7/30/2013, 3/13/2017, 5/17/2017,

6/22/2017, 7/26/2017, 8/2/2017, 8/4/2017, 12/22/2017, 1/31/2018, 2/8/2018.

30.  On information and belief, Peter Thompson alleges additional conspiratorial meetings

between the acting members of the HOA and the City of Bozeman and its employees for date

ranges described above including communications with Captain Jim Veltkamp and City attorney

Tim Cooper.

31.  Each of the foregoing and following facts and allegations of fact are incorporated by

reference into each individual count of complaint. Further, each line and each exhibit of the

attached 85 page affidavit are incorporated into each of the foregoing and following complaints.

32.  Attached 8 pages bearing the following footer;

DV-15-636C - 4/25/206 - Answer +Affirmative Def. + Counter and Third Party Outline  : Page 20 of 27

State claims as counter claims Peter Thompson endeavored to previously file in DV-12-636.

However the district court did not recognize the filed documents as counter claims, subsequently

the named parties as Plaintiff vs Defendant etc. are not exactly accurate for this current filing,

however the facts and counts of complaint are herewith incorporated as counts of this complaint

wherein Peter Thompson is now the acting Plaintiff. It follows that the 85 pages of affidavit and

supporting documents are incorporated as the foundation of these 8 pages.

33. Susan Swimley has breached her duty to the association and abetted the acting board members in fraudulent concealment of forged articles of incorporation and fraudulent concealment of unlawful covenant contract amendments.  See attached notice of complaint for counts against the State of Montana and the Montana Secretary of State.

34. In 2006 acting HOA board members breached their duty of obedience to the covenant contracts which they were administering and then fraudulently concealed these actions from the affected property owners.  These usurping acting HOA members committed similar breaches of duty and fraud in the 2008 covenant contract refiling and these same members continue similarly by incrementally amending covenants via unauthorized alterations of the design regulations.  In so doing these usurpers take away property owners rights without their knowledge or consent while unlawfully inuring the powers of the acting HOA members.

35. Acting HOA members have destroyed documents which could be used against them and Peter Thompson has been damaged.

36. US Bank has abetted the civil rights conspiracy of the City by not producing requested documents which could be used to evidence negligence of the City in managing zoning documents of record.  Additionally US Bank has breached contract by making loan a variable rate when the applied for terms were for a fixed rate. US Bank has also breached contract by converting construction aspect of the loan package to principal and interest payments when the applied for contract allowed for as many extensions of the construction duration as Peter Thompson needed to complete the work.  US Bank has concealed deviations from the agreed to terms by misleading supplemental documents.

37.  Acting members of the HOA have conspired with their attorney Wayne Jennings to violate

Peter Thompsons civil rights in the matter of DV-15-636 by abusing process in an attempt at

ratification, by preventing Thompson from having a full and fair use of the legal system, by

conspiring with the bench to ignore filed counter claims, by conspiring with the bench to commit

fraud upon the court in damaging Thompson with assessments of costs which Mr. Jennings had

procedurally waived, by Mr. Jennings abetting the acting members forgeries in an effort to inflict

money damages against Peter Thompson.


Wherefore, Plaintiff prays this Honorable Court for relief as would be typical and appropriate to

all foregoing complaints, compensatory and punitive damages and for any other relief deemed

just by this Court and for costs.


Dated this 30th day of November 2018.


By: _____

Peter Thompson Pro Se

# Bozeman Police Department



## Report of Investigation

| | |
|---|---|
| **Date:** | **5/26/15** |
| **Case Number:** | **2015000604** |
| **Reporting Officer:** | **Mark Carpenter** |
| **Subject:** | **2988 Blackbird** |

On Tuesday May 26th I was asked by my supervisor Captain Veltkamp to start an investigation to see

If Peter Thompson and his family were living at 2988 Blackbird Dr illegally and if he was, I was to issue a citation for occupying a residence without a certificate of occupancy. I went by the residence with Officer Gappmayer on Wednesday afternoon the 27th of May. We knocked on the front door waiting for someone to answer. There were 2 vehicles in the driveway. I noticed flowers in the upstairs window sill and also a kid's bike on the front porch so I thought someone would be there. After a few minutes of waiting, no one answered the door so I left my business card on the front door to call me at my office number.

The next day I received an email from Peter Thompson mentioning that his wife found my card in the front door and that it was distressing to his family that I would show up unannounced. He asked that any further contact with him be through email or calling him on 1 of 2 phone numbers he provided me. He also mentioned that if I had papers that needed to be given to him, he said he would accept service at a place of my choosing, to just send him an email and he would come and pick them up.

On 5/29/15 I told Peter I would have paperwork for him at the downtown police station, to just let me know what time he could be there. He emailed back on the 29th and said he could meet Saturday and wanted to know the nature and topic of the paperwork. I answered right back on the 29th and told him I was not in on the weekends, only M-F 8-5 and that it was a citation

He wrote right back and thanked me for the note, and wanted to know what the citation was for. He said he was in Wyoming during the week and asked if I could scan and email him the citation or mail it to his home address at 2988 Blackbird Dr. My response to him was that it was a citation on behalf of the building department and that I needed to give it to him in person. He responded right back saying he would get in touch with me when he had time during the week.

On Tuesday June 2nd I emailed Peter back because I had not heard from him and asked when he could come in and get this paperwork done.

Peter replied to me on Wednesday the 3rd and reminded me he worked out of town and if I wanted to meet him during the week I could do it where he worked. I decided to call Peter at the number he gave me and told him I apologized for being confused about his meeting me during the week. I told him it was a citation for living in the house without a certificate of occupancy. He said OK can you scan it to me, I said I would find out but asked him if I sent it certified and restricted delivery so I would know that he got it. He said he was not going to waste time at the Post office to sign for a letter from us. He asked if I would mail it regular mail, he would scan it and let me know he received it when he got back in town. I contacted Bob Risk to make sure that there still was not a COO and want to go talk to neighbors.

The first neighbor I talked to was Brenda Craig who lives at 2962 Blackbird Ln. I told her why I was there and asked her if she had any doubt at all in her mind that the Thompson's were living at 2988 Blackbird Ln. She told me she absolutely had no doubt. She said Mrs. Thompson comes over when they are outside and chats about her kids and other things. Mrs. Craig mentioned that she sees Mrs. Thompson come and go from the property all the time, walk the dog a couple times a day. She also mentioned that the Thompsons 2 kids catch the School bus out front of the house. Brenda also said that Mrs. Thompson has talked to her about them living in the basement and wanting to rent out the upstairs of the home. She mentioned that she didn't think that was possible because it is not zoned for multi family living.

She mentioned that the Thompsons house had multiple power meters on it, I asked if I could go into her yard so I could see them, she took me into her back yard and I snapped a couple photos of the multiple power meters and the 2 gas meters. Brenda also mentioned that living next to her was Randy Sullivan who is the Design and Review Liaison for the Cattail subdivision. So I went to his place which is at 2944 Blackbird Ln. He answered the door, I introduced myself, told him why I was there and asked Randy if he had any doubt at all that the Thompsons were living at the address in question. He said no and that the Thompsons have been living there since he moved in to his place. Randy mentioned he might still have some correspondence that he had with the City in the past and that he would email it if he found it.

Around 1:30pm on the 5th of June, I did receive an email from Randy that he originally sent to Paula Frojae who at the time worked for the building and planning division. It mentioned to her that in January of 2014 the Thompsons were living in their home.

I received an email from Bob Risk around 4:20 on the 5th. He said yes occupancy was still an issue and that it was in the city attorney's hands and that building department was not working on the case at all.

My report is complete. Mark Carpenter 6/10/15

# Info

## CARPENTER-Investigation Notes- 2988 Blackbird Ln

Documents » Peter » CityBozemanMunicipal » CitationMay15th » City Discovery Disk



**Convert**

### Compatibility Mode
Some new features are disabled to prevent problems when working with previous versions of Office. Converting this file will enable these features, but may result in layout changes.



**Protect Document**

### Protect Document
Control what types of changes people can make to this document.



**Check for Issues**

### Inspect Document
Before publishing this file, be aware that it contains:
- Document properties and author's name
- Custom XML data
- Content that cannot be checked for accessibility issues because of the current file type



**Manage Versions**

### Versions
There are no previous versions of this file.

### Properties *

| | |
|---|---|
| Size | 125KB |
| Pages | 3 |
| Words | 1039 |
| Total Editing Time | 14 Minutes |
| Title | Add a title |
| Tags | Add a tag |
| Comments | Add comments |

### Related Dates

| | |
|---|---|
| Last Modified | 6/11/2015 7:47 AM |
| Created | 6/10/2015 9:44 AM |
| Last Printed | Today, 7:10 PM |

### Related People

Author  mcarpenter

Add an author

Last Modified By  mcarpenter

**Calls For Service Report**     **Call ID: 2015000604**                    Printed: November 3, 2015

| 1. Agency | 2. Person Received Complaint | 3. Date/Time Received | 5. Time Arrived | 7. Case # |
|---|---|---|---|---|
| BPD | Carpenter, Mark Alan | 06/10/2015     10:38<br>4. Time Dispatched<br>10:38 | :<br>6. Time Complete<br>: | - |

| 8. Nature Of Incident | Nuisance                               Property |
|---|---|

| 9. Location Of Incident | 2988 BLACKBIRD DR, BOZEMAN          MT |
|---|---|

| 10. Victim or Caller | CITY ATTORNEY<br>2988 BLACKBIRD DR, BOZEMAN |
|---|---|

| 11. Classification | 12. How Received | 13. Disposition | 14. Officer | 15. Date Submitted |
|---|---|---|---|---|
| GENERAL POLICE | PHONE | FOLLOW UP | Carpenter, Mark Alan | 06/10/2015 |

**Notes:**  198 5/26/15 All info in working folder

Based on information and belief the Defendant asserts the following Counter Claims and
third party claims.

As a direct and proximate result of each claim below, the Defendant's family suffered finical
and or medical and or property damages and or non-monetary damages and or civil rights
violations actionable under Sect 1983.

Defendant seeks punitive and compensatory damages where allow by law in an amount to be
determined by the Court, relative to each count and alternative pleading below:

1. Mistake of the Plaintiff's(Jane Doe(s)John Doe(s)), Sandan LLC- Sandra D Hamilton -
Daniel S Madison, Intrinsik Architecture - Rob Pertzborn - Allison Gilley in creating contract
no.2300076, per the particular facts alleged above. This set of facts alternatively plead as

constructive fraud and or fraud and Conspiracy to commit by John Doe(s) and Jane Doe(s)
This count alternatively plead as part of a RICO act conspiracy.

2. Tortious Interference and Conspiracy to commit: The Plaintiff (John and Jane Doe(s)) did
interfere with the Defendants Building permit via influential communications with the City of
Bozeman Building department about May of 2011.  John Doe(s) and or Jane Doe(s)
conspiracy to violate civil rights of Thompson family. This count alternatively plead as part
of a RICO act conspiracy.

3. Tortious Interference and Conspiracy to commit: The Plaintiff (John and Jane Doe(s)) did
interfere with the Defendants written agreement with the City of Bozeman Building
Department in the summer \ fall of 2012.  John Doe(s) and or Jane Doe(s) conspiracy to
violate civil rights of Thompson family. This count alternatively plead as part of a RICO act
conspiracy.

4. Tortious Interference and Conspiracy to commit: The Plaintiff (John and Jane Doe(s)) did
interfere with the Defendants Certificate of Occupancy issued by the City of Bozeman
Building Department in 2010.  C of O was then revoked and by the City of Bozeman without
due process in the spring of 2013. . John Doe(s) and or Jane Doe(s) conspiracy to violate civil
rights of Thompson family. This count alternatively plead as part of a RICO act conspiracy.

5. City of Bozeman's Bob Risk: Breach of Contract, Breach of Fiduciary Duty, violation of
the Covenant of Good Faith and Fair dealing and violation of Defendants constitutional
liberty interest protected under Section 1983 5.1.B.1.d. in the revocation of Defendants
building permit no. 08-7345 about May of 2011.  Conspiracy to violate civil rights of
Thompson family.  Also as element of Count 2 above.  This count alternatively plead as part
of a RICO act conspiracy.

6. City of Bozeman's Bob Risk: Breach of Contract, violation of the Covenant of Good Faith and Fair dealing in City's failure to fulfill terms of written agreement(dated June 6, 2011: breeched December of 2012) with the Defendant. John Doe(s) and Jane Doe(s) Conspiracy to violate civil rights of Thompson family. Also as element of Count 3 above. This count alternatively plead as part of a RICO act conspiracy.

7. City of Bozeman's Bob Risk: Breach of Contract, Breach of Fiduciary Duty, violation of the Covenant of Good Faith and Fair dealing and violation of Defendants constitutional right to Substantive Due Process per Section 1983 5.1.B.1.e in the revocation of Defendants Certificate of Occupancy no. 10-10130 on 7-30-2013 without due process. John Doe(s) and Jane Doe(s) Conspiracy to violate civil rights of Thompson family. Also as element of Count 4 above. This count alternatively plead as part of a RICO act conspiracy.

8. City of Bozeman's Kyla Murray: Breach of Fiduciary Duty and conspiracy to commit civil rights violations (Greg Sullivan) to commit. In failing to respond appropriately when issues of counts 5 thru 7 above were brought to their attention.

9. American Land Title Company (John and Jane Doe(s)): Mistake, alternatively plead as Constructive Fraud and Fraud and conspiracy to commit. ALTC made notarized attachment to Defendants Closing documents of document no. 2300076 bearing the date of Defendants closing. Document no. 2300076 did not exist until a point in time after Defendants closing on lot within the HOA. Other ALTC documents presented at closing had deleted \ missing pages that accurately depicted type of structure to be built and were also missing the appraisal report stating that zoning was by restrictive covenant: The result being concealment of purchasers intended use of lot, within documents prepared by ALTC, based on flawed encumbrances of title vs the allowable use of Lot. This count alternatively plead as part of a

RICO act conspiracy. This count alleged as actionable under the Montana Consumer protection act.

10. Plaintiff's(Jane Doe(s)John Doe(s)), Sandan LLC- Sandra D Hamilton - Daniel S Madison, Intrinsik Architecture - Rob Pertzborn - Allison Gilley, American Land Title Company - Brad Stratton, Richard Embry and Wittich Law Firm-Art Wittich-Amanda Menasco : Conspiracy to commit and or conceal fraud detailed in Count 9 above. This count alternatively plead as part of a RICO act conspiracy. This count alleged as actionable under the Montana Consumer protection act.

11. Plaintiff's(Jane Doe(s)John Doe(s), Sandan LLC- Sandra D Hamilton - Daniel S Madison, Intrinsik Architecture - Rob Pertzborn - Allison Gilley-Susan Kozub and Wittich Law Firm - Art Wittich : Conspiracy to commit fraud as detailed in Count 1 above. This count alternatively plead as part of a RICO act conspiracy. This count alleged as actionable under the Montana Consumer protection act.

12. Sandan LLC-Sandra D Hamilton - Daniel S Madison, City of Bozeman-Dave Skelton-Susan Kozub and TD&H Engineering (John \ Jane Doe(s)): Mistake alternatively plead as constructive fraud and fraud: in the preparation, filing, approval and acceptance of documents establishing Cattail Creek Phase II. Wherein terms known to be scheduled for obsolescence about 2 months after filing were used. The term of R2 was used in the preparation, filing, approval and acceptance of documents that established Cattail Creek Phase II. About 7 weeks after documents were filed the meaning of R2 changed from that of single family medium density to that of two family medium density: It was signed to be future law and known prior to approval and acceptance of the R2 terms thru out the Cattail Creek Phase II documents, in the Documents of record, that the meaning of R2 would change shortly thereafter. So between 2004 and the spring of 2008 the documents of record at the County Court House and

those of the City into about 2011, where positive zoning confirmations are made, stated R2. Various parties relied on these documents in transacting lots of Cattail Creek Phase II (2004 to about 2011) with various parties believing they were transacting lots zoned for two household lots of medium density; The City and the HOA years later after the fact informing people only as compelled to, thru the application for construction process, regarding details of this mistake after numerous transactions occurred (There are lot owners out there that probably still think they own a two household lot). Alternative pleadings of these facts relate to the probability that documents may not have been approved by County and or City officials if the documents had accurately disclosed the true nature of the platted lots proposed for approval as low density R1 lots. Pre plat approval documents call out County zoning in this area as R3 Medium Density; it is unlikely that County officials would have knowingly approved special zoning in this area that restricted the use of 42 quarter acre lots to only allow for R1 low density single family dwelling units in this area. Approval of R1 low density lots in this area is likely to be in conflict with the Bozeman 2020 growth policy. This count alternatively plead as part of a RICO act conspiracy. This count alleged as actionable under the Montana Consumer protection act.

13. Sandan LLC-Sandra D Hamilton - Daniel S Madison, City of Bozeman-Dave Skelton-Susan Kozub and TD&H Engineering (John \ Jane Doe(s)): Conspiracy to commit fraud per facts of count 12 above. This count alternatively plead as part of a RICO act conspiracy.

14. Cattail Creek Phase II-(John \ Jane Doe(s)) HOA: Mistake in not correcting use of obsolete and misleading terms within document no. 2131569 in a timely manner and failure to do so in such a way that the correction and need for the correction was properly made known to the affected parties. This count alternatively plead as part of a RICO act conspiracy. This count alleged as actionable under the Montana Consumer protection act.

15. City of Bozeman - Greg Sullivan, Kyla Murray, Ryan McCarty and Paula Frojae: Fraud Upon

the Court. In City's manufacture of statements of complaint not support by material facts, false

reports and the manufacture of evidence in preparation and litigation of CR-14-70. Conspiracy to

Commit and use of the US postal service is doing so. Plaintiff's (Jane Doe(s)John Doe(s)) as

coconspirators. This count alternatively plead as part of a RICO act conspiracy. This count

alleged as actionable under the Montana Consumer protection act.

16. City of Bozeman - Greg Sullivan, Kyla Murray, Ryan McCarty: Malicious Prosecution in

litigation of CR-14-70. Conspiracy to Commit and use of the US postal service is doing so.

Plaintiff's (Jane Doe(s)John Doe(s)) as coconspirators. This count alternatively plead as part

of a RICO act conspiracy. This count alleged as actionable under the Montana Consumer

protection act.

17. City of Bozeman - Greg Sullivan, Kyla Murray, Ryan McCarty: Obstruction of investigation of

Defendant in CR-14-70 in violation of MCA 46-15-330 Investigation not to be impeded.

Conspiracy to commit per parties above with Mike Lily and Tim Cooper as persons of interest

regarding conspiracy of this count. This count alternatively plead as part of a RICO act

conspiracy.

18. City of Bozeman - Kyla Murray: Swearing of False statements for warrant in the matter of CR

14-70. This in violation of Defendant's civil rights per 42 U.S.C. § 1983. Conspiracy to commit

with Greg Sullivan and Paula Frojae as coconspirators. Plaintiff's (Jane Doe(s)John Doe(s)) as

coconspirators. This count alternatively plead as part of a RICO act conspiracy. This count

alleged as actionable under the Montana Consumer protection act.

19. City of Bozeman - Chis Saunders : Mistake in stating ADU dwelling unit of Defendant was non-

conforming in zoning history report of December 29th, 2011. Alternatively plead as Breach of

Fiduciary duty and violation of the Covenant of Good faith and fair dealing via knowledge of and

failure to disclose that ADU's for lots of this size were, at the time of permitting the work, required to be allowed use in conformance with the Work force housing ordinance. This count alternatively plead as part of a RICO act conspiracy.   This count alleged as actionable under the Montana Consumer protection act.

20. City of Bozeman - Chris Saunders, Dave Skelton, Susan Kozub, Sandan LLC-Sandra D Hamilton - Daniel S Madison, Plaintiff's (Jane Doe(s)John Doe(s): Conspiracy to violate tenants of work force housing ordinance in requiring ADU's as allowed use for R1 low density lots. This count alternatively plead as part of a RICO act conspiracy. This count alleged as actionable under the Montana Consumer protection act.

21. City of Bozeman: Executory accord as cause of action to compel City to restore Defendant to position of having valid building permit no. 08-7435 and valid Certificate of Occupancy no. 10-10130. The City having breached the written agreement, drafted by the City, with the Defendant, the Defendant is there by entitled by contract law to return to the terms of the original contract. Defendant denies that the C of O no 10-10130 was affected or related to the written agreement.

22. Malicious prosecution, violation of civil rights and conspiracy to violate civil rights in the matter of TK -15-03459.

23. Institutional Corruption based on the sum of the above Counts including the City of Bozeman. Alternatively plead is Enterprise Corruption. Alternatively plead as part of a RICCO act conspiracy.

Peter Thompson
2988 Blackbird Drive
Bozeman, Montana 59718

Phone 406-570-0268

Email: thompson0089@msn.com

To: Montana Secretary of State Corey Stapleton
Montana Capitol Building, Rm 260
P.O. Box 202801
Helena, MT 59620-2801
406-444-2034

September 16, 2018

Delivered via US Mail.

PDF copy of this doc on
attached CD.

CC: Kelley L. Hubbard
Assistant Attorney General
PO Box 200151
555 Fuller Ave.
Helena, MT 59620-0151
Phone: (406) 444-2026   khubbard@mt.gov

CC: Susan B Swimley
1807 W Dickerson Ste. #B
Bozeman, MT 59715
Phone number (406) 586-5544

Regarding: Notice Of Complaint.

Dear Mr. Stapleton,

Please regard this letter and the attached documents as notice of complaint pursuant to MCA 2-9-301.

The purpose of this letter is to inform you of managerial issues with your departments work. This in hope that you will respond fairly and in the interests of the people of Montana vs continuing to ignore complaints of illegal filings with your office as a means of helping "commerce thrive" at any cost to the people affected by unlawfully formed entities licensed by your office.  Regarding MCA 2-9-301 as follows:

*Rouse v. Anaconda-Deer Lodge County*, 817 P.2d 690, 250 Mont. 1 (1991).

"the statutory requirements enacted by the legislature mandate a plaintiff asserting a cause of action against a governmental entity to first file a claim against that entity before filing an action in district court. The purpose of such statutes is the furtherance of the public policy to prevent needless litigation and to save unnecessary litigation expenses by affording an opportunity to amicably adjust and settle all claims before suit is brought. See 56 Am.Jur.2d, *Municipal Corporations,* § 686, p. 730 (1971). "

Peter Thompson
2988 Blackbird Drive
Bozeman, Montana 59718

Phone 406-570-0268                                          Email: thompson0089@msn.com

Mr. Stapleton, contact was made over the phone with your office about the first week of

February 2018, your office may have a full or partial recording of this call. I spoke with Katie

Summers. My understanding from this conversation was that your office would not issue nonprofit

articles of incorporation if your office knew that the members claimed in the incorporation did not know

they were becoming members, it follows that it was understood your office should not continue to

endorse \ facilitate formation under such circumstances. However your office could not act based on a

phone call and would need more. I advised I would send an email providing more and understood that

your office would get back to me promptly. I have not heard back from your staff. Attached pages 100

thru 140 are documents sent to your staff. The documents sent to your staff included affidavit statements

and related documents which demonstrated that a 2006 corporation was formed without the knowledge

or consent of property owners bound by the articles of incorporation. Following the phone call with your

office, a range of documents were provided and a specific written request was made as follows:

"Katie, thanks for your time and help.

The short questions that I hope you or someone in your office can answer or give indication of your
offices inclinations, in writing before the end of the day, next Monday are;

A: Would your office have approved the incorporation in question had you been aware that the
individual property owners of the separate subdivisions had not consented or even known about the
incorporation?

B: With the sworn statements provided, does your office regard the incorporation papers as, " nugatory"
or as such papers that may be voidable?

Regardless of what comments you or your office provide or are willing to provide, I would
appreciate electronic copies of the full original application, and recent filings. I am happy to pay for the
work to round up and email this information.

Sincerely,
Peter Thompson
406 570 0268 "

Peter Thompson                                              3 of 5
2988 Blackbird Drive
Bozeman, Montana 59718

Phone 406-570-0268                          Email: thompson0089@msn.com

Mr. Stapleton, in hind sight, though your staff owed a duty of professionalism to do more than

remain silent after giving their assurance over the phone that your office would get back to me, the

document package described above was fragmented and disorganized. Since the contact with your

office described above, I have better studied the specific statutory issues and ended up in a position

where I declared a recent judgement against me void, because the articles of incorporation were forged

documents upon which the Plaintiff's standing was claimed.

This declaration of void judgement is in the form of an affidavit, so your office may regard it as a

bona fide complaint re-filed herewith. See attached pages 18 thru 27, supporting docs 28 thru 99.

Prior to the initial contact with your office this past February, I swapped emails and spoke with

Montana's Assistant Attorney General Kelly Hubbard. My understanding from this conversation was that

though Mrs. Hubbard had read the documents and she did not offer any insight that would suggest the

provided affidavit did not evidence fraud or forgery, her office enjoyed prosecutorial immunity and

could not be influenced to become involved in remedying illegal activities of the HOA and related

nonprofit filings at your office. I also understood that Mrs. Hubbard had never heard of your office

involuntarily dissolving any incorporations based on fraudulent or forged filings with your office. Her

opinion was that even if I presented your office with bona fide proof of illegal filings it was unlikely

your office would do anything about the provided evidence of wrong doing. Her recommend was

private civil litigation to remedy the illegal actions of the HOA. So far the civil litigation approach has

not worked out in state court, this failure appearing to turn on your offices issuance of a certificate of

existence; and the presiding judge's conclusion that such certificate was sufficient evidence of existence,

despite your disclaimer regarding legal sufficiency on the face of the certificate. I expect this

deliberately erroneous conclusion regarding the legal sufficiency of the articles of incorporation is

because of bias in the bench, see attached pages 6 thru 17. Regardless, the bias in state court has

Peter Thompson
2988 Blackbird Drive
Bozeman, Montana 59718

Phone 406-570-0268                                                          Email: thompson0089@msn.com

prevented action in counter claims and this now provides an opportunity to file claims as the Plaintiff in

US District Court.  If and then when I do file a suite against your office, it will be part of a larger claim

of institutional corruption, breach of fiduciary duty and civil rights conspiracies against the state, its

political subdivision(s),the HOA entity, its boards of directors and its agents.

      The aspect of the claim against your office will be based on civil rights issues in your office's

predictable response to my February complaint, ie, your office has a known policy of helping commerce

thrive vs helping people who are victims of unlawful corporate action.  For failure to train your staff on

how to appropriately handle contacts which complain about illegal corporate filings; and for failure to

have appropriate policy and procedures for your staff's use when contacted about fraudulent and or

forged corporate papers; and for abetting breach of fiduciary duty, forgery, fraud and fraudulent

concealment of the board of directors in continuing to service their state managed corporate status after

receiving affidavit statements demonstrating the illegal acts of the incorporators \ usurpers.

      Your office has the affidavit statement of Sandra Rummel, pages 122 thru 129, which evidences

members of the separate HOA's were *never* asked if they wanted to incorporate, but were asked if they

wanted to become one mega HOA and that the owners did not approve of combining into one mega

HOA until years after they were *secretly* bound by the articles of incorporation as approved by your

office in 2006.  Your office also has my affidavit of void judgement, pages 18 thru 27 which details the

statutory violations in the 2006 articles of incorporation.

      The objective of this notice of complaint is to encourage your office to improve "public policy to

prevent needless litigation and to save unnecessary litigation expenses by affording an opportunity to

amicably adjust and settle all claims before suit is brought.", ie, it is reasonable for the people of the

State of Montana to expect your office to have appropriate policies for situations which your staff may

be reasonably expected to encounter during the course of conducting the affairs of your office and

Peter Thompson
2988 Blackbird Drive
Bozeman, Montana 59718

Phone 406-570-0268                                    Email: thompson0089@msn.com

should your office promptly use the immediate circumstances to adopt appropriate policy this notice of litigation would become moot.

In this instance, when your staff receives affidavit statements regarding breaches of statutory duties in filed articles of incorporation, most people would consider it reasonable to expect your office to have a policy of providing notice of involuntary dissolution to said corporations who claim standing under forged or fraudulent documents filed with your office. In the least your office should have a policy of providing notice of intent to involuntarily dissolve such corporations pending their proof of statutory compliance in the original filing of the articles of incorporation. Involuntary dissolution may not be the correct notice in our circumstances, in the case of forged documents it may be more appropriate that your office give notice that the articles of incorporation are nugatory and will no longer be serviced by your office. In any circumstance, your office remaining silent under these circumstances represents a breach of your duty to the public.

It would be appropriate for your office to contact the attorney who filed the forged documents and ask her if she was complicit or misled by others in participating in this crime. In the spirit of efficiency, I have provide this attorney with a copy of this notice of complaint to your office.

Please let me know if there is anything further that I can provide or do to help move the claim process forward.

Respectfully,

Peter Thompson

PETER THOMPSON
2988 Blackbird Drive
Bozeman, Montana, 59718
406-570-0268
thompson0089@msn.com
*Pro Se with Limited Scope Representation*

GALLATIN COUNTY CLERK
OF DISTRICT COURT
JENNIFER BRANDON

2016 APR 25  PH 3: 53

FILED

BY_____ *CAS* DEPUTY

## IN THE EIGHTEENTH JUDICIAL DISTRICT COURT, GALLATIN COUNTY

| | |
|---|---|
| CATTAIL CREEK COMMUNITY ASSOCIATION, a Montana nonprofit corporation<br><br>                Plaintiff,<br><br>   -vs-<br><br>PETER THOMPSON,<br><br>               Defendant. | Cause No. DV-15-636C<br><br><br>**ALLEGATIONS OF FACT AND AFFIDAVIT OF PETER THOMPSON** |

Cattail Creek Community Association, here after as HOA.

1. The water course within the combined areas of Phase I thru III of the Cattail Creek area contains 4.6 acres of registered wetlands.

2. Pre application plat of Cattail Creek Phase II describes the area as R3 zoning.  See Exhibit F.

3. The City of Bozeman amended their zoning map for the Cattail Creek Phase II area, wherein Peter Thompson owns property which is a subject of this dispute, April 14th of 2003. City's zone map amendment calls out the area of the Thompson residence on Blackbird Drive as "R2".  See Exhibit G.

4. In 2008, the City of Bozeman's planning department policy, as stated by City planning department workers to public users of the plat room, was that all positive zoning verification is done in the zoning map amendment drawer.

22

5. In 2010 City of Bozeman employee, Bill Stetzner, stated positive zoning verification was still done in the zoning map amendment drawer and that they were, "always" finding errors needing correction in the GIS zoning map of the City's at this time.

6. At some point in time between 2011 and March 26th of 2012, the City of Bozeman Planning Department changed their stated policy to public users of the plat room about how positive zoning verification was done. In this time bracket, the City Planning Department set up a GIS zoning map station within the plan room. With a new policy of this time period that public user positive zoning verification was now done at the GIS station in the plan room. This in the same room where the zoning map amendment drawer is.

7. At a time approximately between 2011 and March 26th of 2012, City Planner Dave Skelton, directed City employee, Bill Stetzner to make hand drawn amendments to the Cattail Creek Phase II zoning map amendment document within the zoning map amendment drawer. Mr. Stetzner made hand noted corrections to the zoning map amendment document, renaming the former "R2" area where the Thompson residence is as "R1 - Per Ord. 1593". Several other area zoning call outs were similarly changed. There was no mark up or change of the R3 zoning reference on this zoning map document. The original document is attached as Exhibit G. The hand altered document is attached as Exhibit H.

8. Exhibit H1 shows the altered Cattail Creek zoning map amendment with Ordinance 1593 attached.

9. Exhibit H1 with ordinance 1593 attached gives the reader the impression that Ordinance 1593 is the basis of authority upon which the hand noted alterations of the Cattail Creek zoning map amendment are based.

10. Ordinance 1593, dated April 14, 2003 provides amended zoning for the Cattail Creek Phase II area. See Exhibit H2.

11. Ordinance 1593 (Exhibit H2) is not a document that provides authorization of hand note amendments (described in paragraphs 7 thru 9 above) to the Cattail Creek Phase II zoning map amendment plat, as implied by Exhibit H1.

12. Ordinance 1593 (Exhibit H2) is not a document that communicates to the approving signers, that this document is capable of allowing Sandan LLC, to in fact plat and develop 42, one quarter acre low density lots  which restricted allowable uses to only that of single family use in an area formerly zoned R3 Medium density.

13. Attached Exhibit J is a copy of the Phase I Plat of record.  Exhibits F, G, H, and J were all prepared by TD&H Engineering for Sandan LLC as part of a continuous phased development plan, in close working timelines to each other.

14. Exhibits F and J similarly make clear statements relative to the zoning callouts pertinent to the respective documents.  Exhibit K is the TD&H plat for Cattail Creek Phase II, as prepared for Sandan LLC.

15.  The Phase II plat (Exhibit K) differs from Exhibits F and J which do make clear statements relative to zoning call outs on the plats.

16. The Phase II plat (Exhibit K) provides no information of what the zoning may be for any of the lots depicted. Nor does the document have any information regarding what the allowable uses of the individual lots are.

17. The Phase II plat (Exhibit L) signatory cover sheet, provides no information of what the zoning may be for any of the lots depicted. Nor does the document have any information regarding what the allowable uses of the individual lots are.

18. Assistant City Attorney, Tim Cooper approved both Exhibits K and L as to form of the documents.

19. The owners of Lot 3 Block 9 and or their realtor conclude and or understood the lot that they had purchased and owned to be, "R2 - Two Household Medium Density" zoned.  In January of 2008, Lot 3 of Block 9 was advertised (Exhibit M) for sale as R2 - Two Household Medium Density.  The Thompson residence is on the same street and block a little farther to the south.

20. Exhibit N is an excerpt from the Cattail Creek Phase II covenants (doc. No.2131569), filed on the same day as Exhibit K (Cattail Creek Phase II plat - as discussed in paragraph 14 thru 18 above).  Exhibit N describes the Thompson property of lot 7 block 9 as follows:

| Block | Lot # | Fronting Street | Zone | Front Yard Setback | Side Yard Setback | Rear Yard Setback | Notes |
|-------|-------|-----------------|------|--------------------|-------------------|-------------------|-------|
| 9 | 1 | Blackbird Drive | R-2 | 20' | 5' | 20' | 1,3 |
|   | 2 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 3 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 4 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 5 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 6 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 7 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 8 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |

21. Page 40 of the Cattail Creek Phase II covenants (doc. No. 2131569) provides the following general note:

## General Notes:

- All zoning designations and setbacks are listed for general reference.  Current city of Bozeman Codes and Ordinances, at the time of development, take precedent.

22. Rob Pertzborn of Intrinsik Archtecture, while acting as the HOA's agent conducting design review, explained the general note (paragraph 21) above to Peter Thompson, as being applicable to Exhibit N above and the body of the Cattail Creek Phase II covenent contract (doc. No. 2131569).

23. The general note of paragraph N above is applicable to the entirety of Cattail Creek Phase II Covenant contract no. 2131569.

24. Intrinsik Architecture, while representing the HOA, provided Peter Thompson, on January 14th,2008, a spreadsheet of setback and zoning designations by lot which was explained as an update and a document that supersceds the lot table in the back of the original Phase II covenants (Paragraph 20 above).  The spread sheet provided a range of changes in zoning decriptions.

25. Rob Pertzborn of Intrinsik Architecture, while acting as the HOA's agent (in or about January of 2008), explained to Peter Thompson that Intrinsik Architecture was prepareing new covenants that would change zoning call outs of Exhibit N (paragraph 20) above.  At this time Rob Pertzborn stated that the draft covenants his firm was preparing had not yet been voted on or approved by the HOA.

26. On January 15, 2008, Allison Gilley of Intrinsik Architecture requested a meeting with Rob Pertzborn and Susan Kozub (both of Intrinsik Architecture), to disuss incorrect information out there regarding the Cattail Creek covenants.

27. On information and belief, Peter Thompson, alleges that Susan Kozub did formally work for the City of Bozeman Planning department and that Susan Kozub did participate in the City of Bozeman's adminstration of the City's review and approval of Cattail Creek subdivision.  In 2008 Susan Kozub was receiving employment from Intrinsik Archtecture.

28. In a January 15, 2008 email to Allison Gilley of Intrinsik Archtecture, Peter Thompson made the following statement, "My feeling is that there are current owners of lots on block 9 that feel their lots are R-2.  I think this is an issue that needs further attention from the home owners association and also from the city planning department.".  On this same day, Peter Thompson made the following statement in a email to Rob Pertzborn of Intrinsik

Architecture,"...a person should be able to go down to the clerk and recorders office and learn what kind of land a particular lot is. I also feel that some how it is the responsibilty of the planning department and who ever first establishes the covenants to be certain the documents of record are reasonably correct...Rest assured, I am on Dave Skelton's schedule for tommorow and will be certain to let him know how I feel."

29. About mid year of 2010, Dave Skelton stated to Peter Thompson that he had written them about them needing to correct mistakes or errors in the documents at the Court house. At this time the topic with Dave Skelton was the Cattail Creek Phase II documents describing most of the lots as R2 zoning. In this discussion with Dave Skelton, Peter Thompson and Mr. Skelton did also dissucss a document the City had recently provided to Peter Thompson which stated the City had used eminent domain to change the zoning descriptions of the Cattail Creek area from R2 to R1. At this time Dave Skelton did offer to provide a copy of the letter that he wrote them, regarding corrections needed at the Court House, Mr. Skelton offerd this for a fee, Peter Thompson declined.

30. On information and belief, Peter Thompson alleges that Rob Pertzborn and Allison Gilley of Intrinsik Archtecture did receive legal advise from Wittich Law Firm, regarding the incorrect information about Cattail Creek Covenants described in paragraph 26 above.

31. Peter Thompson did purchase Lot 7 of Block 9, within Cattail Creek Phase II, from Richard Embry. Cade Embry had previously MLS listed this lot for sale with zoning described as "Other, Res", see Exhibit O. Richard Embry was included in the email communications described in paragraph 28 above.

32. On information and belief, Peter Thompson alleges that Richard Embry did receive legal advice from Wittich Law Firm, regarding the incorrect information about Cattail Creek Covenants described in paragraph 26 above.

33. On information and belief, Peter Thompson alleges that Mr. Arthur Wittich has a long running friendship with Mr. Brad Stratton (owner of American Land Title Company) and that Mr. Wittich and Mr. Stratton do have contact thru their respective work on a professional level.

34. Peter Thompson, about a month prior (per paragraphs 22 thru 28 above) to closing on property within Cattail Creek Phase II on February 27, 2008, provided notice to Richard Embry(seller of the lot), persons in control of (HOA's agent) and or having access to documents of record at both the Court house and the zoning map ammendement plat files (City planning department workers), that Peter Thompson intended to rely on these documents of record in a upcoming realestate transaction.  Peter Thompson, did near to closing on February 27, 2008 visit both the County Court house and the zoning map ammendment files in the City plan room. No changes, notes or any ammendments were evident at either location just prior to closing. Peter Thompson then attended closing on the 27th of February, 2008 with the understanding that a faction of the local HOA was well along the path of trying to get property owners to vote on approval of significant changes to their covenant contract, but voting nor the voting meeting to approve changes had yet occurred.

35. On information and belief, Peter Thompson alleges that, John Doe(s) and or Jane Doe(s) of the HOA and or their agents and or Richard Embry and or his agent, communicted with John Doe(s) and or Jane Doe(s) of American Land Title Company regarding the incorrect information described in paragraph 26 above and that as a result the Covenant Contract of record at the time of closeing (Cattail Creek Phase II – doc. No. 2131569) was withheld from the closing transaction, conducted by and at American Land Title Company on February 27th, 2008.  This realestate closing transaction between the Seller (Richard Embry) and the purchaser (Peter Thompson).

36. Peter Thompson did not receive or sign any covenants during the land transaction

descibed in paragraph 35 above.

37. On information and belief, Peter Thompson alleges that American Land Title Company had a purpose and or need to later represent that covenants of record had been presented to the purchaser, Peter Thompson, at the closing described in paragraph 34 and 35 above.

38. Documents manufactured by American Land Title Company (as obtained by Peter Thompson about 2013) represent by way of notorized attachement of document no. 2300076, that the revised and restated covenant contract (of May 15, 2008) was a part of and or presented at the land closing of February 27, 2008(Paragraph 34 and 35).  When in fact Document no. 2300076 (this document forms the entity of the Plaintiff now before the Court) did not exist until May 15th, 2008, a point in time well after Peter Thompson's closing transaction (per paragraph 35) on property within the HOA.  ALTC documents presented at closing had deleted \ missing pages that accurately depicted the type of structure to be built and were also did not include the appraisal report stating that zoning was by restrictive covenant.

39. The closing document package described in paragraph 38 above, which included notarized attachment of the revised and restated covenants Document no. 2300076 (this document forms the entity of the Plaintiff now before the Court, created on May 15th, 2008) bares a date out, stamped date of March 18th, 2008, a point in time before the existence of document of record no. 2300076.

40. It is most common that covenants of record be presented at closing by the seller and signed by the purchaser at closing of a real-estate transaction and although this may not be a legal requirement under the Montana Code, it would be a requirement of standard business practice for most all companies who are routinely involved in such transactions.

41. On information and belief, Peter Thompson alleges that John Doe(s) and or Jane Doe(s)

of American Land Title Company transmitted the document package described in paragraphs 38 and 39 above to the Lender of the purchaser and or to the Title insurance company who issued the actual title insurance policy and or others.

42.  On information and belief, Peter Thompson alleges that John Doe(s) and or Jane Doe(s) of American Land Title Company transmitted the document package described in paragraphs 38 and 39 above with no less than one ulterior motive; to fulfill a requirement of entities (paragraph 41), that such closing packages as received from a closing conducted by a Title insurance company, are expected to include documentation that covenants of record were presented and accepted at closing and or that proposed to be built structure, included in the title insured closing amount, be complaint with applicable restrictive covenants.

43. On information and belief, Peter Thompson alleges that John Doe(s) and or Jane Doe(s) of American Land Title Company transmitted the document package described in paragraphs 38 and 39 via the US Postal Service and or that other documents were differently manufactured that did not include any indication that the revised and amended covenants were a part of the February 27, 2008 closing and that this different set of documents were mailed via the US Postal service to Peter Thompson.

44. On information and belief, Peter Thompson alleges that American Land Title Company has at least a dozen or so title insured interests within Cattail Creek Phase II that could be affected by incorrect information as described in paragraph 26 above.  This if it is determined that any encumbrance of title (the original or the revised covenant contracts) is tainted by mistake and or fraud.

45.  Between 2004 and 2008, Sandan LLC attracted a range of people who purchased within Cattail Creek Phase II.  These people understanding they were purchasing quarter acre low density single family lots and or built out structures on the lots.

46. In this same time period (paragraph 45 above) there is another range of people that were attracted to purchase within Cattail Creek Phase II, who believed they were purchasing to hold and or build on and or resell lots which the purchasers and or sellers believed were R2 - Two Household medium density lots.  See Exhibit M.

47.  On October 22, 2001, the City of Bozeman adopted the 2020 Community Plan.  See Exhibit P.

48.  Development activities within Cattail Creek Phase II are required to comport with the City's adopted 2020 Community Plan of paragraph 47 above.

49.  On information and belief, Peter Thompson alleges that the 2020 Community plan prohibits the development of one quarter acre low density lots which are restricted to single family only use in areas not zoned Residential Suburban.

50. In Explanation of paragraph 49 above, approval of 40 or more quarter acre low density single family only lots in any area previously or currently zoned as R3 medium density and or R2 medium density under the 2020 plan, would require variance and or amendment of the 2020 community plan.

51. Commission Resolution No. 3630 (Exhibit Q), adopted and passed on September 22, 2003 established various strategies of affordable housing.

52.  Excerpts from Commission Resolution No. 3630 as follows:

**Strategy II.** **Regulatory and Process Reforms**
   1.   Major site plans with no deviations can be approved by City planning staff.

**Strategy III.** **Restricted Size Lots (RSL) & Restricted Size Units (RSU)**
   1.   As stated in the 2020 Plan, every residential annexation into the City of Bozeman of five acres or more, that is not zoned as Residential Suburban shall have a minimum net acreage density of 6-8 units when subdivided.
   2.   Every residential annexation of five acres or more that is not zoned as Residential Suburban shall have a minimum of 10% of the buildable net acreage dedicated to Restricted Size Lots (RSL) that are 4,000 to not greater than 5,000 square feet for single family household detached (SFD SHD) and 2,500 to 3,000 for single family household attached (ASF SHA) units when subdivided.  The RSL shall be designated designation shall be recorded with on the final subdivision plat.

53. On information and belief, Peter Thompson alleges that Subdivisions platted and approved after the adoption of Commission Resolution No. 3630 on September 22nd 2003 were required to comport with the requirements of the Resolution.

54. On information and belief, Peter Thompson alleges that Cattail Creek Phase II plat approval was subject to the requirements of Resolution No. 3630 and that the approved plat, Exhibits K and L (the Cattail Creek Phase II plat of November 11th 2003) does not comport with the specific requirements of Resolution 3630 seen in paragraph 52 above.

55. Public Notice and subsequent Zoning Commission and Planning Board review of Ordinance 1604 was completed on August 12th 2003.  The City commission held three separate public comment meetings in September of 2003 to take public comment of proposed Ordinance 1604.  On first reading the City Commission passed ordinance 1604 on November 10th of 2003 with a targeted effective date of January 1st 2004.

56. Ordinance 1604 changed the previously confusing zoning definitions, such as R2 Medium density allowing for small sized single family lots to R2 post Ordinance 1604 meaning Two Household Medium density zoning.

57. The Cattail Creek Phase II zoning map amendment plat (Exhibit G), upon which positive

zoning verification by public users of the City Plan room depended on between 2004 and some time prior to the City's implementation of the GIS station method about 2011/2012 called out zoning consistent with terms of ordinance 1604 meaning R2 – Two Household use as follows:



58. R2 Two Household use is consistent with the pre approval plat zoning (Exhibit F) of R3 for the same area as follows:



59. R2 Two Household medium density dwelling in this area is also consistent with the 2020 community growth plan.

60. Mid summer of 2008, Peter Thompson went to the US Post Office on Baxter Lane and

spoke with Jane Doe. Requesting Mrs. Doe issue a second street addresses for Lot 7 of Block 9

within Cattail Creek Phase II. Mrs. Doe advised she could not issue the street adress based on

the covenant doc. 2131569 as requested, addresses would need to be issued by the City.

Peter Thompson went to the City Planning Department and asked Tara Hastie about

getting street adresses. Mrs. Hastie located the Thompson property on the wall map across

from her counter and explained the property was in the donut district and street addresses would

need to be issued by the County.

Peter Thompson went to the County GIS office and met with Allan Armstrong.

Inturupting Mr. Armstrongs brown bag lunch, Peter Thompson explained his visit to the Post

office and the City planning departments referral to his office. After understanding where the

property in question was, Mr. Armstrong explained that the address should be issued by the

City, but as it sounded like you have been getting the run around he could help out and issue the

2nd address. Mr. Armstrong requested and received a copy of the site plan showing where both

doors would be, reviewed a copy of the covenant doc. No. 2131569's table describing the lot as

R2 and then stated that he would contact the City (Bill Stetzner) to confirm that the City zoning

allowed for a 2nd street address and to come back in an hour or two.

Later this day, Mr. Armstrong issued the second street address of 2990 Blackbird Drive

and wrote the number down on a scrap of paper.

Later this day, Mrs. Doe of the US Post office stated a number on a scrap of paper was

not going to fly with her, she had Allan's number and called him, getting confirmation that he

had issued the 2nd street address. Mrs. Doe than went on about how expensive the group mail

box pedestals were and that I might have to pay for more if there was not enough room in the

area boxes to allow for a second street address as requested, Mrs Doe would send her keying

person out there to check things out.

Later it was asscertained by the keying person that there was plenty of room and boxes were set up with keys issued to Peter Thompson for 2990 Blackbird Drive and 2988 Blackbird Drive.

 

61.  In or about December of 2009, Peter Thompson met with City of Bozeman plan's examiner Tim McGough.  One of the topics discussed at this time was how Peter Thompson could complete the lower area of 2988 Blackbird Drive, so as the lower area scope of work, when completed, would be in compliance with City's minimum standards for issuance of a Certificate of Occupation.  Occupants and sleeping areas were discussed amongst other details pertinent to the City's minimum requirements for occupancy.  Peter Thompson and Plans examiner Tim McGough, near the close of this preliminary meeting did request supervisory input from the Chief Building official Bob Risk. After a summary briefing of details discussed between Plans Examiner Tim McGough and Peter Thompson, Bob Risk was asked for any comments \ input regarding any issues he might have in permitting the proposed scope of work.  Mr. Risk declined to make any specific comment and then did direct, Peter Thompson to submit the final plan in writing in the form of a Building Permit application.

62.  The City of Bozeman issued Building Permit no 10-10130 to Peter Thompson on February 9, 2010.  Building Permit no 10-10130 was for the scope of work discussed with City plans examiner and Chief Building official Bob Risk, per paragraph 61 above.

63. Construction authorized under Building Permit no 10-10130 was based on plans for the lower areas of the substantially complete building shell at 2988 Blackbird drive. At this time, most all exterior finishes of the upper building area were complete, less a few exterior decks; this upper area work being conducted under building permit number 08-7435. The City had demanded Peter Thompson acquire a separate building permit for the lower area occupancy work. Subsequently, Peter Thompson did apply for and did receive building permit no. 10-10130, per paragraphs 61 and 62 above.

64. During the course of applying for and receiving building permit no. 10-10130, Peter Thompson was informed by the City Planning department that they now regarded his property as R1 and only one cooking facility would be allowed. Peter Thompson wrote a letter stating that as a condition of achieving occupancy under building permit no 08-7435, the cook stove from the area of work permitted under building permit no 10-10130 would be removed as a prerequisite condition of later gaining a certificate of occupancy under building permit no 08-7435.

65. About this same time (paragraph 64 above), Peter Thompson did revisit the City's plan room, to again look at the Cattail Creek Phase II zoning map amendment document. This plan room visit is partially described in paragraph 5 above. City employee, Bill Stetzner did assist Peter Thompson in the Plan room on this day. Mr. Stetzner helped locate the Cattail Creek Phase II zoning map amendment document and did make a blue print copy of the document for Peter Thompson to purchase. While the copy was being made, Peter Thompson explained to Mr. Stetzner about having to write a letter about the one cook stove in the building in applying for the Building permit and that he had recently been advised the planning department thought his property R1 based on their GIS map. Mr. Stetzner explained that they were always finding errors in the GIS map and that positive zoning verification was still done in the zoning map amendment drawer. Mr. Stetzner quizzically stated that he was having lunch tomorrow with the person in

charge of the GIS map and that he would get it corrected. This as we could see that the area in question was R2 per the current zoning map amendment document that Mr. Stetzner had just made a copy of.

66. Leaving the plan room conversation with Mr. Stetzner (paragraph 65) Peter Thompson explained to Tara Hastie, at the planning department counter, what Mr. Stetzner had just said and showed her the copy of the zoning map amendment document. Mrs. Hastie then called Dave Skelton, who was out of office with a medical issue. Mr. Skelton told Mrs. Hastie about some files somewhere. Mrs. Hastie then produced a paper from the document folder Mr. Skelton had directed her to. A part of the document explained the R2 lot description of the zoning map amendment document had been changed from R2 to R1 via the use of eminent domain in a City meeting. Mrs. Hastie explaining that Mr. Skelton said the zoning map amendment document was incorrect. There was a similar document that spoke about changes from R3 lots to R2 lots. Peter Thompson bought copies of both letter sized documents of change in zoning descriptions and the blue print copy of the original zoning map amendment document.

67. Shortly after the time described in paragraphs 65 and 66 above, Peter Thompson made walk in contact with Brad Stratton of American Land Title Company. After hearing an outline if the issues encountered in paragraphs above, Mr. Stratton explained the issued title insurance did not cover zoning issues and he did not think any submitted claim would be successful. Mr. Stratton presented a copy of what was not covered by the title insurance policy and explained his reasoning. Peter Thompson asked for a copy of what was covered by the insurance policy and left.

68. Certificate of Occupancy no 10-10130 was issued to Peter Thompson on September 24th, 2010. This Certificate of Occupancy was issued for work and areas of construction now completed under Building Permit no 10-10130.

69. Peter Thompson began legal occupation under Certificate of Occupancy no 10-10130, the same week in September of 2010 that the first C of O was issued, at 2988 Blackbird Drive in Bozeman, MT (per paragraph 68 above).

70. Certificate of Occupancy no. 10-10130 as follows:

# Certificate of Occupancy

## Department of Building Inspection

This certificate issued pursuant to the requirements of the International Residential Code certifying that at the time of issuance this structure was in compliance with the various ordinances of the city regulating building construction or use.
Issuance of a Certificate of Occupancy shall not be construed as an approval of a violation of the provisions of this code or other ordinances of the jurisdiction.
Certificates presuming to give authority to violate or cancel the provisions of this code of other ordinances of the jurisdiction shall not be valid.



City of Bozeman

BUILDING INSPECTION DIVISION

Permit Number: _10 – 10130_

Owner of Building: _PETER THOMPSON_

Building Address: _2988 BLACBIRD DR._

Building Official: _[signature]_   Date: _9-24-10_

"_LOWER AREA_"

Upon issuance of Certificate of Occupancy no 10-10130, the work authorized under building permit no 10-10130 was now complete and the completed work met the City's minimum requirements for occupancy, as it was originally planned to per paragraph 61 above.

71. Certificate of Occupancy no 10-10130 (paragraph 70 above) is a *conclusive* document *binding* upon *all* city agencies and empowered under Montana State Law as follows:

MCA: **50-60-107. Certificate of occupancy.** (1) A certificate of occupancy for a building constructed in accordance with the provisions of the state building code or county, city, or town building code must certify that the building conforms to the requirements of the building regulations applicable to it.
(2) Every certificate of occupancy, unless and until set aside or vacated by a court of competent jurisdiction, is binding and conclusive upon all county, city, or town agencies as to all matters set forth, and an order, directive, or requirement at variance with the certificate of occupancy may not be made or issued by any other state agency or county, city, or town agency.

72. Certificate of Occupancy no 10-10130 (paragraph 70 above) is a constitutionally protected document.

73. The US Supreme Court explains:

The "hallmark" of a protected property interest is "an individual entitlement grounded in state law, which cannot be removed except 'for cause.' " Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982)

74. After completing the construction necessary to obtain Certificate of Occupancy no. 10-10130, moving in and getting past Christmas. Peter Thompson made contact with Attorney Doug Marshal regarding perceived issues outline in the paragraphs above. Mr. Marshal was initially enthusiastic and stated that we might not get much money out of them, but could probably get a city lot or two from the developer. At this early time, Mr. Marshall felt we should sue my real-estate agent, the seller, the developer, the HOA, the title insurance company and the City. Mr. Marshal said to bring your documents in.

    In a later meeting, Peter Thompson brought Mr. Marshal a file box full of papers and paged thru the box with Mr. Marshal. Peter Thompson explained to Mr. Marshal that he was not comfortable suing everyone, my wife and I had known our realtor for years as a friend. I saw the seller Richard Embry as much a victim of the circumstances as I was and believed the principle issue was with the makings of the City and the Developer (Sandan LLC - owned by Sandra Hamilton and Dan Madison), Mr. Marshal said to keep an open mind and we would talk more later.

75. Peter Thompson was, in or about April \ May of 2011, confronted with HOA efforts to enforce covenants that were not of record when he purchased within the HOA which Peter Thompson had no knowledge of, as well as HOA taking issue with the duration of construction. Peter Thompson did then requested written response from the HOA on this matter thru their agent Above and Beyond Management. At this same time, Peter Thompson gave notice to the

HOA's agent (Above and Beyond Management) regarding the HOA's design committee review representative, Rob Pertzborn, allowing that construction taking longer than one year would be not be a problem, provided the Defendant had a valid building permit. The issue of trailers being allowed onsite during permitted construction work was also presented to the HOA's agent at this time. The HOA's agent (Above and Beyond Management) wrote a letter to the HOA regarding the issues and requests made of the HOA by Peter Thompson at this time.

76. The HOA failed to respond to this request for written response in 2011 and for a period of time into the following year of 2012, the HOA stopped directly raising issues with Peter Thompson.

77. Subsequent to Peter Thompsons meeting and requests of the HOA's agent, per paragraph 75 above, the HOA did then name Peter Thompson as a person likely to have committed acts of vandalism in the local park. Officer Rick Musson did then aggressively interrogate Peter Thompson and his wife in their driveway at 2988 Blackbird Drive. Peter Thompson did make written request of the PD for all information, documents and records relative to the accusation of the HOA in this matter. City Attorney Gregg Sullivan did apply for order of the Court relative to this document request. The Honorable Holly Brown granted the order requested by Mr. Sullivan. Production per the Courts order did not include any call for service documentation. Production under the Court's order did include a recording of Officer Musson's interrogation.

78. About the time of the request of Peter Thompson, per paragraph 75 and the accusation of the HOA (per paragraph 77 above), the City of Bozeman Building department, in response to a series of calls from the HOA regarding the Thompson family's residency at 2988 Blackbird Drive and the duration of construction under building permit no 08-7435, provided notice to Peter Thompson that building permit no 08-7435 had expired and that the City was revoking Certificate of Occupancy no. 10-10130. In this letter, the City allowed that, for a fee, building permit no 08-7435 could be renewed and subsequent to renewal of the building permit, the City

would allow 30 days to complete the permitted work, remove the basement dwelling allowed under Certificate of Occupancy no 10-10130 and obtain a Certificate of Occupancy for the area of work to be completed under building permit no 08-7435.  See Copy of this notice letter as Exhibit R.

79. Peter Thompson called Code Enforcement officer Frojae in response to her letter described above in paragraph 78 (Exhibit R).  During this phone call, Peter Thompson compelled officer Frojae to locate the inspection card records and she confirmed that she was incorrect in her determination that building permit no. 08-7435 was expired due to "inactivity".  Peter Thompson advised Officer Frojae that substantive work on the structure during the last 6 months had occurred, this as required by the City's adopted code and that the project had also received an inspection validating construction activities within the last 6 months pursuant to the unique card inspection validation of progress requirement of the City. Officer Frojae apologized for her mistake and stated the Peter Thompson had until June 12th to have an approved inspection.

80. Peter Thompson called for and received an approved inspection under building permit no. 08-7435 on June 7th, 2011, as follows:



Pursuant to the City's unique policy of only validating ongoing construction activities thru approved inspection card sign offs, Building Permit no. 08-7435 was now proved up for another 6 months into 2012 as an ongoing and active Building Permit.

81.  Peter Thompson, in early June of 2011 contacted new Planning Department head to discuss the zoning issues and the letter obtained from Tara Hastie which explained changes in zoning descriptions had been made via use of eminent domain.  This meeting was set up to occur in conjunction with meeting with Chief Building official Bob Risk and Code Enforcement officer

Paula Frojae on June 8th, 2011. With some encouragement, Doug Marshal did attend the early

portion of the meeting on June 8th where in Chris Saunders presented documents and explained

the City's position relative to zoning confusions regarding R2 vs R1 issue of Cattail Creek Phase

II. As it had already been established with Code Enforcement officer Frojae that Building Permit

no 08-7435 was alive and well and Mr. Marshal was very busy, Mr. Marshal and City Planner

Chris Saunders did not attend the second half of the meeting on June 8th, 2011. The second half

of the meeting is described as follows:

82.   . On June 8th, of 2011, in a meeting at the City Building department office, City of

Bozeman's Chief Building official, Bob Risk did coerce Peter Thompson into signing an

agreement written by Mr. Risk. Mr. Risk's agreement established a specific completion date for

work currently authorized under Building Permit no 08-7435. Mr. Risk committed this act of

coercion by momentarily *pretending* to revoke Peter Thompson's established Certificate of

Occupancy no 10-10130 and also added further weight to this act of coercion by arbitrarily

revoking Peter Thompson's active and valid building permit by falsely stating that building

permit no 08-7435 was expired for lack of activity under the permit. Mr. Risk's agreement

attached as Exhibit S.

83. At the meeting described in paragraph 82 above, Former Code Enforcement Officer Paula

Frojae, did verbally support the fact that Building Permit no 08-7435 was in fact in good

standing, this, moments before and in the same meeting wherein, Bob Risk did then while acting

under the color of law, without due process, summarily, arbitrarily and illegally declare building

permit no 08-7435 expired as a part of the act of coercion described in paragraph 82 above.

84. About the time of the June 8th 2011 meeting (paragraphs 82 and 83 above), the substantial

investment of Peter Thompson and the related construction work in place, prior to and leading up

to the period of time around the June 8th 2010 meeting, had established a property right, lawfully

owed and possessing of constitutional protections under building permit no 08-7435 for the upper area residence at 2988 Blackbird Drive.

84. In a meeting with Doug Marshal subsequent to the June 8th 2011 meeting described above, Mr. Marshal's perspective had changed.  Mr. Marshal with little explanation, now stated we would lose the house. Mr. Marshal was referring me to Art Wittich as Mr. Wittich had more experience in this sort of matter and Mr. Wittich had previously referred clients to Mr. Marshal. Mr. Wittich found time to accept calls on the matter, even while in line at the airport on his cell phone at 406 570 5598.  Mr. Wittich personally made arrangements for Peter Thompson to meet with his assistant, Amanda Menasco to go over the situation and file box of documents picked up from Mr. Marshal.

85. Peter Thompson met with Wittich Law Firm's, Mrs. Menasco on the 18th of July, 2011 and went over title insurance documents, contacts with the HOA, HOA design review comments from Intrinsik Architecture, the seller etc.  Mrs. Menasco would review the CCR's, zoning issues and present summary report for purpose of initiating title insurance claim.

86. Peter Thompson and his wife met with Mr. Wittich on July 19th, 2011.  Mr. Wittich handed out Mrs. Menasco's summary report of our situation which included names of parties involved etc..  My wife and I agreed Mrs. Menasco had made a good accounting of the folks involved and our perceived issues.  Mr. Wittich then collected from my wife and I the copies of Mrs. Menasco's summary report in this same meeting.  It seemed like he would recycle the paper or something.  Mr. Wittich became uncomfortable because there were window washers outside the conference room and we went to a smaller meeting place.  In the second meeting room, Mr. Wittich made a list of things he was to do for us.  At the top of the list was initiate our title insurance claim.  The following topics were in the body of the list, assess the sellers liability, the developers and the City's in this matter, and verify that the covenant amendments were lawful. We were suspicious of the covenant changes as we were owners when the changes were made

and did not understand how the covenants could be changed without us knowing about it. It was understood in the meeting that Mr. Wittich would write us a letter regarding his recommends on how to proceed in a few weeks. Mr. Wittich commented that we seemed like some really stressed out people and my wife broke down crying, Mr. Wittich provided tissues and then made us a copy of the revised and amended covenants. Mr. Wittich recommended we read them and try to do what they said while he looked into things on our behalf.

87. After a series of prompting letters and months of waiting, Mr. Wittich wrote us a letter with his input on March 6th of 2012. Mr. Wittich's letter was very unsatisfactory and did not address the vast majority of the issues we were expecting his input and help on. In parting ways Peter Thompson made in person and email requests for a copy of Mr. Wittich's to do list from our first meeting and for a copy of Mrs. Menasco's summary of our situation, Wittich Law Firm kept the requested documents from Peter Thompson.

88. After parting ways with Wittich Law Firm, Peter Thompson started in on working to prepare a title insurance claim without Wittich Law Firm's support. This involved requesting documents from the HOA and the City, neither of which has ever provided copies of the requested documents. The title insurance claim investigator did contact the City of Bozeman as part of their investigation. Title insurance claims efforts were protracted and hampered due to failure of the City and the HOA to provide requested documents. Active efforts of claim spanned from March of 2012 thru August of 2013. Efforts in this direction have become stalled due to more pressing issues in maintaining possession of our property at 2988 Blackbird Drive and reacquiring our lawful right to occupy our home and lawfully resume construction to complete the structure.

89. About this same time as our parting ways with Wittich Law Firm, in March or so of 2012, the HOA resumed putting door hanger complaint notices regarding our the presence of our smallish 16 foot stock trailer and duration of construction.

90.  The period of time that elapsed between 2011 and 2012, per paragraph 76 above, was enough time so that when the HOA did resume door hanger notices (based on covenants not of record at time of Peter Thompson's closing-paragraph 35) and Peter Thompson did then ask the HOA for records that would shed light how changes to the covenants came about, the HOA could then and did at this later time in 2012 cite, MCA stating that members were only entitled to 3 years back records.

91. Subsequently, per paragraph 90 above, Peter Thompson was prevented by the HOA from getting access to information from the HOA, regarding changes to the covenants of record that Peter Thompson originally purchased his lot within the HOA under.

92.  In response to the HOA resuming door hanger complaints regarding construction duration and the presence of a small stock trailer in our driveway, Peter Thompson wrote the HOA's president of the time with a list of issues that needed to be resolved between the HOA and Peter Thompson.  See Exhibit T.

93.  The HOA responded with by and thru Mr. Jennings in a March 30th, 2012 letter as follows:

The covenants for the subdivision and the accompanying design regulations require construction to be completed within one year of commencement. At this point, you have gone well beyond one year and the association is concerned. I understand that you have received permission from the appropriate officials of the City of Bozeman to reside in the basement of the house, but that does not preclude the association from taking steps to protect its interest. The most obvious step for the association would be to seek an injunction against you to prevent you from living in the house until it is completed. If the association takes that step I believe that it will be entitled to recover its attorney fees and court costs from you, which could make the case rather expensive for you.

Rather than take court action, the board is willing to allow you to continue residing in the house provided that you take steps to mitigate the impact on the neighborhood. The first step will be to remove the storage container located along the south side of your house. That container is unsightly and not consistent with the intent of the covenants for the subdivision. Removal of the storage container shall be a condition of allowing you to continue residing in the house.

You also apparently keep a horse trailer on the premises. The covenants preclude storage of such items on the property and the association could have it towed, in which case you would be liable for the tow charges and storage costs. Your voluntary removal of the trailer will be the second condition of allowing you to continue your residency.

The exterior of the house is incomplete and the driveway, sidewalk and landscaping have not been installed. Those items will need to be completed, although it is understood that it may not be possible to complete them until more favorable weather conditions exist. The association is willing to discuss a timetable for their completion as a condition of waiving the occupancy restriction, provided that you agree to the other conditions in this letter in a timely manner.

Finally, you have disturbed the landscaping in the park area adjacent to your property, which is your responsibility to correct. You did not have the right to store your dirt on the adjacent ground and the cost of fixing the problem must be borne by you. Again, the association is willing to allow the work to be completed this growing season, provided that you provide a concrete plan for mitigating the damage, including a timetable, and you meet the other conditions of this letter.

If you will correct these problems as outlined in this letter, the association will waive the requirement to complete the house before beginning occupancy. If you will not agree to these terms, then I will recommend to the association that it initiate a court action to have you removed from the house as quickly as possible. If the court issues such an order and you then violate the terms of the order, you could be found in contempt of court and fined or jailed as a result. If you couple that outcome with the possibility of the court awarding attorney fees and court costs, it certainly appears that it would be in your best interests to live up to the terms of your original agreement by completing the exterior of the house, installing landscaping, sidewalks and the driveway, and generally cleaning up the property.

Since this has gone on for much longer than it should, you must agree to these terms within 7 days of receipt of this letter, and it shall be deemed received three days after mailing. Please let me know your response within that time.

Very truly yours,

Wayne Jennings

94. Peter Thompson responded to the HOA's demand letter above with 21 pages of details and references laying bare all perceived issued between the parties, various requests for documents within the HOA's control were made and did also propose solutions. One of which being that the HOA separate undisputed billings from disputed ones, so as the parties could remain current with undisputed assessments.

95. The HOA's response is summarized as follows:

May 10, 2012

Mr. Peter Thompson
2988 Blackbird Drive
Bozeman, Montana 59718

Re Cattail Creek HOA

Dear Mr. Thompson:

I met with the board of directors to discuss your response to my March 30, 2012 letter. In short, the board finds your response to be unacceptable. Therefore, in compliance with the covenants for the subdivision, my client is prepared to engage in mediation as an attempt to resolve the situation before filing a court action. The board proposes that we use the services of Dan Roth or Leanne Schraudner, who are both practicing lawyers in Bozeman and experienced mediators. If you have another mediator in mind, please let me know the name of such person. The particular mediator is not as important to the board as the qualifications of the person proposed and their independence from the parties.

96. Peter Thompson did personally speak with the retired Honorable Judge Karla Gray, Judge

Gray responded to a voice mail left by Peter after looking up Judge Gray in the white pages.

Peter Thompson respects the logic of the wide range of Judge Gray's decisions that the he has

read.  In the phone call with Judge Gray, she made clear she could not comment or provide any

elaboration on her past published decisions as she remained on call for adjudication of issues as

may be needed.  Peter Thompson imagined that Judge Gray may be available for employment as

mediator in the HOA's proposed mediation and put her forth as a proposed mediator to the HOA.

The HOA did not respond to Peter Thompson on the topic of proposed mediator or discovery

that Peter Thompson felt entitled to prior to actively engaging in mediation.

97. Peter Thompson reached the final point in 2012 with the HOA, where after, the HOA became

non responsive and had little or no further direct contact with Peter Thompson until filling of the

recent complaint now before the Court as follows:

Friday, May 18, 2012                                              Delivered By Hand

Jennings Law Office, P.C.
1704 W. Babcock Suite A
Bozeman, Montana 59715

Dear Mr. Wayne E. Jennings Esquire

Having received no confirmation of your receipt of my 5-12-2012 letter, as request in my email to you of the same day, I am hand delivering Attachments 1 thru 6. These are copies of correspondence with you that I need to be certain you have received.

A few days ago, we had the storage container moved to the back yard. My wife then melted down under the long term emotional distress of dealing with the HOA and begged me to haul the container somewhere else for fear of what the HOA might do next.

Above and Beyond Property Management made notes and or had correspondence with the HOA Board of Directors regarding the meeting described in Attachment B of my March 23, 2012 letter to Mr. Munter. Above and Beyond Property management gave these documents to Minnick management. I am requesting copies of these papers and any other notes or meeting minutes where the meeting at Above and Beyond Management was discussed by or presented to any members of the HOA and or its various Boards. This date range of the correspondence requested is May June of 2011.

Mr. Jennings, I am pleased that you and your client have requested this mediation and I am very happy and hopeful that we will be resolving this situation soon and satisfactorily to everyone involved.

Mr. Jennings, we do not seem to be making any progress with the written discovery approach. How would you feel about depositions in preparation for your proposed mediation? I am interested in eventually getting statements from Sandra Hamilton, Dan Madison, Randy and Sally Sullivan, Travis Munter, Jaymie Larson, Rob Pertzbourne, Susan Kozub, Nathan Minnick and possibly others.

Perhaps, as the moving party in this issue, you can propose a schedule of events leading up to your proposed mediations?

98. After the HOA effectively withdrew from their proposed mediation by failing to respond, the City of Bozeman had further contact with the HOA regarding the Thompson residence at 2988 Blackbird Drive, the Thompson family's occupation of their dwelling and ongoing construction permission agreements between the City and Peter Thompson.

99. The construction work permitted under Building permit no. 08-7435 included a main floor bedroom with a full ADA bathroom for Peter Thompson's mother in law, Maija Katlaps. Maija was distressed by our circumstances and long running problems in endeavoring to get her room done in our intended family home.

Maija was invested in completing work under building permit no 08-7435, provided assistance in going about our title insurance claim, networked and did research thru her contacts at church and proposed solutions to our problems with the Building department based on input

from a local architect. The Building Department, by and thru Bob Risk denied Maija's ideas on how we could figure out to move forward.

Maija was a prayer deacon at her church and often prayed for relief from our problems at prayer meetings. Maija's reverend came to our home at 2988 Blackbird drive for several prayer meetings to help us get through our problems in the paragraphs above. Maija was distressed and worked to help us thru our troubles with the City in many ways. Maija passed away before we able to finish her room in the house.

100. At some point in time after becoming non responsive to mediation efforts per paragraph 97 above, the HOA received copies of the agreement drafted by City Building Chief Bob Risk. The HOA brought to the City's attention that Mr. Risk's agreement, although plainly stating on the signing line and in other areas of the agreement that Peter Thompson hand until Dec of 2013 to complete work under building permit no 08-7435, that other aspects of the agreement could be interpreted to only allow until Dec of 2012 for the completion of the work.

101. The City responded to the HOA's input of paragraph 100 above and announced their intentions compel Peter Thompson to finish work under Mr. Risk's agreement by Dec 2012. This created a great deal of stress which contributed to my wife on several occasions thinking she was having a heart attack that resulted in paramedic responses to 2988 Blackbird Drive as well as time in the emergency room. We did what we could to earn enough money to keep up with the mortgage payments and get things done outside before winter set in. During the visits leading up to the City's announced intention to end permission in Dec of 2012, Code enforcement officer Frojae reminded us that she would turn this "case" over to the City Attorney's office if we did not get things done in time. Mrs. Frojae also told stories about how on other projects she had helped to get Court orders to kick folks out and had later shown up with the armed PD to help kick folks out and board things up.

102. Towards December of 2012, the stresses of dealing with the City's pressure became acute, resulting in Peter Thompson receiving medical treatment at Hope House in a situation that deteriorated, resulting in the arrest, hospitalization and the County petitioning for the involuntary commitment of Peter Thompson.

103. The City, about December of 2012 provided written notice that construction work previously authorized via Mr. Risk's agreement was no longer allowed and that any further work would require a new building permit and new construction documents. At this time Code Enforcement Officer Paula Frojae's previous statement that Certificate of Occupancy no. 10-10130 remained valid and intact, held true.

104. About early January, the Code Enforcement Officer Paula Frojae turned matter over to the City attorney's office as an expired building permit issue without mention of any certificate of occupancy issues.

105. On information and belief Peter Thompson alleges that the HOA, in this time period (Jan - March of 2013) resumed complaining about habitation and or construction duration at 2988 Blackbird Drive. On March 15th, 2013, City Attorney Kyla Murray determined that due to the City's breach of the written agreement with Bob Risk, now Certificate of Occupancy no 10-10130 was no longer valid. Mrs. Murray set out terms where the Thompson family could acquire a new building permit, and a temporary Certificate of Occupancy but would be compelled to complete all remaining work within 30 days and obtain a certificate of occupancy within the same time to be allowed to lawfully continue living in their home. See Exhibit U.

106. On June 30, 2013, City of Bozeman's Chief Building official Bob Risk did in fact revoke Peter Thompson's Certificate of Occupancy no 10-10130. This revocation was without due process of the sort intended and required by the US Constitution, before or after, Mr. Risk's summary revocation of this day. Mr. Risk's revocation was also in violation of Montana state

law per paragraph 71 above.   Mr. Risk's summary revocation as follows:

# Certificate of Occupancy

*Revoked — BR*

## Department of Building Inspection

This certificate issued pursuant to the requirements of the International Residential Code
certifying that at the time of issuance this structure was in compliance with the various
ordinances of the city regulating building construction or use.
Issuance of a Certificate of Occupancy shall not be construed as an approval of a
violation of the provisions of this code or other ordinances of the jurisdiction.
Certificates presuming to give authority to violate or cancel the provisions of this code of
other ordinances of the jurisdiction shall not be valid.

**City of Bozeman**

BUILDING INSPECTION DIVISION

Permit Number: 10 – 10130

Owner of Building _____

Building Address: 2988 BLACBIRD DR

Building Official: _____   Date: 9-24-10

X Revoked 7-30-2013 *"LOWER AREA"*

107.   Mr. Risk did on this same day of paragraph 106 above, did write Peter Thompson a letter
stating that Peter Thompson was no longer permitted to be living in his home with his family at
2988 Blackbird Drive and that any and all additional work done on the structure at 2988
Blackbird Drive, without a valid building permit would be illegal.  Mr. Risk's letter of this day,
also stated that any previously issued Certificates of Occupancy for the structure at 2988
Blackbird Drive were now revoked.  However, Mr. Risk's correspondence offered no real
evidence that Mr. Risk was not again pretending in yet another act of coercion as he had in the
past (see paragraph 82 above).  Mr. Risk's revocation letter did not speak specifically to
Certificate of Occupancy no 10-10130 by name.  Mr. Risk's letter did not mention the established
US postal service address for the lower area dwelling unit at this time, nor did Mr. Risk's letter
provide any copy of whatever C of O (s) he was allegedly revoking at this time.  The document

of paragraph 106 above, was withheld from Peter Thompson until Discovery production by the

City in the matter of CR2014-00070 on December 11th, 2014.

108. City of Bozeman's Chief Building official Bob Risk in his June 30th 2013 letter to Peter

Thompson (Risk's letter also described per paragraphs 107 above), did somewhat explain the

actions taken on the day of his June 30th letter as being per Peter Thompsons failure to comply

with the agreement draft by Mr. Risk. Mr. Risk explaining, "Your original building permits

expired along with the temporary agreement I drafted to allow you an opportunity to come into

compliance."

109. On August 12th, 2013 Peter Thompson did write City of Bozeman Attorney Kyla Murray

on the topics of paragraphs 103 thru 108 above. The topic of the August 12th letter to the City

being an effort to repair the City's breach of the contract drafted by Mr. Risk per paragraph 82

above, Exhibit S, (The agreement drafted by Mr. Risk allow for one full year more to complete

the work at 2988 Blackbird Drive at the time the City breeched the agreement in terminating the

agreement draft by Mr. Risk, one full year before the end date specified) and the related

allegations that Peter Thompson and his family were no longer permitted to be living in their

home at 2988 Blackbird Drive. The other plain intention of this August 12th, 2013 letter to City

Attorney Kyla Murray was to make clear that the City's actions in this matter were illegal.

110. The City of Bozeman remained silent to the written specifics of paragraph 109 above and

remained similarly silent to further probing of related specifics via a series of letters and emails

to City Attorney Kyla Murray. City Attorney Kyla Murray confirmed receipt of about 7 letters

spanning from August 12th 2013 thru to January 2nd 2014 on this topic. The City substantially

remained silent to all specific facts, interrogatories and requests for information via this series of

letters to the Attorney's office.

111. Thru the acquiescence of silence (per paragraph 110) and the City's failure to provide any

direct proof of the alleged revocation of C of O no 10-10130 (Per Mr. Risk's June 30th 2013

letter - Paragraph 107 above), on January 1st 2014, Peter Thompson wrote City Attorney Kyla

Murray a letter declaring C of O 10-10130 as valid now in 2014 as it was when issued in 2010.

As follows:

Wednesday, January 01, 2014

Kyla C. Murray
City Prosecutor

Regarding Occupancy Permit No.10-10130

Dear Kyla C. Murray,

Having brought to your attention in my September 6th 2013 letter to you the simple fact
that construction work permitted under building permit No. 10-10130 when complete was
intended to meet the City of Bozeman's minimum requirements for occupancy. Ed
Norsby, City of Bozeman Building Inspector, did inspect the work when completed and
found it to be in compliance with the permitted construction documents and then issued
Occupancy permit No. 10-10130 as per the very same procedure you detailed to me in
your September 5th 2013 letter.

Having no direct response on this topic from my September 6th 2013 letter to you
regarding Occupancy Permit No. 10-10130, having been told by the Code Enforcement
Officer Paula Frojae that we were fine with Occupancy permit No. 10-10130 and having
received no documents ever naming and or revoking Occupancy Permit No. 10-10130,
we know that Occupancy Permit No. 10-10130 was lawfully issued and a document that
will stand up in court.

If you or anyone else you are in contact with is aware of any minimum requirements of
Final occupancy as detailed to me in your September 5th letter that are not met by work
completed under construction permit No. 10-10130, please let me know as soon as
possible and we will make corrections.

Respectfully:

Peter Thompson

112. The City failed to provide Peter Thompson any evidence to contradict the declarations of paragraph 111 above until the City's production of Discovery relative to CR2014-00070 on December 11th of 2014.

113. CR-2014-00070 is an act of litigation that spanned approximately 210 days consisting of 165 pages of documents. This case was dismissed without prejudice on March 4th, 2015. The full case files of CR-2014-00070 will be submitted as a later Exhibit relative to third party claims.

114. The City again brought action against Peter Thompson based on the same single ongoing act that was the City's basis for CR-2014-00070 in the matter of TK-15-03459. This particular criminal suite of the City against Peter Thompson remains an active case of the City in Municipal Court, currently scheduled for Trial on May 3rd, 2016. If this matter is adjudicated per Montana Rule of Law, this case will be dismissed with prejudice at some point in time prior to trial. The full case files of this matter will be submitted as a later Exhibit relative to third party claims.

115. Peter Thompson received notice of the matter of TK-15-03459 within one day of service of the HOA's complaint now before the District Court as the matter of DV-15-636C. Defense in the matter of TK-15-03459 has been very time consuming and strenuous. Without a decent background of the overall all facts, every attempt at brevity thru single sets of facts per single counts falls short of accurately communicating the circumstances before the Court. Subsequently this overly long opening pleading.

116. The HOA's affirmative step in preventing Peter Thompson from getting access to information that would shed light on how covenant changes were made, without his knowledge or notice, while he was a property owner - per paragraphs 75, 76, 90 and 91; was circumnavigated thru years of persistent questioning of neighbors met on dog walks in the park.

117. In 2015, the Defendant did locate someone who said they were at the meeting where combining the HOA's was voted on. This person described this meeting as follows:

118. Notice to and voting of the members, where it was decided to combine the formerly separate HOA associations, was only to combine three associations into one. There was no notice of substance, discussion of or voting for any substantive covenant amendment other than combining and consolidating the three formally separate HOA associations into one HOA. There was no voting quorum established at the meeting. The newly formed, combined HOA, is the entity which now brings action before the Court as the Plaintiff in this matter.

119.  Document of record no. 2300076, confirms the initial statement of paragraph 118 as follows:



2300076
Page. 4 of 24
05/11/2008 04:33P
Charlotte Mills—Gallatin Co MTRXEC     228.00

WHEREAS, on *March 26*, 2008, Phases 1, 2 and 3 of Cattail Creek Community Associations conducted an election and received ballots by more than 75% of their respective members affirmatively voting to consolidate the covenants for each phase of Cattail Creek Subdivision, the Bylaws for each phase of Cattail Creek subdivision and determining for the betterment of all Phases of Cattail Creek Subdivision, the governing Community Associations should be consolidated into one Community Association; and

120. On information and belief, Peter Thompson alleges the HOA actually voted on combining per the description of paragraph 119 above in 2006 and failed. The various boards of directors again put the issue to the land owners in 2007. Sandan LLC owners hold positions on the various boards.

121. In 2007, without providing notice of an *actual* voting meeting were parties of the three separate HOA's could speak for or against the proposed combination of the three separate HOA's as a full group of property owners at a *duly* held meeting. The various boards mailed out some proxy ballots and later alleged to property owners to have acquired enough mail in ballots to finally approve the combination of the 3 previously separate HOA's.

122. On information and belief, Peter Thompson alleges that there was no notice of substance of meeting and contractually required voting at a *duly* held meeting where 75% of the represented property owners in fact voted to combine the formerly three separate HOA's on March 26th 2008 as described in doc. 2300076, per paragraph 119 above.

123. Requirements for amending *any* covenant of the former three HOA groups are consistent with the requirements of Cattail Creek Phase II document no. 2131569 as follows:

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**SECTION 1.** In addition to the rights reserved to the Declarant to modify or supplement the Cattail Creek Covenants with respect to land annexed to Cattail Creek, the Cattail Creek Covenants, may, at any time, be amended or replaced upon the happening of all the following events:

A. The vote of Owners having not less than three-quarters (3/4) of the total votes of each class of Owners of lots then within Cattail Creek Covenants at a meeting of the Association duly held. For the purposes of this section, an Owner will be allowed a number of votes equal to the number of dwelling units assessed to his/her lot at the time of the proposed election. The notice of the meeting shall state that the purpose of the meeting is to consider the amendment or repeal of the Cattail Creek Covenants, giving the substance of any proposed amendments or indicating the provisions to be repealed, as the case may be; and

B. The recordation of a certificate of the Secretary or an Assistant Secretary of the Association setting forth in full the amendment or amendments to the Cattail Creek so approved, including any portion or portions thereof repealed, and certifying that said amendment or amendments have been approved by vote of the Owners pursuant these covenants.

124. Aside from the statement cited in paragraph 119 above, there are no other statements within document no. 2300076 (this document forms the entity of the Plaintiff now before the Court) that can be construed as making the contractually required statements of paragraph 123 above, as required for the amendment of *any* covenant of the originally separate HOA covenants.

125. The statement of paragraph 119 above from document no. 2300076 does *not* certify that the voting process occurred *pursuant* to the common requirements of all of the originally separate covenant contracts, as is required by the respective original contracts.

126. The specific contract requirement for statement certifying that voting was *pursuant* to the requirements of the original contracts is as follows:

amendment or amendments have been approved by vote of the Owners pursuant these covenants. certifying that said

127. The failure of contract no. 230076 to make a plain statement that voting for the combining and consolidating of the three original covenant contracts occurred *pursuant* to the requirements of the original contract in paragraph 123 above, constitutes a mistake of contract no. 2300076.

128. The contractual duty imposed by the original contract (paragraph 123) effectively requires *any* future amendments to include a notarized statement of the Secretary or the Assistant Secretary of the HOA to make a plain statement that voting *did* occur in *compliance* with the requirements of the original contract.

129. Document no. 2300076 (this document forms the entity of the Plaintiff now before the Court), technically fails to fulfill the contractual requirements of the original contracts on the topic of combing the three separate HOA's into one. Doc. No. 2300076 is not signed by anyone named as the Secretary or the assistant secretary of the original Phase II HOA.

130. Document no. 2300076 (this document forms the entity of the Plaintiff now before the Court), fails to make any certified statement that land owners had notice of, opportunity to vote at meeting for or against *any* proposed amendment and that successful voting occurred for *any* covenant addition or deletion other than combining the three separate HOA's into one HOA.

131. The operative contractual obligations of all the original covenants for *all* amendments and

or deletions of covenants is specifically as follows:

Creek Covenants, may, at any time, be amended or replaced upon the happening of all the
following events:

Per above, *all* of the following events and certifications that *all* such events have in fact occurred

are contractual requirements for *any / all* ammendments or deletions to the original covenant

contracts.

132. Section A of Article VIII (paragraph 123) requires as follows:

A. The vote of Owners having not less than three-quarters (3/4) of the total votes of each
class of Owners of lots then within Cattail Creek Covenants at a meeting of the
Association duly held.

133. Per section A above(paragraph 132), the requirement is for 75% property owner approval *at*

*meeting* of the Association *duly* held.  This particular contract clause effictivly prohibits

gathering of proxy ballots after a meeting for subsquent and later final voting approval.

Furthermore, there is no provision that would allow for use of mail out or mail in ballots.

134. Other administrative Articles of the Covenant contract do have provisions for proxy votes to

make decisions relative to required management actions and leviing of fees as need to keep the

HOA opperational.

135. Articles that do allow for proxy voting have their own Article topic specific tenants for

proxy voting.

136. Article VIII includes provisions for ammendment of the Covenents.  Article VIII has no

article specific provision for the use of proxy votes in ammending the Covenants.

137. The operative contractual obligations of all the original covenants for *all* amendments and

or deletions of covenants is specifically as follows:

Creek Covenants, may, at any time, be amended or replaced upon the happening of all the following events:

A.

                           The notice of the meeting shall state that the purpose of the meeting is to consider the amendment or repeal of the Cattail Creek Covenants, giving the substance of any proposed amendments or indicating the provisions to be repealed, as the case may be; and

138. Per paragraph 137 above, notice of the *substance* of *any* proposed ammendment or *repeal* of any provision must be given for all additions or deletions to any of the original covenant contracts prior to having the required *duly* held *meeting* as described in pargraph 132 above.

139. The common contractual elements for additons or deletions to all of the original covenant contracts that were combined to form the current HOA \ Plaintiff in this complaint are summarized in Peter Thompson's words as follows:

      A. Notice of substance of addition or deletion of of *each* contractual ammendment prior to a Duly held meeting.

      B. Assembly of property owners at a Duly held meeting where there is a opportunty for property owners to speak for or against, any and all proposed changes to the covenant contract where 75% of the property owners do vote in favor of the previosly noticed additions or deletions to the covenant contract.

      C. Recordation at the Court house of a certified statement of the Secretary or the Assistant Secretary of the HOA stating that voting occurred *persuant* to the Covenants and said certificate is also required to state specifically what deletions were in fact made and what specfic additions were made.

140. There are a variety of covenant amendments within document no. 2300076(this document forms the entity of the Plaintiff now before the Court) that were not a part of any of the original three association covenant documents which were combined into document no. 2300076.

141. Change in Voting Majority needed to ammend covenats as follows:

All of the original covenants required a 75% voting majority to ammend covenants, now the active members under the reformed HOA of 2008(Per document no. 2300076 - this document forms the entity of the Plaintiff now before the Court) may more easliy change the covenants with a lesser 2/3 majority as follows:



The vote of Owners having not less than two-thirds (2/3) of the total votes within Cattail Creek at a meeting of the Association duly held. The notice of the meeting shall state that the purpose of the meeting is to consider the amendment or repeal of the Cattail Creek Covenants, giving the substance of any proposed amendments or indicating the provisions to be repealed, as the case may be: and

142. Changing from a 75% percent majority needed to ammend covenants to 66% majority needed to ammend covenents is a subtanative change to all the original covenant contracts that would require enactment in complaince with Article VIII Section I to be a lawfully enacted ammendment to the original covenat contracts.

143. The ammendment described in pargraph 141 is an ammendment of the original coveant contracts that goes beyond the scope of property owner approval for ammendment alleged by the HOA per pargraph 119 above.

144. Hold Harmless water waiver changes as follows:

None of the original three covenant contracts provided any agreement to hold harmless, the Farmer Canal Company, it's successors, Covenants Investments Inc, it's officers, directors or successors in interest, the Communtiy Associatoin nor adjacent land owners.  The only

statements regarding water level hazards or soil hazards found by Peter Thompson in the original

covenants merely pertained to the Design review committee as follows:

## SECTION 5. Limitation of Responsibilities

The primary goal of the CCDC is to review the submitted applications, plans, specifications, materials, and samples in order to determine if the proposed structure conforms to the Cattail Creek Subdivision covenants.  The CCDC does not assume responsibility for the following:

The structural adequacy, capacity, or safety features of the proposed structure or improvement.

Soil erosion, ground water levels, non-compatible or unstable soil conditions.



2131569
Page: 25 of 49
11/12/2003 03:43P
Shelley Vance-Gallatin Co MT MISC    249.00

Compliance with any or all building codes, safety requirements, and governmental laws, regulation or ordinances.

The covenants refiled in 2008 (Per document no. 2300076 - this document forms the entity of the

Plaintiff now before the Court) provide that upon acceptance of the covenant 5.4(b), the land

owners agree to hold harmless a variety newly introduced entities as follows:

**5.4 Notice of Water Features**

(a) Notice: Each owner of property within Cattail Creek, as individuals and as members of the Association, acknowledges the presence of water features within the subdivision. Each owner of property within Cattail Creek, as individuals and as members of the Association, acknowledges that water could pose a danger to humans, animal life and property. By this acknowledgment, each owner of property within Cattail Creek, as individuals and as members of the Association assumes the normal and ordinary consequences of their actions when in, next to or in the vicinity of water features within Cattail Creek.

(b) Hold Harmless: Each owner of property within Cattail Creek, as individuals, agrees by acceptance of this covenant to hold harmless Covenant Investments, Inc., its officers and directors, and successors in interest, the Community Association, adjacent property owners, and the Farmer Canal Company and its successors in interest for any water related injury to persons, property and animals and damage due to acts of God and nature, including but not limited to a flood from the canal and other water features resulting from circumstances beyond the control of the parties listed herein.

(c) Insurance: Each owner of property within Cattail Creek acknowledges that it is advisable to seek insurance to protect the owner's property in the case of a water event relating to the water features.

145. Holding harmless a range of entities not previousvy enttiled to such protections under any of the original covenant contracts is a subtanative change to all the original covenant contracts that would require enactment in complaince with Article VIII Section I to be a lawfully enacted ammendment to the original covenat contracts.

146. The ammendment described in pargraph 144 is an ammendment of the original coveant contracts that goes beyond the scope of property owner approval for ammendment alleged by the HOA per pargraph 119 above.

147. Change in responsibility for legal fees as follows:

The original Phase II covenants stated:



Enforcement of these covenants by Declarant, CCDC, Board, Owner or any party having standing, shall include for the party seeking enforcement and prevailing in such enforcement, an award of costs, fees and reasonable attorney's fees.

The new filed covenants of 2008(Per document no. 2300076 - this document forms the entity of the Plaintiff now before the Court) establish an improved postion for the drafter of the contract relative to recovery of legal fees, if then when litigation breaks out. Per below, the first paragraph was part of all the oringinal covenants, the second paragraph was not part of *any* of the original covenant contracts:



Enforcement of these Covenants by the Declarant, CCDC, Board of Directors, Owner or any party having standing, shall include for the party seeking enforcement and prevailing in such enforcement, an award of costs, fees and reasonable attorney's fees.

Should any lawsuit or other legal proceeding be instituted by the Association or an owner against an owner alleged to have violated one or more of the provisions of these Covenants and should the Association or owner enforcing the provisions of the Covenants be wholly or partially successful in such proceedings, the offending owner shall be obligated to pay the costs of such proceeding, including reasonable attorney's fees for all time associated with the action.

148. Allowing the HOA to recover Attorney's fees for all time associated with any legal action wherein the HOA only partially previals in ligation is a significantly more dominant legal postion for the dafter of the new revised contract (Per document no. 2300076 - this document forms the entity of the Plaintiff now before the Court) which none of the original HOA's were previously enttiled to under any of the original covenant contracts. This is a subtanative change to all the original covenant contracts that would require enactment in complaince with Article VIII Section I to be a lawfully enacted ammendment to the original covenat contracts.

149. The ammendment described in pargraph 147 is an ammendment of the original coveant contracts that goes beyond the scope of property owner approval for ammendment alleged by the HOA per pargraph 119 above.

150. On information and belief, Peter Thompson alleges that Mr. Jennings participated in the drafting of document no. 2300076 - this document forms the entity of the Plaintiff now before the Court.

151. On information and belief, Defendant Peter Thompson that Mr. Jennings drafted the second paragraph of the new covenants (document no. 2300076 - this document forms the entity of the Plaintiff now before the Court) seen in paragraph 147 above.

152. Inequitable contract clauses such as the HOA has rights to collect fee's for all cost of litigation even though they may only prevail on a de minimus aspect of litigation demonstrates to the Court the importance of establishing that these covenant contracts now before the Court are in fact adheasion contracts and should be adminsistered as such in Montana Courts.

153. This particular contract clause (second pargraph, doc. No.2300076, at 147 above) takes away the Court's authority to determine whether or not there was a previailing party and if not, whether or not a partially prevailing party is deserving of reimbursemnt for legal expenses.

154. Repeal of land use restriction as follows:

Rob Pertzborn of Intrinsik Archticture, for the benefit of his client (The Klos Living Trust, owned by James Mitchell, James and Jane Klos) did facilitate the conversion of 8 original Phase II lots into 12 smaller lots capable of 24 dwelling units when ADU permits are granted. Rob Pertzborn of Instrinsik Architecture, did use his inside knowledge of the low denisty .25 acre lots in Phase II to help his client capitalize on subdividing these lots to be more conforming with the original medium density zoning of this area. Rob Pertzborn did descibed the neigbors response at public meetings where he did aquire legal rights for the benefit of The Klos Living Trust to bring the subdvision density of the proposed Foxttail Street Subdivision, more in line with the intended medium density zoning for this area within Cattail Creek Phase II, along the lines of, the locals turned out with pitch forks and torchs to oppose the subdivision, they said the neighborhood would end up like Valley West and they did not want this.

155. Phase III residents had deeded protection against increases in dwelling unit density as follows:



R-1 and R-2 lots shall not be further subdivided individually or as a group to increase density.

156. With the formation of the new combined HOA in May of 2008, via deletion of former members of the Phase III area lots ban on further subdivision of oversized lots, substanative and significant changes in property rights were made.  Now Phase III owners are no longer bound by this restriction with the combined HOA (Per document no. 2300076 - this document forms the entity of the HOA now before the Court).

157. Repealing Phase III HOA's restriction on further subdivsion to increase density, as Phase III owners were previouvsy enttiled to protection from under their original covenant contracts, is a subtanative change to the Phase III covenant contracts that would require repeal in complaince with Article VIII Section I to be a lawfully enacted repeal of the original covenat contract.

158. The repeal of deed restriction described in pargraph 155 is an ammendment of the original coveant contracts that goes beyond the scope of property owner approval for ammendment alleged by the HOA per pargraph 119 above.

159. Excerpt of Phase II HOA covenant contract Exhibit B as follows:



**EXHIBIT B**

**Cattail Creek Subdivision**
**Phase II**
**Property Setbacks**

| Block | Lot # | Fronting Street | Zone | Front Yard Setback | Side Yard Setback | Rear Yard Setback | Notes |
|---|---|---|---|---|---|---|---|
| 9 | 1 | Blackbird Drive | R-2 | 20' | 5' | 20' | 1,3 |
| | 2 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 3 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 4 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 5 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 6 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 7 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 8 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 9 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 10 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 11 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 12 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 13 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
| | 14 | Blackbird Drive | R-2 | 20' | 5' | 20' | 1,3 |

160. Some property owners relied on Exhibit B(of doc. No. 2131569) above, in determining their percieved allowable use of land purchased and sold within Cattail Creek Phase II between 2004 and 2008.

161. Exhibit M is an example of how one property owner understood the allowable uses of the land they had purchased and were trying to sell.  Property owners who were bound to the original covenants which contained incorrect information were possesing of contractual rights to have knowledge of how, when and why incorrect parts of the contract they were bound to were made.

162. Deletion of Exhibit B from the original Phase II covenants (Doc. No. 2131596) during the drafting and adoption of the revised and ammended covenants represents a repeal or ammendment of an aspect of covenant contract such as would require the ammendment or repeal

to be in complaince with Article VIII Section I to be a lawfully enacted ammendment or repeal of the original covenant contract.

163. The deletion described in pargraph 162 is an ammendment of the original covenant contract that goes beyond the scope of property owner approval for ammendment alleged by the HOA per pargraph 119 above.

164. Deletion of Exhibit B from Doc. No. 2131569 and relpacement of Exhibit B from Doc. No. 2121569 with Exhibit B of the revised covenants(document no. 2300076 – this document forms the entity of the HOA now before the Court) represents a correction of misleading information within original covenant contract doc. No 2131569.

165. Regardless of the motivation for the action described in paragraph 164 above,  HOA management owed a duty to the property owners to advise them of the erroneous information of the original contract and to follow the appropraite proceedures for ammending the contract to correct the erronious information there in.

166. Exhibit B of the revised covenants (Per document no. 2300076 – this document forms the entity of the Plaintiff now before the Court) functionally replaces Exhibit B of the Phase II covenant contract described in paragraph 159 above.  Exhibit B of the revised covenant contract is no more legible in the Court House records than it is pasted below.  Exhibit B of the revised covenant contract as follows:



167. Cattail Creek Phase II covenant contract, doc. No. 2131569 is a contract entered into by

Peter Thompson where in Peter Thompson had no meaningful choice regarding acceptance of the

contract provisions prior to purchasing land within Cattail Creek Phase II (this was a take it or

leave it encumbrance of title at closing) nor was there any opportunity for the Peter Thompson to freely negotiate the terms of the covenant contract prior to or at the time of execution of the land transaction which indirectly bound the Peter Thompson via an encumbrance of title. The actual covenants were not presented at closing by the seller nor has Peter Thompson ever signed any covenants of Cattail Creek Phase II or even the new revised and amended covenants.

168. Peter Thompson became a property owner under the Cattail Creek Phase II covenants on February 27th, 2008. Peter Thompson received no notice of meeting to change any covenants nor any notice of substance of any proposed covenant amendment or repeal prior to the recording of document no. 2300076, - this document forms the entity of the Plaintiff now before the Court, on May 15th, 2008.

169. Peter Thompson has had no opportunity to freely negotiate the terms of the revisions covenant contract no. 2300076. This speaking particularly to contract revisions detail in paragraphs 140 thru 168.

170. The inability of any one property owner to change or amend the covenant contracts is proven by the fact that the Developer working with a group of like minded property owners was unable to legally make an apparently innocuous covenant amendment in 2006. The attempted amendment was to simply combine the separate HOA's into one for ease and efficiency of management. It may appear on paper that a given property owner has the ability to negotiate the terms of the covenant contract, but the intractability of the contract is in reality beyond the ability of any given property owner to overcome.

171. Despite the affirmative steps of the HOA in preventing Peter Thompson access to historical information regarding how changes to the original covenant contract came about, per paragraphs 75, 76, 90 and 91, in 2016 Peter Thompson obtained the copies of HOA's past publications that describe certain aspects of the notice of substance of change, meetings and how voting occurred

in the establishment of the current HOA entity taking action against Peter Thompson. See

Exhibit V.

Peter Thompson does solemnly swear that the statements contained in this affidavit are true to the best of his knowledge and belief.

DATED this 25th day of April 2016.

BY: _____

Peter Thompson
Pro Se Litigant with Limited Scope
Representation

Subscribed and sworn to before me, a notary public,
this 25th day of April 2016.

JENNIFER BRANDON
Clerk of Court
By: Cara B. Edgerley, Deputy

Exhibit F:



PRE-APPLICATION PLAT OF CATTAIL CREEK SUBDIVISION

FIGURE 1

# CATTAIL CREEK SUBDIVISION, PHASE 2 — ZONE MAP AMENDMENT

### CITY OF BOZEMAN

A TRACT OF LAND BEING LOT 1A OF MINOR SUBDIVISION NO. 145A,
LOT A OF MINOR SUBDIVISION NO. 145B AND THE PROPERTY
DESCRIBED ON THE PLAT OF RECORD FILM 12, PAGE 1159
LOCATED IN THE NW 1/4 & THE SW 1/4 OF SECTION 35, T1S, R5E,
P.M.M., GALLATIN COUNTY, MONTANA

### TOTAL AREA 59.03 ACRES



## LINE TABLE

| LINE | BEARING | DISTANCE |
|---|---|---|
| L1 | N00°10'12"E | 331.34' |
| L2 | N89°41'24"E | 30.00' |
| L3 | N00°09'17"E | 360.74' |
| L4 | N89°46'56"W | 30.03' |
| L5 | N00°00'17"E | 149.80' |
| L6 | S89°50'33"E | 30.00' |
| L7 | N00°09'17"E | 291.90' |
| L8 | N89°43'37"E | 223.37' |
| L9 | N00°13'52"E | 195.10' |
| L10 | S89°42'55"W | 253.03' |
| L11 | S00°13'52"W | 194.86' |
| L12 | S89°46'09"E | 58.43' |
| L13 | S00°13'52"W | 30.00' |
| L14 | N00°13'52"E | 170.65' |
| L15 | N79°54'24"E | 108.81' |
| L16 | N28°12'45"W | 100.19' |
| L17 | S30°22'19"E | 32.50' |
| L18 | S59°37'41"W | 87.15' |
| L19 | S89°41'56"W | 198.91' |
| L20 | S00°13'18"W | 331.47' |
| L21 | S89°46'08"E | 129.50' |
| L22 | S00°13'52"W | 338.99' |
| L23 | S89°48'08"E | 300.00' |
| L24 | N00°13'52"E | 163.95' |
| L25 | S89°46'08"E | 129.51' |
| L26 | N85°58'19"E | 175.00' |
| L27 | S27°29'58"E | 135.32' |
| L28 | S59°37'41"W | 249.23' |
| L29 | S30°22'19"E | 32.50' |
| L30 | N59°37'41"E | 67.36' |
| L31 | S30°22'19"E | 236.99' |
| L32 | N89°46'08"W | 58.43' |
| L33 | S00°13'52"W | 30.00' |
| L34 | S59°37'41"W | 174.86' |

## CURVE TABLE

| CURVE | RADIUS | DELTA ANGLE | ARC LENGTH | CHORD BEARING | CHORD LENGTH |
|---|---|---|---|---|---|
| C1 | 150.00 | 13°59'02" | 36.61' | N77°53'59"E | 36.52' |
| C2 | 780.00 | 09°08'24" | 124.43' | S16°31'24"E | 124.30' |
| C3 | 780.00 | 03°55'43" | 53.48' | N28°19'40"W | 53.47' |
| C4 | 780.00 | 09°11'55" | 125.33' | S23°41'53"E | 125.00' |
| C5 | 780.00 | 14°24'37" | 196.16' | N17°39'34"E | 195.66' |

### SCALE
0    200'    400'    600'

BEARING BASIS: MINOR SUBDIVISION NO. 145B

POINT A = POINT OF BEGINNING R-3A (WEST PARCEL)
POINT B = POINT OF BEGINNING R-3A (EAST PARCEL)
POINT C = POINT OF BEGINNING R-2

ZONING BOUNDARY
CONTAINS 59.03 ACRES

P-2 BOUNDARY
CONTAINS 21.59 ACRES

R-3A CONTAINS 0.58 ACRES

R-3A CONTAINS 3.25 ACRES

R-3 BOUNDARY
CONTAINS 33.61 ACRES

VICINITY MAP

THOMAS, DEAN & HOSKINS, INC.
ENGINEERING CONSULTANTS

# CATTAIL CREEK SUBDIVISION, PHASE 2 — ZONE MAP AMENDMENT

Exhibit H1:









J-369

Exhibit L:

## PLAT OF CATTAIL CREEK SUBDIVISION, PHASES 2A & 2B

AN AMENDED PLAT OF MINOR SUBDIVISION NO. 140A, LOT 1A

A TRACT OF LAND BEING LOT 1A OF MINOR SUBDIVISION NO. 140A, LOT 2 OF MINOR SUBDIVISION NO. 140B AND
THE PROPERTY DESCRIBED ON THE PLAT OF RECORD FILM 10, PAGE 1179
LOCATED IN THE SW 1/4 & THE SE 1/4 OF SECTION 36, T1S, R5E, P.M.M.
CITY OF BOZEMAN, GALLATIN COUNTY, MONTANA

J-369

THOMAS, DEAN & HOSKINS, INC.
ENGINEERING CONSULTANTS

# Exhibit M:

**ALL FIELDS CUSTOMIZABLE 2**



| | | | |
|---|---|---|---|
| Mls # | 142253 | Acreage | -1 Acre |
| Status | Expired | Water | City |
| Type | SUBDIVISION LOT | Horse | Not Allowed |
| Address | TBD BLACKBIRD DR | Wtr Amen | Yes |
| Address 2 | LOT 3 BLOCK 9 CATTAIL SUB Zoning | | R2 – Residential 2-household, Medium Density |
| City | BOZEMAN | | |
| State | MT | | |
| Zip | 59718 | | |
| Area | Boz N of Main/E of 19th 1NE | | |
| Class | LAND | | |
| Asking Price | $117,000 | | |
| Sale/Rent | For Sale | | |

**GENERAL**

| | | | |
|---|---|---|---|
| Number Of Acres | 0.2630 | Price Per Acre | 444866.92 |
| Apx Lot Sz | .263 | Subdiv. | Cattail Creek |
| Directions | Cattail St, Left on Blackbird Dr | Zoning District | yes |
| Covenant | yes | Approx SqFt | 11455 |
| Price per SqFt | 10.21 | Days On Market | 172 |

**FEATURES**

WATER AMENITIES
  Stream

**FINANCIAL**

| | | | |
|---|---|---|---|
| Apx Tax $ | 466.30 | Tax Year | 2006 |

**PUBLIC INFORMATION**

Ideal building lot that backs to open space and creek. Close to the park, with beautiful mountain vews and an in-town setting, this 11,455 +/- SF lot is hard to b eat!

**ADDITIONAL PICTURES**



**DISCLAIMER**

Information provided by Gallatin Association of REALTORS/Southwest Montana MLS is compiled from miscellaneous sources. Neither the Association, listing brokers, agents or subagents are responsible for its accuracy. MLS users should be advised and should advise prospective purchasers to verify all information in regard to the property by their own independent investigation prior to submitting an offer to purchase the property. Copyright 2007 Southwest Montana MLS.

2131569
11/12/2023 03:49P
Shelley Vance-Gallatin Co MT MISC        240.00

## EXHIBIT B

### Cattail Creek Subdivision
### Phase II
### Property Setbacks

| Block | Lot # | Fronting Street | Zone | Front Yard Setback | Side Yard Setback | Rear Yard Setback | Notes |
|-------|-------|-----------------|------|--------------------|-------------------|-------------------|-------|
| 9 | 1 | Blackbird Drive | R-2 | 20' | 5' | 20' | 1,3 |
|   | 2 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 3 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 4 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 5 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 6 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 7 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 8 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 9 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 10 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 11 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 12 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 13 | Blackbird Drive | R-2 | 20' | 5' | 20' | 3 |
|   | 14 | Blackbird Drive | R-3A | 20' | 5' | 20' | 1,3 |
| 10 | 1 | Typha Court | R-3 | 20' | 5' | 25' | 1 |
|   | 2 | Typha Court | R-3 | 20' | 5' | 25' | 1 |
|   | 3 | Cattail Street | R-3 | 20' | 5' | 25' |  |
|   | 4 | Cattail Street | R-3 | 20' | 5' | 25' | 1 |
| 11 | 1 | Fen Way | R-3 | 20' | 5' | 25' | 1,4 |
|   | 2 | Fen Way | R-3 | 20' | 5' | 25' | 4 |
|   | 3 | Fen Way | R-3 | 20' | 5' | 25' | 4 |
|   | 4 | Fen Way | R-3 | 20' | 5' | 25' | 4 |
|   | 5 | Fen Way | R-3 | 20' | 5' | 25' | 1,4 |
| 12 | 1 | Fen Way | R-3 | 20' | 5' | 25' | 1,4 |
|   | 2 | Fen Way | R-3 | 20' | 5' | 25' | 4 |
|   | 3 | Fen Way | R-3 | 20' | 5' | 25' | 4 |
|   | 4 | Fen Way | R-3 | 20' | 5' | 25' | 4 |
| 13 | 1 | Catron Street | R-3 | 20' | 5' | 20' | 1 |
|   | 2 | Catron Street | R-3 | 20' | 5' | 20' |  |
|   | 3 | Catron Street | R-3 | 20' | 5' | 20' |  |
|   | 4 | Catron Street | R-3 | 20' | 5' | 20' |  |
|   | 5 | Catron Street | R-3 | 20' | 5' | 20' |  |
|   | 6 | Catron Street | R-3 | 20' | 5' | 20' | 1 |

# Exhibit O:

| mtskyrealty@aol.com

**MLS# 135502**

| **Asking Price:** | **$119,000** |
|---|---|
| Class: | Land |
| Type: | Bldg Lot Under 1 Acre |
| Status: | Active |
| Acres: | n/a |
| Lot Size: | n/a |
| Horse: | Not Allowed |
| Water: | City |
| Water Amen.: | Yes |
| Forest: | No |
| Mobile/Manu/Mod: | Not Allowed |
| Topography: | n/a |
| Zoning: | Other, Res |
| Subdivision: | Cattail Creek |
| Address: | L7 B9 Cattail Creek Blackbird |
| City: | Bozeman |
| State: | MT |
| Zip: | 59718 |

**No Image Available At This Time**

**Description**
RARE FIND. LARGE CITY LOT LOCATED ON THE PARK. CREEK, WALKING TRAILS AND POND BACK UP TO THE LOT. GREAT MOUNTAIN VIEWS. GREAT LOCATION.

**Domestic Water:**
- City

**Electricity:**
- To Lot

**Natural Gas:**
- Available

**Road:**
- Paved

**Sewer:**
- City

**Telephone:**
- To Lot

**View:**
- View Of Mnts
- Pond/lake

Search results are produced through the Southwest Montana Multiple Listing Service, Inc.
All information is provided exclusively for consumers' personal, non-commercial use and may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing. Information is deemed reliable but not guaranteed and should be independently verified. Data updated nightly.
© Southwest Montana Multiple Listing Service, Inc

**IDX by Cevado Technologies**

**Listing courtesy of:**
COLDWELL BANKER RCI RLTY
KADE EMBRY
2621 COLLEGE
BOZEMAN, 59718

**COMMISSION RESOLUTION NO. 3486**

**A RESOLUTION OF THE CITY COMMISSION OF THE CITY OF BOZEMAN, MONTANA, ADOPTING A NEW GROWTH POLICY FOR THE BOZEMAN PLANNING AREA KNOWN AS THE *BOZEMAN 2020 COMMUNITY PLAN*.**

**WHEREAS,** the City of Bozeman has established a Planning Board pursuant to Section 76-1-101, MCA, and

**WHEREAS,** the City Commission of the City of Bozeman, Montana requested the Planning Board to undertake the preparation of a growth policy for the City of Bozeman, and

**WHEREAS,** the City of Bozeman Planning Board caused to be conducted extensive forums for public participation to identify areas of community concern, and

**WHEREAS,** the City of Bozeman Planning Board has prepared a new growth policy designated as the *Bozeman 2020 Community Plan* to supercede the *1983 Bozeman Area Master Plan* and the *1990 Bozeman Area Master Plan Update*; and

**WHEREAS,** the Planning Board has prepared the new growth policy pursuant to the requirements for growth policies established by Section 76-1-601, MCA; and

**WHEREAS,** the Planning Board conducted three public hearings on the proposed new growth policy, as required by Section 76-1-602, MCA, on April 10, 2001, April 12, 2001 and May 17, 2001, and considered the recommendations and suggestions elicited at said hearings; and

**WHEREAS,** the Planning Board found that with amendments the proposed growth policy constitutes an improvement to the *1983 Master Plan* and *1990 Master Plan Update* and complies with the requirements of state law, and

**WHEREAS,** subsequent to its public hearings, the Planning Board, by Resolution, recommended adoption of the *Bozeman 2020 Community Plan* with accompanying amendments as the City's official growth policy; and

**WHEREAS,** the City Commission held a public hearing on September 10, 2001 for the purpose of receiving public testimony regarding the Planning Board's recommended draft of the *Bozeman 2020 Community Plan*, and

**WHEREAS,** the City Commission deems it necessary for the purpose of updating the Community Plan and complying with the content requirements of growth policies established by Section 76-1-601, MCA, to adopt a new growth policy; and

**WHEREAS,** the City Commission found that with amendments the proposed growth policy constitutes an improvement to the *1983 Master Plan* and *1990 Master Plan Update* and complies with the requirements of state law, and

**NOW, THEREFORE, BE IT RESOLVED** by the City Commission of the City of Bozeman, Montana, that:

### Section 1

That the growth policy for the Bozeman Planning Area as prepared and submitted by the Bozeman City Planning Board by that document designated *Bozeman 2020 Community Plan*, as amended by the Planning Board by Resolution No. P-9851, which Resolution by reference is made a part hereof and incorporated herein, and as further amended by the City Commission on September 10, 2001, and as further emended by the City Commission on October 15, 2001, said amendments being set forth in the document, be and is hereby adopted as the Growth Policy for the Bozeman Planning Area pursuant to Section 76-1-604, MCA.

## Section 2

That the attached maps, including the official Community Plan Land Use Map, plans, and policies, as currently adopted and as amended from time to time, together with all matters and things shown on such maps and articulated in such plans and policies, are adopted and approved, incorporated herein and made a part hereof and collectively shall constitute the official Growth Policy.

## Section 3

**Directive.**

That staff is directed to prepare a presentation draft of the adopted text and map to facilitate the use of this growth policy by the public.

## Section 4

**Severability.**

If any provisions of this growth policy or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect the other provisions of this growth policy which may be given effect without the invalid provision or application and, to this end, the provisions of this growth policy are declared to be severable.

## Section 5

**Savings Provision.**

This growth policy does not affect the rights of duties that matured, penalties and assessments that were incurred or proceedings that began before the effective date of this resolution. The amendment of any map, plan, or policy which has heretofore been adopted and incorporated into the official Growth Policy, or the adoption of any subsequent map, plan, or policy, to the extent inconsistent or in conflict with the official Growth Policy, shall not operate as an amendment, repeal, or partial repeal of the official Growth Policy.

## Section 6

**Effective Date.**

This growth policy shall be in full force and effect upon passage.

PASSED AND ADOPTED by the City Commission of the City of Bozeman, Montana, at a regular session thereof held on the 22nd day of October 2001.

MARCIA B. YOUNGMAN, Mayor

ATTEST:

ROBIN L. SULLIVAN
Clerk of the Commission

APPROVED AS TO FORM:

PAUL J. LUWE
City Attorney

- 2 -

## COMMISSION RESOLUTION NO. 3630

**A RESOLUTION OF THE CITY COMMISSION OF THE CITY OF BOZEMAN, MONTANA, ESTABLISHING AN AFFORDABLE HOUSING POLICY FOR THE CITY OF BOZEMAN AND SUPERSEDING THE AFFORDABLE HOUSING POLICY PREVIOUSLY ADOPTED BY COMMISSION RESOLUTION NO. 3037.**

**WHEREAS,** the City Commission did, on the 19th of December 1994, adopt Commission Resolution No. 3037, establishing an affordable housing policy, based on the recommendations of its Bozeman Housing Task Force; and

**WHEREAS,** the Community Affordable Housing Advisory Board identified the need to amend the affordable housing policy to more accurately reflect current needs; and

**WHEREAS,** the City of Bozeman entered into an agreement with Bay Area Economics to conduct a study and submit recommendations for a new affordable housing policy; and

**WHEREAS,** Bay Area Economics submitted its recommendations to the City of Bozeman in May 2003; and

**WHEREAS,** the Community Affordable Housing Advisory Board subsequently modified those recommendations to more accurately reflect the community needs; and

**WHEREAS,** the City Commission, at its meeting on September 8, 2003, indicated general support for the recommended policy.

**NOW, THEREFORE, BE IT RESOLVED** by the City Commission of the City of Bozeman, Montana, that the Commission hereby adopts the ***Affordable Housing Strategies***, dated September 22, 2003, a copy of which is attached hereto as Exhibit "A" and by this reference made a part hereof.

**PASSED AND ADOPTED** by the City Commission of the City of Bozeman, Montana, at a regular session thereof held on the 22nd day of September 2003.

ATTEST:

STEVEN R. KIRCHHOFF, Mayor

ROBIN L. SULLIVAN
Clerk of the Commission

APPROVED AS TO FORM:

PAUL J. LUWE
City Attorney

# Exhibit Q:

## AFFORDABLE HOUSING STRATEGIES
### September 22, 2003

**Strategy I.**     ***Housing Affordability Guidelines***
1. The City will use the HUD Gallatin County Area Median Income (AMI) or, if supplied, the HUD City of Bozeman Area Median Income (AMI).
2. Using HUD definitions, households shall pay no more than 30% of their gross annual income towards their housing payment.
3. Bozeman's Standard Housing Affordability Income Guidelines for homeowners are 61-100% of the AMI.
4. Bozeman's Standard Housing Affordability Income Guidelines for renters are 40% to 60% of the AMI.

**Strategy II.**     ***Regulatory and Process Reforms***
1. Major site plans with no deviations can be approved by City planning staff.
2. Concurrent development of infrastructure and housing should be allowed for affordable housing in appropriate situations.
3. Whenever practical, all City Departments will give priority to projects that exceed affordability requirements.
4. As opportunities arise, City Staff will explore ways to reduce development costs without compromising the livability and quality of the neighborhood.
5. The City will continue to work with the legislature to revise subdivision guidelines to encourage more dense development.
6. The City will develop systems to provide details on types of units being developed. Information gathered shall include inventorying vacant land, existing housing and buildings, and tracking new subdivisions in order to provide market information.
7. The City will invite the business/building community to suggest possible additional regulatory and process reforms and streamlining that would promote construction and rehab of affordable housing.

**Strategy III.**     ***Restricted Size Lots (RSL) & Restricted Size Units (RSU)***
1. As stated in the 2020 Plan, every residential annexation into the City of Bozeman of five acres or more, that is not zoned as Residential Suburban shall have a minimum net acreage density of 6-8 units when subdivided.
2. Every residential annexation of five acres or more that is not zoned as Residential Suburban shall have a minimum of 10% of the buildable net acreage dedicated to Restricted Size Lots (RSL) that are 4,000 to not greater than 5,000 square feet for single family household detached (SFD SHD) and 2,500 to 3,000 for single family household attached (ASF SHA) units when subdivided. The RSL shall be designated designation shall be recorded with on the final subdivision plat.
3. The total floor area of the unit built on an RSL (minus the garage) shall not exceed a ratio of 1:3.3. Units built on RSLs shall be known as Restricted Size Units (RSU). Example if the lot is 4,000 square feet the square footage of the house can not exceed 1212, or a ratio of 1 square foot of floor area per every 3.3 feet of lot.
4. In lieu of designating the required number of RSL for market sale with the final plat, the owner may provide a donation by fee-simple transfer of title of buildable donate developed RSLs to the City, on a one donated for three required basis with 1 fee simple transfer RSL being equivalent to 3 for market sale RSLs. The City will utilize donated RSLs or the proceeds of sales only for affordable housing.
5. In lieu of designating RSLs within the subdivision being annexed, annexed land being subdivided the owner may designate off-site comparable RSLs on

a one required for one replaced basis at a ratio of 1:1. The subdivision containing the off-site fee simple transfer RSLs cannot be comprised of more than 50% RSLs without prior City Commission approval. The off-site fee simple transfer RSL shall be established and transferred to the City not later than the time of final plat approval of the subdivision responsible for creating the fee simple transfer RSL.

6.  Within multi-household zoning districts and with approval from the City Commission, the area required for RSLs may be assembled into larger lots to allow construction of affordable housing complexes.

6~~7~~.  At residential annexation, in lieu of supplying the required number of RSLs, the owner may pay a "cash in lieu" fee to the City. The payment shall be calculated as the appraised value per square foot of developed land within that specific subdivision at the time of final plat approval ~~multiplied by 3,425 (the averaged size of a SFA or SFD) multiplied by the number of required RSL.~~ The cost per square foot shall be multiplied by 5,000 in single household districts and by 3,000 in multi-household districts for each required RSL. The appraisal cost shall be borne by the owner of the land being subdivided. The City will use payments in lieu of RSLs only for affordable housing.

7~~8~~.  City staff will give high priority to ensuring that RSL/RSU language is included in the Unified Development Ordinance as soon as possible in autumn 2003. This language will be subject to the sunset clause described in Strategy IX.

**Strategy IV.    Home Ownership Program**

1.  The City shall cause to be developed a down payment assistance program for home purchasers whose household income meets Bozeman's Standard Housing Affordability Income Guidelines.

2.  The down payment assistance program shall include components of home ownership education and counseling, information on mortgage products and affordable housing assistance programs, and referrals to developers of RSU.

3.  Families who meet the City's Standard Housing Affordability Income Guidelines, have completed the down payment assistance program, and qualify for a Class A Mortgage shall be known as target income purchasers.

4.  Households whose income is below Standard Housing Affordability Income Guidelines, but meet all the other criteria of a target income purchaser, may be considered for down payment assistance; however, the households must have additional financial assistance from alternate sources so that the amount of the City's down payment assistance does not exceed the amount generally supplied to target income purchasers.

5.  The City shall develop a system to track RSL and building permits for RSU so that target income purchasers can be notified when units are being developed.

6.  During the construction process, builders of RSU will give priority to target income purchasers who qualify to purchase the home.

7.  The down payment assistance program will work with local lenders and state, federal and private affordable housing programs to develop a variety of home ownership options and information packets for interested parties.

**Strategy V.    "Very Low-Income Units" Development Incentives**

1.  "Very low-income" is defined as housing that is affordable to households whose income is below the City's adopted Standard Housing Affordability Income Guidelines. Incentive developed housing is affordable to households whose gross annual income is below 60% of the AMI for for-sale-homes or 40% of the AMI for rentals.

2.  Conditional upon prior City Commission approval and funding availability, an affordable housing developer may enter into an agreement with the City to receive building permit fee waivers, waiver of other City fees, impact fee reimbursement, and/or financial assistance in exchange for developing very low-income units. The impact fee reimbursements, fee waivers, and financial assistance shall collectively be referred to as "Housing Development Incentives."

3. Although Strategy V is not limited to affordable housing developments, the Housing Development Incentives will need to be combined with another subsidy program in order to achieve affordability for very low-income households.

4. The City will reimburse the developer for the agreed upon amount of Housing Development Incentives upon occupancy of the very low income units and eligibility verification of the unit and occupant.

5. The affordability period for very low-income units shall be the greater of 20 years or, if the owner is participating in another public or private entity's housing program, the guidelines of that entity's program.

6. For-sale very low-income houses shall be tracked with a deed restriction.

7. Very low-income rentals shall be tracked through the City's property inventory system recommended in Strategy II.

8. The owners of very low-income rentals will annually submit eligibility along with a $25 fee per unit to the monitoring agency.  If the information is available from another monitoring source, the owner can substitute that entity's monitoring certification and pay no fee.

9. For-sale, very low-income units shall have the subsidy forgiven at the rate of 1/20th annually.  If the home is resold prior to the 20th year the owner shall repay a pro-ration of the subsidy to the City's affordable housing fund.

10. One and two bedroom units that are affordable to persons below 40% of the AMI shall be reimbursed at a rate of 100% of the Housing Development Incentives per qualifying unit.

11. Three and four bedroom, two bathroom units that are affordable to persons below 40% of the AMI, shall be reimbursed at a rate of 150% of the Housing Development Incentives per qualifying unit.

12. For units affordable to person below 30% of the AMI, Housing Development Incentives will be doubled.

13. No more than 50% of the units in a development may receive Housing Development Incentives.

**Strategy VI.    Additional Financial Contributions**

1. Alternative or additional financial incentives to for-profit and nonprofit affordable housing developers would be on a case by case basis as recommended by the CAHAB and approved by the City.  Examples would be land grants, low-interest loans, property tax abatement, and or infrastructure assistance.

2. The City will complete legal research to determine if property tax abatement is allowed for affordable housing projects under State law. If so, the City will make any changes necessary to local laws to permit this option to be made available.

3. The City will welcome any financial data made available by for-profit and non-profit affordable housing developers that will help the City determine the amount of financial incentives/assistance needed to make it possible for the private market to respond to the City's high-priority housing needs.

**Strategy VII.    City Participation**

1. The City of Bozeman will dedicate a minimum of $200,000 annually to the Community Affordable Housing Fund.

2. To assist with the annual affordable housing funding commitment, the City will dedicate at least 50% of economic development impact fees collected from Big Box stores to the Community Affordable Housing Fund.

**Strategy VIII.    City Land**

1. Should the City receive property of 10 acres or more not earmarked  for another use, a priority for the use of the property shall be a model subdivision designed to showcase the development goals of the 2020 plan.

**Strategy IX.** ***Biennial Review, Sunset Provision***

    1.    Biennially after adoption, the CAHAB, in conjunction with City staff, shall review the City's affordable housing priorities and strategies and make recommendations to the Commission as necessary to meet the City's affordable housing needs and goals, as identified in the ~~2020 Plan~~ City's adopted growth policy, the 2003 Housing Needs Assessment, and any subsequent needs assessments prepared for the City.

    2.    A sunset clause will be included in ordinances and code revisions adopted to implement strategies II and III to ensure mandatory review and timely revision of housing policies in response to changing housing needs. (The sunset clause should specify a five-year period or an alternate length of time to be determined through discussion among City staff, the City Commission, and the CAHAB, with public input from the building industry and other interested organizations.)

**Strategy X.** ***Business Plan, Long-term Funding Stream***

    1.    Upon City adoption of Affordable Housing Strategies and ordinances, the CAHAB will work with City staff to complete a business plan regarding annual and five-year budget needs; funding sources (grants, big box fund, general fund, housing loan repayments, etc.); staffing; and so forth.

    2.    The CAHAB will work with City staff, the City Commission, and interested organizations to create a reliable long-term funding stream for the Affordable Housing Fund, to ensure a base of predictable funding for the first-time home buyers' program and for rental housing. One intent will be to strive to reduce the level of City General Fund commitment necessary to maintain the City's affordable housing programs through diversification of funding sources and, if possible, eventual endowment of the Housing Fund.

    3.    The City, in cooperation with other interested organizations, will aggressively pursue grants to help with affordable housing.

**Strategy XI.** ***Additional Potential Actions for Research and Consideration***

    1.    The City will review the purposes of the Design Review Board and consider the advantages and disadvantages of redefining its purposes--such as shifting its development review responsibilities to staff--or eliminating the board. If the City chooses to redefine the role of the DRB, it will not eliminate DRB development review only for affordable housing projects, which need to receive the same degree of review as all housing projects.

    2.    The City will consider a guaranteed timeframe for review and approval of affordable housing projects.

    3.    The CAHAB, in cooperation with City staff, will assess establishing a residency requirement for the home buyers' program, and a possible provision regarding full-time students, and make a recommendation to the City Commission.

    4.    The City will research the legality of selling parcels of long-unused, perhaps impractically located or sized parkland, or of building affordable housing on them.

    5.    The City, in cooperation with any interested local organizations, will consider developing a kiosk or referral service for affordable units to make it easy for very low-income and low-income residents to find housing in their price range without developers of this housing needing to spend significant sums on marketing.



**City of Bozeman**

BUILDING INSPECTION DIVISION

20 E Olive St, Ste 208 * PO Box 1230
Bozeman MT 59771-1230
PH: 406.582.2931 * FAX: 406.582.2256

May 20, 2011                    Certified Letter Number 70071490000375897258

Peter Thompson
1627 W. Main St. Suite 155
Bozeman, Mt. 59715

Re: Building Permit #08-7435 at 2988 Blackbird Dr.

The purpose of this letter is to advise you that building permit #08-7435 expired on August 24, 2010, due to inactivity on the project. You are further advised that the temporary certificate of occupancy issued for the basement has been revoked by the Chief Building Official.

This letter shall serve as a **NOTICE OF VIOLATION** of the Administrative Rules of Montana, the Bozeman Municipal Code and State adopted 2009 Building Codes.

The 2006 International Residential Code Section R107 Temporary Structures and Uses, R107.1, states: *The building official is authorized to issue a permit for temporary structures and temporary uses. Such permits shall be limited as to time of service, but shall not be permitted for more than 180 days. The building official is authorized to grant extensions for demonstrated cause.*

The 2006 International Residential Code Section R110 Certificate of Occupancy, R110.5 Revocation, states: *The building official shall, in writing, suspend or revoke a certificate of occupancy issued under the provisions of this code wherever the certificate is issued in error, or on the basis of incorrect information supplied, or where it is determined that the building or structure or potion therof is in violation of any ordinance or regulation or any of the provisions of this code.*

This letter serves as a notice the 180 days have passed, therefore the certificate of occupancy issued for the basement has been revoked.

---

The last approved inspection for the house was on February 26, 2010, which means permit #08-7435 has expired.

Section 15.02.020 of the Administrative Rules of Montana and Section 105.5 of the 2006 International Residential Code states: *"Every permit issued shall become invalid if the work authorized by such permit is suspended or abandoned for a period of 180 days after the time the work is commenced.*

1 | P a g e

Bozeman Municipal Code and Administrative Rules of Montana, 15.02.020, C-2, states: *In order to renew action on an expired permit, a new permit shall first be obtained and the fee therefore shall be one-half the amount required for a new permit for such work, provided no changes have been made or will be made in the original plans and specifications for such work, and provided further that such suspension or abandonment has not exceeded one year.*

Bozeman Municipal Code and Administrative Rules of Montana, 15.02.020, C-3, states: *In order to renew action on a permit after expiration, (exceeding one year) the permit fee shall pay a new full permit fee.*

Since the expiration has not exceeded one year the fee to renew permit #08-7435 is one-half the amount, which equals $734.50.

The house has not received a final inspection or a certificate of occupancy, therefore use or storage of any kind in the house is a violation of the Bozeman Municipal Code and Administrative Rules of Montana, Section 1, F-2, 15.02.010, Move-in prior to issuance of a Certificate of Occupancy. *When an occupant moves into a structure prior to Certificate of Occupancy being issued by the building inspector, a re-inspection fee shall be assessed against the previously issued permit. Such fees are based on the extra time expended, multiplied by the building inspectors total hourly rate. This additional fee is to be paid to the Division prior to any further inspections being made by the building inspector to the site. The re-inspection fee is to be based on a minimum time of 2 hours,* which is $75.00 an hour, equaling $150.00.

The City of Bozeman would like to resolve this matter as soon as possible. Your cooperation is greatly appreciated. Please visit our office by June 3, 2011 to renew permit #08-7435. Failure to comply by June 3, 2011, will result in further fees being assessed.

Following the renewal of permit #08-7435, the building division will grant 30 days to complete the house, discontinue occupancy of the basement and remove the basement kitchen.

Thank you for your prompt attention to this matter,

Paula Frojae
Code Enforcement Officer, Building Inspection Division

Copy: Bob Risk, Chief Building Official

2 | P a g e

# Exhibit S.

**City of Bozeman**

BUILDING INSPECTION DIVISION

20 E Olive Street STE 208 • PO Box 1230
Bozeman, MT 59771-1230
Phone: (406) 582-2375 • Fax: (406) 582-2256

June 9, 2011

Peter Thompson, Property Owner
2988 Blackbird Drive
Bozeman, MT 59718

RE:   Building Permit Number 08-7435
      2988 Blackbird Drive

The purpose of this letter is to outline and strike an agreement between Peter Thompson and the City of Bozeman Building Division which will allow safe occupancy of a basement dwelling unit located under a new house that is currently under construction during the final construction phases of that dwelling which is located at the above referenced address.

Our intention is to work with the property owner in the attempt to approve a temporary occupancy of the basement dwelling unit and the garage as allowed by IRC Section R110.4 Temporary occupancy which states, *"The building official is authorized to issue a temporary certificate of occupancy before the completion of the entire work covered by the permit, provided that such portion or portions shall be occupied safely. The building official shall set a time period during which the temporary certificate of occupancy is valid."*

Please be advised that at this time building permit # 08-7435 is expired and that no occupancy or use of any kind is currently approved for the structure.

Because the above referenced structure is still under construction it is currently deemed to be unsafe and inappropriate for any use or occupancy.

IBC Section 116.1 Conditions states; *"Structures or existing equipment that are or hereafter become unsafe, insanitary or deficient because of inadequate means of egress facilities, inadequate light and ventilation, or which constitute a fire hazard, or are otherwise dangerous to human life or the public welfare, or that involve illegal or improper occupancy or inadequate maintenance, shall be deemed an unsafe condition. Unsafe structures shall be taken down and removed or made safe, as the building official deems necessary and as provided for in this section."*

Due to the unusual and extenuating circumstances involving this project, the building division is prepared to service the expired building permit for a period of 18 months (December 20, 2013) providing all of the following conditions are met.

The Structure;
1. The living area must be completely separated from any areas still under construction by a full one hour fire rated assembly.
2. The required exit from the living area must go directly to the exterior of the structure and may not pass through any areas that are still under construction.

Page 1 of 3

Exhibit S

3. All required smoke detectors in all areas of the structure, including areas still under construction, must be interconnected and fully operational.
4. No storage of any kind other than construction materials will be permitted in any area of the structure that has not been completed and passed the required final inspection.
5. The garage may be completed and used to store personal items not considered to be construction materials. A full one hour fire separation between the garage and the rest of the structure and a final inspection of the garage by the building division will be required prior to the garage being used for any storage purposes.
6. Complete all corrections resulting from the onsite inspection which occurred on June 8, 2011 that was conducted by Paula Frojae and Tim McGough. (See attached correction list)

   **All of the above conditions must be met no later than June 30, 2011.**

**The Plans;**

1. Provide a revised "as built" plans (2 copies) for the house and garage that incorporates all revisions and any deviations from the original approved set of plans.
   - All changes to the plans may be hand drawn but must be drawn to the same scale as the main plan sheet and must be fully dimensioned.
   - There will be no "red lines" on the revised plans and all revisions and deviations from the original plans must be clearly identified on the new revised plans by clouding the area where the change occurs. A narrative explaining the change may also be required.
2. The revised plans shall include complete plans for any decks that will be attached to the dwelling. The deck plans must include;
   - An accurate and fully dimensioned location on the site plan.
   - A section drawing from the foundation to the top of the handrails that identifies all structural components of the deck including the foundation.
   - Details for all structural connections including, foundation to post, post to beam, beam to floor joists, floor joists to ledger, ledger to house, and safety railings to the deck structure.
3. A building division plan review for the new "as built" set of plans is required. The fee for that review will be calculated on an hourly basis based on the building division hourly rate of $75 per hour.
4. Provide current mailing address and phone number to update building permit info.

   **All of the above conditions must be met prior to conducting any further inspections on this project, but no later than June 30, 2011.**

**Future Inspections;**

1. Even though the building permit has expired, all required inspections will be conducted and documented by the building division as if the building permit was valid for a period of 18 months which equates to December 20, 2013.
2. Inspection fees will be required for the remainder of the required inspections on this expired building permit. The inspection fee will be calculated on an hourly basis per the building division hourly rate of $75, with a one hour minimum. This inspection fee will also apply to onsite consultation requests. All inspection and consultation fees must be paid prior to being scheduled.

Page 2 of 3

# Exhibit S

3. During the 18 month agreement period the building division code enforcement officer will make a monthly site inspection to verify compliance with the fire and life safety requirements of this agreement. The $75 inspection fee will be waived for this monthly inspection.

This letter shall also serve as a **Notice of Violation** as required by IRC Section R113.2 Notice of violation which states, *"The building official is authorized to serve a notice of violation or order on the person responsible for the erection, construction, alteration, extension, repair, moving, removal, demolition or occupancy of a building or structure in violation of the provisions of this code, or in violation of a detail statement or a plan approved thereunder, or in violation of a permit or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation."*

The final inspection for the complete structure must be called for and completed on or before December 20, 2013.

If the final inspection has not been completed and the required certificate of occupancy has not been issued, a new building permit will be required for this project.

To obtain the new building permit, a new permit application package must be submitted and all applicable permit fees for the new permit must be paid. As part of the new permit application package, new plans that reflect the requirements of the current code that is effect at the time of the new permit application.

I agree to the conditions and timelines as listed above:

_____     6/9/2011
Peter Thompson, Property Owner          Date

I have received but do not agree to the conditions and timelines listed above:

_____     NA / BR
Peter Thompson, Property Owner          Date

_____     6-9-2011
Bob Risk, Chief Building Official- City of Bozeman          Date

Page 3 of 3

Peter Thompson
2988 Blackbird Drive
Bozeman, Montana 59718.

Cell Phone 406-570-0268                                    Email: Thompson0089@msn.com

Friday, March 23, 2012                                     Delivered by Hand

Cattail Creek Community Association
Travis Munter, President

406 581 9663

Dear Sergeant Munter, Badge # 151;

Recently, I was at the courthouse doing some research and was surprised to find the attached lien document(see attachment A).

As we do check our mail at the address above regularly and somewhat frequently at a mail box service located at 1627 West Main Street, I went directly to our west main street mail box and found no notice of service there.

So we have received no notice of service of lien as your representative Nathan Minnick has asserted in his lien filing and it was pure happenstance that I have received it.

However, provided your lien dated 02/16/2012, included nothing but the document attached herewith; you can consider your lien document accurately recorded - as to and only in that we have obtained a copy of the lien recording, seen as attachment A. herewith.

Also attached herewith is attachment B. It is an excerpt from my recent letter to Above and Beyond Property Management discussing my issues that I feel were poorly handled by Cattail Creek Community Association when they occurred, remain unresolved today and have direct bearing on Mr. Minnicks lien filing.

In 2008 we received billing from Peak, including HOA dues for 6 months prior to the purchase of our lot; I set the bill aside and planned on giving them a call. In the mean time they left an unfriendly message on my answering machine threatening to file lien on my property if their bill was not paid immediately. We turned the other cheek and paid the bill without any protest.

June 10, 2009 Peak Property Management dated a letter threatening fines and held it until June 16th before mailing it(see attachment C), Peak's letter also threatened to come onto our property, take care of the weeds, bill me for the weeds and fine us 120 dollars if the work was not complete by June 22nd. Again we turned the other cheek, I paid extra for fast acting Roundup and got weeds sprayed. I drove by the day before Peak's deadline and saw the weeds were burnt and wilting. I was relieved we had met the deadline: Next week when I got back to work on the house, the lot was mowed. Later I received a 200 dollar bill from the city for the mowing. Again we turned the other cheek and paid the bill.

Having someone enter your private property and do damage is more than frustrating.

The weeds were mowed so short we had to take the top 6 inches of dirt off all the mowed areas to remove the underground roots and then sort out the grub pile and regrade the entire lot. Our plan had been to Roundup the weeds killing them and then with their upper plant material still in place, we could canvas the lot with skid steer and all weed and root material would clean up easily. This approach would have avoided forcing us to grub the entire lot and regrade. Again, we turned the other cheek and moved on.

For a while the Cattail Creek Community Association seemed to be leaving us alone, then in October of 2010 they started up again with door hangers. I called Peak and spoke with someone – see comments in attachment B about this.

For another while, the Cattail Creek Community Association seemed to be leaving us alone.

Then mid summer of 2011 they started up again. See attachment B

Instead of getting the written response requested and assured from Above and Beyond as described in attachment B:

Officer Rick Musson Badge # 166 arrived at my house secretly wearing a wire and recorded his interrogation of me with an accusatory style of questioning, pointedly asking my wife and I about vandalized trees in the Park.

Being interrogated in my driveway while the neighbors(some board members) watched and probably sniggered smugly, was a very public and humiliating experience for my wife and I. We have similar feelings when I search the internet and find copies of Nathan Minnick's flawed work done on the behalf of Cattail Creek Community Association.

After getting the runaround, at the PD while asking for a copy of Musson's report and making 3 different trips and requests, eventually on July 8, 2011 Judge Holly Brown issued a court order for the Police Department that you work for, to release officer Musson's report to me.

Around this time I did also obtain a copy of the police report we filed regarding vandals who had developed the habit of throwing eggs at our house and cars.

When I went to Above and Beyond, I was giving notice of complaint and fair warning that we felt wronged and would seek legal remedies if Cattail Creek Community Association continued with their selective enforcement of covenants. In an effort to openly resolve the problem without legal remedies; I specifically asked for a written response as a way of documenting issue and getting it resolved. Twisting this effort around to making me a person if interest in cutting down 18 trees in the park is ridiculous and can only be seen as passive aggressive behavio  by petty and mean spirited people.

Deliberately choosing not to make a written response to issues as requested and filing a lien without making any effort resolve problem thru direct communication, can also been seen as the actions of bullies and or petty and or mean spirited people.

Knowing Above and Beyond to be professionals, we are certain they relayed all issues to you personally as detailed in the attached letter. It is apparent to us that you and the Cattail Creek Community Association were frustrated about being challenged regarding the fairness of your actions against us. We can see that you failed to make a direct response and instead the Cattail Creek Community Association slandered us to the police department and this resulted in the humiliating interrogation in our driveway in front of your fellow board members.

For years now, my wife and I check our house and cars for eggs, we often look at our door knob with a sinking expectancy and sense of dread when ever we pull in into the driveway; we cannot help but to wonder what will come next. Additionally, we cringe with a twinge of fear as we see the daily black and white patrols of the neighborhood as we wonder what the Cattail Creek Community Association might imagine to slander us with again. Especially, now that, in lieu of any proper written response from Cattail Creek Community Association, we are making our own efforts to directly call you out and address this issue formally and in writing.

---

Does the Cattail Creek Community Association wish to withdraw your threat to enter our private property, take actions necessary to improve the appearance of our private property to bring it in compliance as threatened in your 4-28-2011 letter? I feel  compelled to ask as this same letter also included the other

EXHIBIT 1.

threat that you have recently raised by you to fine us for the use of our horse trailer on our active and permitted construction site.

---

Again, for a while the Cattail Creek Community Association left us alone, but recently we have received a series of door hangers, some threatening fines via community member Peter.

We will reply specifically to each item that I recall from the recent rash of door hangers via Cattail Creek Community Association's representative. Community Team member Peter

1: X Remove RV, trailer, boat or snowmobile from housing community.

    A: See attachment B – Issue previously discussed with Peak via phone stating we were then and are now a permitted construction site and use of horse trailers for construction related work is common.

    B: See attachment B – Issue previously discussed with Above and Beyond Property Management and I have been waiting for your written reply since June of 2011.

    C: We are in Montana, Gallatin County, where there have often been more horses than people, is a horse trailer parked in a driveway really an issue? The city of Bozeman, I think of as one of the most overbearing small governments I have ever seen. Does the city have rules against parking a horse trailer in a driveway?

    D: Would you stop harassing me about the horse trailer if I park it on the road?

2: X other Remove Storage Container + Clean up wood pile

    A: storage container – Issue is similar to horse trailer and the answer provided Peak in 2010 should have sufficed thru today. Answer previously provide Above and Beyond in 2011 is just as good and should suffice thru today. Again here in writing for your easy reference is an answer that should suffice into the future. We are currently under construction and use of horse trailers and or containers on construction sites is common.

    B: Storage container will not remain on site when construction is complete.

    C: the wood pile is a mystery to me. I have seen others around the neighborhood for years and do not recall them being addressed in the covenants. When we first received notice threatening fines about the wood pile, I was out of town and my wife was very upset about the notice of fine. I told her, you have a bad back, there is nothing in the covenants about wood piles, other wood piles are in sight from our house; do nothing and I will handle it when I get home.

    D: By the time I came home the wood pile had been carried inside. Several weeks later we again received a door hanger threatening a fine for the now nonexistent wood pile.

    E: Please provide some more information on Cattail Creek Community Association's issues with wood piles in general and specifically how it relates to the one on my property when it was outside of the garage and explain why Cattail Creek Community Association threatened to fine us when the wood pile was inside the garage.

    D: Does Cattail Creek Community Association have rules against wood stoves and or wood piles; that I might be unaware of?

---

For the record, if you send a bill to the address previously stated in 2010 to Peak Management, again in 2011 to Above and Beyond Management and contained here in the header of this letter and this bill was for dues only and your bill provides an accounting of past payments received from me back thru 2008, I would pay it in full within 60 to 90 days.

Furthermore, if you continue to send bills to the address described in the paragraph above for dues only, I will continue to pay them promptly.

Essentially, we are unwilling to pay late fees for bills, sent to the wrong address which we have not received. We are unwilling to pay fines or late fee's regarding any issues that we have previously addressed (as stated in attachment B) that you have failed to make a direct response to since July of 2011.

Sincerely
Peter Thompson



## NOTICE OF CLAIM OF LIEN

MINNICK MANAGEMENT, INC., 2339 Birdie Drive, Bozeman, MT 59715, on behalf of the CATTAIL CREEK COMMUNITY HOMEOWNERS ASSOCIATION, does hereby claim a lien upon the real property located hereinafter described: 2988 Blackbird

THAT said lien is claimed as security for the payment of delinquent assessments for the dues for the CATTAIL CREEK COMMUNITY HOMEOWNERS ASSOCIATION for the following address:2988 Blackbird

THAT the sum of $475.00 (four hundred seventy five dollars) is now due, unpaid, delinquent and owing to said Association, and that the amount of $200.00 (two hundred dollars) per year plus any and all fees shall continue to accrue until paid;

THAT said lien is claimed in said amount upon the following real property situated in Gallatin County, Montana, described as follows:

Property address: BLACKBIRD DR, BOZEMAN MT 59715
Subdivision: (CC2) Cattail Creek Subdivision Phase 2A & 2B Lot: 7 Block: 9
TRS: T01 S, R05 E, Sec. 35
Legal: CATTAIL CREEK SUB PH 2A & 2B, S35, T01 S
R05 E, BLOCK 9, Lot 7, ACRES 0.237, IN
W2, PLAT J-399 PLUS OPEN SPACE

THAT Peter Thompson 665 Sycamore Lane Bozeman MT  59718 at the time said assessments became due, and now are, the owners of said real property; that they have been timely notified that said assessments were due and payable and that they have failed and refused to pay the said assessments.

## CERTIFICATE OF SERVICE

Notice of the Lien Assessment was provided as required by the Declarations, to Peter Thompson by U.S. Mail on February 10, 2012.

Nathan Minnick
President of Minnick Management, INC
Manager for Cattail Creek Community
Homeowners' Association

Peter Thompson
2988 Blackbird Drive
Bozeman, Montana 59718

Cell Phone 406-570-0268                                      Email: Thompson0089@msn.com

Wednesday 3-21-2012

Above & Beyond Property Management                    Delivered by Hand
Bozeman, MT 59718
406 551 – 2093

To whom it may concern:

I was in and spoke with one of your folks, probably Alisha late May maybe early June of 2011.

I was at your office in response to letter endeavoring to enforce covenants against me in ways that I felt were unfair and not correctly interpreted and also to provide my correct mail address for the second time, so as I might receive mail from the HOA when it was sent to me.

The topics we discussed are as follows:

I was frustrated with previous Property Management company as I had already given them my change of address over the phone and mail still went to a house that sadly had been foreclosed on in 2010; almost a full year in the past.

I was asking for copies of any door hangers from Peak as I could not find them and was collecting information to present to a lawyer to talk about selective enforcement of the covenants constituting harassment.  - Alisha made a good effort but found none.

I remember calling Peak back about the door hangers and telling them I was a permitted construction site and the neatest one I had ever seen and my feelings were hurt that they felt otherwise.  I was told I would get call back from person who set door hanger to hear their point of view – I never did hear anything back.

We talked about timing and construction: One year to complete

I pointed out that first off, during plan review – I had told Rob Pertzbourne, my estimate showed 18 months of construction time if I managed to work 60 hours per week.  In conversation Mr. Pertzbourne, was friendly and helpfull pointing out that the covenants had a clause that said if city rules conflicted with covenants, city rules superseded covenants.  So as long as I had active building permit there was no issue and even so there were other building out there that had taken longer than a year.

I gave some examples of projects in area that I had noticed taking more than a year to Alisha in this meeting:

In effect I feel I had given you fair notice that I would see continued notice of Timing and Construction complaints as harassment.

I went to my car and drug up the covenants I had received at closing and pointed out that they were different than the ones Alisha was showing me in your office.  As I recall the ones in your office said more like no trailers.

The ones I had said no recreational vehicles and I felt it was a stretch to apply rules about recreational vehicles to trailer .

I showed pics of many other trailers in area and also pointed out that even if we were talking about no trailers, my pics showed other trailers in place for years and that typically voids the

covenants and is pretty much the definition of harassment via selective enforcement of the Covenants.

In effect I feel I had given you fair notice that I would see continued notice of Trailer complaints as harassment.

I showed Alisha our address and she noticed it was the address where these complaints had originated. I pointed out we had been receiving our mail at this address since 2009. Ironically, now in 2012 the HOA continues to send their mail for me else where.

Somewhere in the meeting I pointed out that my trailer remained on site and if I was to be fined over it please do it soon so I would know to proceed with defending myself.
At the close of the meeting I asked for a written reponse to the issues and heard I would have a response in about a week.
I assume someone at your office gave an accounting of our meeting similar to my note above directly to Travis Munter.
I have never received an letter from your office regarding these issues after our meeting. I assume the response was left for Travis to handle – Please clarify who you told about our meeting and how you were instructed to handle my expected response.

Recently while at the Courthouse doing research on another matter, I noticed Minnick had filed a lien on my house.

The lien claimed to have given notice via mail, but this was the first I had heard of it.

This lien appears to have nothing but late fee's for bills I did not get and also includes a fine based on your letters to me discussed above – Hence, this long and detailed note to you looking for help and information.

Thanks for your time in hearing me out your patience and help
Sincerely
Peter Thompson

Dear Current Homeowner:

As a community, we are striving to keep Cattail Creek Community a beautiful community you are proud to call home and we need your help.

Per State Law and the declarations and bylaws, "the landowner shall be responsible for the control of the state and county declared noxious weeds on his or her own lot. Both unimproved and improved lots shall be managed for noxious weeds."

Additionally, we are asking you to make sure all debris including construction material, trash, concrete chunks, boards, pallets etc. are removed and cleaned up.

Please have your lot sprayed and mowed by June 21, 2009. On June 22, 2009 we will be re-inspecting Cattail Creek Community for both the weeds and debris clean up. If this problem has not been properly resolved, Cattail Creek Association will have your lot sprayed and controlled with all costs being assessed to your account, along with a fine of $120.00.

Thank you for your prompt attention to this matter and for your help in keeping Cattail Creek a beautiful community to live in. Please feel free to submit your questions or comments in writing through email or postal service, and I will forward them to the Board of Directors of Cattail Creek Community Association.

Sincerely,

Sheila Forsythe
Peak Property Management
on behalf of the Cattail Creek Board of Directors

EAK
MANAGEMENT

F Ste. B
'18

$ 000.44

Peter Thompson
665 Sycamore Lane
Bozeman, mt 59718



# City of Bozeman
## City Attorney's Office

*Tim Cooper, Staff Attorney*
*Susan L. Wordal, Staff Attorney*
*Kyla Murray, Staff Attorney*
*Ryan McCarty, Staff Attorney*
*Anna Saverud, Staff Attorney*

March 15, 2013

**HAND DELIVERED**

Peter Thompson
2988 Blackbird Drive
Bozeman, MT 59718

RE:  Building Division violations at 2988 Blackbird Drive

Mr. Thompson,

The agreement you signed with Chief Building Official Bob Risk on June 9, 2011 allowed you to continue work on the structure at the above address without a current building permit. Now that the agreement has expired you must obtain a new building permit to do any additional work on the structure. Any work on the property after December 20, 2012 without a valid building permit is a violation of International Residential Code (IRC) § R105.1 (2006).

In addition, the agreement allowed you to occupy the basement of the structure with a temporary certificate of occupancy. Now that the agreement has expired, you are occupying the structure illegally pursuant to IRC. § R110.1.

Violations of the International Residential Code are enforceable against the property owner for *each day a violation exists.*  §10.02.010 Bozeman Municipal Code. Violations of the Bozeman Municipal Code are subject to the municipal code's general penalty:

§1.01.210 General Penalty for Code Violations.

> Unless otherwise specifically provided in the Bozeman Municipal Code, any person, firm or corporation, their agents or servants, who violates any of the provisions of the Bozeman Municipal Code shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine in any sum not exceeding $500.00 or by imprisonment for a period not exceeding six months, or both such fine and imprisonment, and in addition shall pay all costs and expenses of the case. *A separate offense shall be deemed committed upon each day during or on which a violation occurs or continues.*

In order to come into compliance with the International Residential Code, you must immediately comply with the following. You must obtain a new building permit for 2988 Blackbird Drive from the Building Department by March 29, 2013. Along with the issuance of the building permit the City will issue you a new temporary certificate of occupancy for the basement only. This certificate will not include the deck or the use of any other part of the house. This temporary

*Street Address: 121 North Rouse*
*Mailing Address: P.O. Box 1230*
*Bozeman, Montana 59771-1230*

*Phone: (406) 582-2309*
*Fax: (406) 582-2302*
*TDD: (406) 582-2301*

certificate of occupancy will be valid for no more than 30 days after issuance of the building permit. At the end of this 30 day period you must have obtained a final certificate of occupancy FOR THE ENTIRE STRUCTURE.

If you fail to comply with any of the above, a criminal complaint will be filed against you. A separate criminal complaint may be filed each day that the offenses continue. If you fail to obtain a new temporary certificate of occupancy by obtaining a building permit by March 29th or if you fail to obtain a final certificate of occupancy, in addition to filing criminal charges against you the City will seek a court order requiring you to vacate the entire structure.

At the time of applying for a new building permit you must make an appointment with the Chief Building Official Bob Risk. You can contact him at 582-2377.

Sincerely,

BOZEMAN CITY ATTORNEY
Kyla C. Murray
City Prosecutor

cc:    Bob Risk, Chief Building Official

Cattail Creek Homeowner's Association
PO Box 1254
Bozeman, MT 59771-1254

July 1, 2007

Dear Fellow Owners:

As many of you know, there was an unsuccessful attempt in July 2006 to combine all three phases of the Cattail Creek Homeowner's Association boards into one association. Since then, the three volunteer boards of directors have attempted to lay the foundation for the three separate HOA's. Unfortunately, there have been many stumbling blocks to this process. There has been massive duplication in setting things up. Many of the vendors and service contractors we will need to deal with are not willing to work with three different associations, billing each HOA for their respective portions under the same contract. We also feel that by combining the three phases into one HOA, the yearly dues can be kept to a minimum.

These issues among others, have brought the boards and the developer back to you, to ask you to please reconsider the issue of combining the three phases and associations into one association, and making minor revisions to the covenant documents by combining them into one document which applies to all phases. Last year's vote was almost unanimous in favor; the only reason the vote did not pass was that the required percent of homeowners in each phase did not respond. If 75% of the owners in each phase had responded, the vote would have passed. This made sense last year, and after struggling with the problems and issues this year, it makes even more sense now.

The covenant document changes will be kept specifically to a minimum. The only changes that will need to be made relate to the Design Review fees (having the same fee for all design reviews in Cattail Creek) and changing the number of the board of directors. A proposed copy of the revised documents is available for your review; you may contact Sandi Rummel (586-4426) or Allison at Instrisik, 111 E Tracy, 582-8933 for a copy of the documents. These changes, concerns or questions you have, and any issues for the upcoming year will be addressed at a meeting to be held on August 7, 2007 at 7:00 pm at the Wingate Inn. This will also give you an opportunity to meet the current volunteer boards of directors.

Please do not hesitate to contact us with any questions. Ballots may be returned in the enclosed self addressed, stamped envelope and must be received no later than August 15. Your ballot may be turned in at the meeting on August 7 at the Wingate Inn. If we have do not receive your ballot before August 7 or at the meeting, we will be contacting you. On August 15, the current boards of directors will count the ballots.

Thank you for your prompt response to this matter. While things are moving along in Cattail Creek, everyone has an active part in us becoming a community.

| | | | |
|---|---|---|---|
| Jaymie Hauer | 585-9885 | Mark Niemi | 556-4694 |
| Lola Jeffers | 624-6024 | Sandi Hamilton | 580-4364 |
| Sandi Rummel | 586-4426 | Dan Madison | 580-4451 |
| Sonny Greer | 581-1312 | Justin Tribitt | 539-1062 |

July 7, 2007

Dear Property Owner:

SANDAN is extremely pleased with progress of Cattail Creek Subdivision as one of Bozeman's nicest subdivisions. At this time we have three HOA's in place and we would like to combine the three into one. We attempted to set up one HOA last summer, but we were not able to obtain the 75% total ownership to qualify for one HOA. SANDAN and the current Phase 1-3 Board of Directors have discussed the issues and have determined it is in the best interest of the neighborhood to have one HOA. We are working together to get the message out and to lay the groundwork necessary for what we hope will be a successful merge.

The HOA officers have met several times to discuss the establishment of one HOA for Cattail Creek Subdivision. We believe it would benefit all of the owners if we set up one HOA instead of three separate associations. The cost to each member would be less and the ease of maintaining one HOA instead of three would be very beneficial to everyone.

Our HOA dues cover the following cost:

1. Liability insurance
2. SANDAN Park and Cattail Creek Parkway maintenance
3. Taxes for the park and parkway
4. Well utilities
5. Irrigation pipe maintenance
6. Snow Removal
7. Miscellaneous expenses

If one HOA exists we believe we will be able to keep our HOA dues to a minimum. SANDAN and the current HOA officers anticipate the dues will be $120.00 per unit yearly, but if we have to maintain three HOA's the dues will likely be substantially higher. You will be billed for 2007 dues after we have voted on the HOA issue. Because Cattail Creek was established in Phases, there are three separate associations with the same responsibilities and obligations to cover the same areas.

If you have any questions, you may contact any of the following people to discuss the establishment of one HOA for all three phases of our subdivision.

| Jaymie Hauer | 585-9885 | Sonny Greer | 581-1312 |
| Dan Madison | 580-4451 | Mark Niemi | 556-4694 |
| Justin Tribitt | 539-1062 | Lola Jeffers | 624-6024 |
| Sandi Hamilton | 580-4364 | Sandi Rummel | 586-4426 |

We are enclosing a Cattail Creek Subdivision Ballot, Phases I, II and III plus a ballot for the combination of the three sets of covenants, by-laws and design regulations.

Please support this consolidation.

Thank you.

SANDAN, LLC


Sandra (Sandi) Hamilton                    Daniel S. Madison

Exhibit V.

September 18, 2007

Dear Cattail Creek Property Owner:

WE MADE IT!!!! We would like to thank everyone for their votes regarding combining the three phases of our homeowners association into one, we are now one association. Our official name is the **CATTAIL CREEK COMMUNITY ASSOCIATION.**

The covenants are being revamped by our attorney and as soon as we have them ready we'll send out another ballot for their approval. Hopefully this will happen within the next month or so, depending on how quickly she can get them done.

Enclosed is your bill for 2007, you may pay for 6 months or for the full year. We will send out future bills in December and June.

We might be looking for another board member from Phase II, so if you are interested in serving, please contact one of the current board members.

Our Cattail Creek dues are used for park maintenance, well utilities, repairs, snow removal, irrigation pipe maintenance, insurance and taxes, etc. These dues are separate from your regular condo dues that are for your individual condo association.

We are having a little bit of confusion as to the property addresses of some of the condos. The tax records show one address and the post office shows another address, so if your address is incorrect on our bill, please correct it and return it with your check.

If you have any questions, please contact one of your current board members that are listed below.

| Sandi Rummel | 586-4426 | Sandi Hamilton | 580-4364 |
| Mark Neimi | 556-4694 | Lola Jeffers | 624-6024 |
| Justin Tribitt | 539-1062 | Dan Madison | 580-4451 |
| Sonny Greer | 581-1312 | Jaymie Hauer | 585-9885 |

Thank you.

CATTAIL CREEK COMMUNITY ASSOCIATION

Sandi Hamilton, Treasurer

Exhibit V.

**Cattail Creek Community Association**
**PO Box 11842**
**Bozeman, Montana 59719**



CATTAIL CREEK
A Community Development
by Sanden, L.L.C.

January 25, 2008

Dear Owner:

After many months of review and revisions, the Cattail Creek Community Association documents, consisting of the Bylaws, Covenants and Design Regulations are ready! Enclosed please find your ballot for voting on the proposed changes as well as a stamped and addressed envelope for returning your completed ballot.

The Covenants and Bylaws were amended to reflect the combining of the three phases/HOA associations into one association. These edits include changes to the composition and duties of the Board of Directors, voting, membership interests, and assessments.

There are also several proposed changes to the Design Regulations. One of the changes is to establish the same design review fees for all phases. Previously, no design review fees were required in Phase 1, one design review fee was required for Phase 2, and another design review fee was required for Phase 3. With the combination of all three phases into one association, the same design review fee will apply to all three phases. Other changes include the clarifications to the design review process, the addition of an inspections procedure, and more user-friendly language.

The proposed documents need to be voted on by all property owners in all three phases of Cattail Creek Community Association. The documents are available in PDF format, and may be requested via email at cattailcreekhoa@hotmail.com. The documents will be sent via return email. In your email, please include your name and property address. Hard copies are also available to borrow or to purchase (at a cost of $5.00), and can be requested by contacting Intrinsik at 406-582-8988. Any questions on the documents may be addressed to board members, Jaymie Hauser at 585-9885 or Sandi Hamilton at 580-4364.

Please return your completed ballot in the enclosed addressed and stamped envelope. Please note; all ballots must be received no later than March 10, 2008. Please make sure you mail your ballot on time.

We have had several inquires regarding the vacant Board positions for Phase II. We are excited to meet with the interested candidates to fill these positions and have a full board serving our association.

Sincerely,

**Cattail Creek Community Association Board Members**

Sandi Hamilton, Dan Madison, Justin Tribitt
Lola Jeffers, Jaymie Hauser, Sandi Rummel