IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| PETER THOMPSON,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF BOZEMAN, a Montana<br>Municipal Corporation, et al.,<br><br>        Defendants. | CV 18–75–BU–BMM–KLD<br><br><br>**FINDINGS AND<br>RECOMMENDATION** |

This matter is before the Court on Defendants U.S. Bank, N.A., John Thorn,

Scott Blando and Wayne Hirsch's (collectively "US Bank") Motion to Dismiss

(Doc. 16).[1]  For the reasons stated below, the Court recommends the motion be

granted as to all claims against the US Bank Defendants.

## I.     Background

On November 30, 2018, Plaintiff Peter Thompson ("Thompson") filed an

18-page Complaint (with an additional 102 pages of attachments) alleging various

constitutional violations and torts against numerous defendants.  (Doc. 1).  On

January 21, 2019, Thompson, who is appearing pro se in this action, moved the

---

[1] Defendants Blando and Hirsch moved the Court to join Doc. 16 on April
17, 2019 and May 1, 2019, respectively (Docs. 22 and 39).  Those motions are
granted.

Court to vacate the previously scheduled Preliminary Pretrial Conference and extend the time for service, stating that he needed additional time to file and serve an amended complaint intended to improve the clarity of his pleading and ensure the appropriate parties were named.  (Doc. 7).  The Court granted this motion, and allowed Thompson until March 14, 2019 to effectuate service on all Defendants. (Doc. 8).  On March 14, 2019, Thompson filed his Amended Complaint, consisting of 104 pages and an additional 164 pages of exhibits.  (Doc. 9).  Summons were issued on March 15, 2019.

Although Thompson's Amended Complaint is lengthy and confusing, it appears that there are two primary issues with US Bank.  First, Thompson alleges US Bank joined a conspiracy to deprive Thompson of his civil rights by failing to provide him documents which might aid him in his ongoing battle with his homeowner's association and the City of Bozeman.  Second, Thompson alleges US Bank breached its contract with him and violated the implied covenant of good faith and fair dealing in its handling of his construction loan and two mortgages for property owned by Thompson.  Thompson alternatively pleads the contractual claim as an "alteration" to the contract, pursuant to Montana Code Annotated § 28-2-1703(1).

In 2008, Thompson purchased a lot from Richard Embry in Cattail Creek Subdivision Phase II, which is located in Bozeman, Montana.  The subdivision had

both low-density, single family lots and medium-density, two family lots.  (Doc. 9-12 at ¶¶ 45-46).  Thompson intended to build a home for himself and his family, with a basement apartment on the lot he purchased.  Thompson's understanding at the time he purchased the lot from Richard Embry was that the lot was zoned R-2, which would allow him to build a separate basement apartment contained within the home he planned to build on the lot.

On July 2, 2007, the Cattail Creek Community Association's ("CCCA") apparent predecessor, the Cattail Creek Homeowner's Association, sent a letter to all homeowners in the subdivision.  (Doc. 9-8).[2]  The letter discussed how having three separate homeowners' association ("HOA") boards and three separate covenant documents (for the three phases of the subdivision) was unwieldy, and requested the property owners to vote on consolidation of the phase HOA boards into one board and combination of the covenant documents with some modifications of the existing documents.  Thompson alleges that sometime between late 2007 and 2008, Susan Swimley, a Bozeman attorney, met with members of the three separate HOA boards to conspire to develop a system or enterprise that could be used to defraud property owners within the Cattail Creek Subdivision of their right to use their property in a number of ways, including

---

[2] It is unclear from the parties' filings if the "Cattail Creek Homeowner's Association" was a different entity or simply a shorthand reference to the CCCA. For the purposes of this motion, it is not relevant.

accessory dwelling units ("ADUs").  This was allegedly accomplished by misleading the subdivision homeowners about the true intent of the change to the covenant documents, including removing the design regulations from the covenants.

In January 2008, the homeowners were provided ballots asking them to approve amendments to the covenants for the subdivision.  The ballots were counted at a meeting on March 26, 2008, and ultimately the Amended and Restated Covenants for Cattail Creek Phases 1, 2, and 3, Design Review Regulations for Phases 1, 2, and 3, and Bylaws for the CCCA Phases 1, 2, and 3 were approved by a 75% vote.  Notably, the ballots were sent prior to Thompson purchasing his property but counted and operative after Thompson purchased his property.

In May 2008, the CCCA Board filed amended and restated covenants, which applied to all three phases of the Cattail Creek Subdivision.  Thompson alleges the design regulations were separated out of the new, combined covenants in an attempt to conceal new restrictions on design regulations, including a limitation on the ability of homeowners to have ADUs within the confines of their structures, as Thompson was planning to do.

Over the next four years, Thompson had a number of significant issues relating to the construction of his home, including disputes over completion requirements, the re-zoning of his home from R-2 to R-1, and the expiration of

certificates of occupancy issued by the City of Bozeman.  In March 2012, Thompson contacted Allen Armstrong, who was the Gallatin County GIS manager, seeking confirmation that Armstrong had previously issued Thompson a second address, 2990 Blackbird Drive, for the ADU on his property. (Doc. 9 at ¶ 138). Thompson alleges that after confirming with the City of Bozeman that the property zoning, R-2, allowed a second street address, Armstrong issued Thompson the 2990 Blackbird Drive address.  (Doc. 9 at ¶ 140).  However, when Thompson sought confirmation of this fact from Armstrong in 2012, Armstrong could not locate official records of his prior verification of the zoning of Thompson's property and there was no record confirming that Armstrong had in fact issued the 2990 Blackbird Drive address to Thompson.  (Doc. 9 at ¶¶ 141 and 142).

In April 2012, Thompson contacted Scott Blando, the branch manager of the US Bank 19th Avenue branch in Bozeman.  (Doc. 9 at ¶ 147).  Blando had previously worked with Thompson at a different US Bank branch in Bozeman, and though he was now a manager, Blando still personally assisted Thompson with his banking needs.  (Doc. 9 at ¶ 147).  Thompson asked Blando to locate a copy of the check Thompson used to pay the Gallatin County GIS department for the issuance of the second address for his property.  However, Blando could not locate any such check copy.  (Doc. 9 at ¶ 147).

Thompson additionally alleges that US Bank, which he alleges to be in a

special relationship with him, inappropriately advised him about a mortgage loan for his new construction; secretly procured mortgage insurance to protect itself in the event of a default by Thompson; prevented him from renting out his prior home, located at 665 Sycamore Lane, to make payments on his various loans with US Bank; and advised him that it provided a construction loan program that included construction and permanent funding with one approval process.[3]

According to Thompson, John Thorn, whose relationship is not specified but who appears to be in some management position with US Bank, advised Thompson that a loan under this program would initially provide Thompson with a variable rate, interest-only payment while his home was being constructed, with a conversion to a 30-year, fixed-rate principle and interest payment after construction was completed.  (Doc. 9 at ¶ 199).  Thompson took Thorn's advice, and Thorn approved Thompson's loan on December 14, 2007.  (Doc. 9 at ¶ 201).  Thompson retained Martel Construction as the general contractor, but the Martel contract specified that Thompson himself would be doing the construction work on the home.  (Doc. 9 at ¶ 204).

When Thompson and Thorn met in February 2008 to review the Martel contract, they noticed that the contract, which was an AIA form contract, stated

---

[3] Thompson's factual allegations in relation to these claims are approximately twenty-three pages long.  The Court has read and considered all of the facts, and is simply summarizing them here.

that construction would be completed in one year.  Thorn advised Thompson that

there was no need to change the Martel contract, because US Bank would allow as

many extensions on the construction duration portion of the loan as Thompson

needed.  (Doc. 9 at ¶ 205).  Thompson intended to build his house himself, and the

"sweat equity" he was putting into the house would take him, by his own

estimation, "time measured in years."  (Doc. 9 at ¶ 206).  Thompson entered a

multi-phased construction loan package with US Bank in late February, 2008.

(Doc. 9 at ¶ 211).  Thompson alleges that although Thorn advised him that

Thompson himself did not need mortgage insurance, US Bank purchased mortgage

insurance to protect it from the risks involved with the loans it had extended to

Thompson.  (Doc. 9 at ¶ 213).

By 2010, Thompson owed approximately $625,000.00 in loans to US Bank,

and was having difficulty making payments on those loans.  (Doc. 9 at ¶ ¶ 216 and

218).  Thompson was able to secure an occupancy permit for the lower half of the

home he was building on Blackbird Lane, and asked US Bank for permission to

rent out his Sycamore home to help with the payments he owed to US Bank.  US

Bank denied his request.  (Doc. 9 at ¶ 219).  Thompson attempted to market and

sell the Sycamore property, which slowed construction on the Blackbird home.  He

also tried to arrange short sales for the Sycamore property, which US Bank denied.

Thompson and his family were evicted from the Sycamore property in late 2010,

and moved into the Blackbird property.  (Doc. 9 at ¶ 223).  Ultimately, US Bank foreclosed on the Sycamore property and sold it for less than the short sale offers Thompson had provided.  (Doc. 9 at ¶ 221).

In 2011, US Bank required Thompson to pay principal and interest payments on the remaining construction mortgage Thompson had taken out for the Blackbird property, even though the property was still under construction.  Thompson had understood that he would be able to exercise construction duration extensions while he was building the home, and would be able to simply make interest only payments during that time.

By 2016, Thompson was struggling to make his payments to US Bank, and he participated in consumer counseling, wherein he was advised to apply for the Home Affordable Modification Program ("HAMP").  (Doc. 9 at ¶ 233). Thompson filled out his application, which was denied by US Bank because he was current with his payments.  (Doc. 9 at ¶ 234).  Thompson wrote to US Bank to inform it that it was acting in bad faith by denying his HAMP application and to ask for a period of time in which he would be able to make interest only payments so he could complete construction on his home.  Thompson informed US Bank that it was in breach of its contract with him by not fixing the interest rate when it converted the construction loan to principal and interest payments, and he asked US Bank to fix the interest rate "in a manner consistent with the HAMP

modification that was applied for."  (Doc. 9 at ¶ 237).  US Bank replied that Thompson's entitlement to a long-term, fixed interest rate "was subject to criteria other than agreed to with Mr. Thorn."  (Doc. 9 at ¶ 238).

Thompson alleges US Bank abetted or joined a conspiracy to deprive Thompson of his civil rights by failing to provide him documents he requested from Scott Blando and thus aiding the City of Bozeman and other co-conspirators in its conspiracy to violate his due process and other civil rights.  Thompson alternatively alleges that the failure to find the bank documents was a breach of the covenant of good faith and fair dealing in the US Bank service agreement, done in in retaliation for an unrelated incident with Thompson's brother-in-law, Dave Katlaps.  Thompson also alleges US Bank breached its contract with him and violated the implied covenant of good faith and fair dealing by failing to extend the construction duration loan, by converting the interest rate and the loan terms, and by misleading him in written responses to his communications.  Thompson alternatively pleads the contractual claim as an "alteration" to the contract, pursuant to Montana Code Annotated § 28-2-1703(1).

Thompson seeks compensatory, nominal and punitive damages as well as a declaratory judgment that US Bank, by breaching its contract with Thompson, has extinguished all obligations under the contract.

US Bank moves to dismiss the Amended Complaint under Federal Rule of

Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  US Bank argues Thompson's federal claims are barred by the applicable statute of limitations, that his contract claims are barred by the statute of frauds and that his claim for breach of the covenant of good faith and fair deals fails because there is no applicable written contract.

## II.   Legal Standards

### A. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint will survive a motion to dismiss if it alleges facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory," then dismissal under Rule 12(b)(6) is appropriate.

*Mendiondo*, 521 F.3d at 1104.

In determining whether this standard is satisfied, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049, 1055 (9th Cir. 2008). Assessing a claim's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). However, a court may take judicial notice of "matters of public record." *Lee*, 250 F.3d at 688-89.

### B. Pro se Pleadings

Because Thompson is proceeding pro se the Court must construe his pleading liberally, and "however inartfully pleaded, [it] must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). *See also Neitzke v. Williams*,

490 U.S. 319, 330 n.9 (1989).  However, "pro se litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler,* 790 F.2d 1362, 1364 (9th Cir. 1986).  This means that "[p]ro se litigants must follow the same rules of procedure that govern other litigants." *King v. Atiyeh*, 814 F.2d 565, 576 (9th Cir. 1987).  Nevertheless, in the motion to dismiss context, courts are to construe pro se documents liberally and give pro se litigants the benefit of any doubt.  *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citation omitted).

In view of the required liberal construction, "a district court should grant leave to amend even if no request to amend the pleading was made, <u>unless</u> it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (emphasis added) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

## III.  Discussion

### A. State Law Claims

Construing the Amended Complaint liberally, it appears Thompson has potentially alleged contract-based claims against US Bank:  breach of contract and breach of the covenant of good faith and fair dealing, as well as contract "alteration."  US Bank moves to dismiss Thompson's state claims, arguing that the oral representations allegedly made to him are unenforceable and thus cannot be a

breach of a written contract.

## 1.  Breach of Contract

Thompson alleges US Bank breached its contract with him when it failed to continue providing him construction duration loan extensions and when it converted the terms of the loan by requiring him to pay principal and interest payments, as opposed to interest only.

Under Montana law, a mortgage or deed of trust "can be created, renewed, or extended only by writing, with the formalities required in the case of a grant of real property."  Mont. Code Ann. § 71-1-203.  A trust indenture is considered to be a mortgage on real property, and is "subject to all laws relating to mortgages on real property. . . ."  Mont. Code Ann. § 71-1-305.  A modification of an existing mortgage or deed of trust must be reduced to writing to be enforceable, unless the parties no longer have any obligation to act.  *Morrow v. Bank of Am., N.A.*, 2014 MT 117, ¶ 27, 324 P.3d 1167.  "An agreement to extend the time for repayment of a debt secured by a mortgage or deed of trust is within the scope of § 71-1-203, MCA."  *Morrow*, ¶ 28.

Thompson's breach of contract claims do not allege that US Bank breached its written contract with him; instead, he argues that by failing to act consistently with John Thorn's oral promises, US Bank is in breach of its loan agreement with Thompson.  However, Thompson's claim relies on oral representations made by

Thorn, not the specific written terms of the loan agreement itself.  The Amended

Complaint is replete with references to the advice given by Thorn and the

explanations Thorn made to Thompson prior to the execution of the loan

agreement.  For example, in Paragraph 205, Thompson alleges he met with Thorn,

who advised him that "there was no fixed limit on duration extensions of the

construction phase of the contract" and that Thompson could purchase additional

extensions in 6-month increments.  Thompson further alleges that the availability

of unlimited construction duration extensions was "the most important aspect of

the contract."  (Doc. 9 at ¶ 206).  Notably, however, Thompson does not state that

the contract actually contained such a provision; instead, he alleges that Thorn told

him as such.

In its motion to dismiss, US Bank correctly notes that it cannot be in breach

of an unenforceable oral contract for the financing of real property, without

evidence that the oral promises were reduced to writing.  In response, Thompson

argues that the Amended Complaint simply alleges that Thorn was explaining the

"fine print" of the contract.  In other words, Thompson alleges Thorn did not make

any oral modifications or promises; instead, he was explaining the actual written

terms of the contract.

The Court cannot discern exactly what the terms of the construction loan

contract were, as neither Thompson nor US Bank have provided a copy of the

document.  It could be that the contract itself supports Thompson's argument, or it could be that it supports US Bank's argument.  However, though Thompson's allegations regarding the actual terms of the loan agreement are confusing, it does appear that he alleged the existence of a contract with US Bank, "per the terms explained by and agreed to with US Bank's John Thorn," in the Amended Complaint.  (Doc. 9 at ¶ 211).  The Court cannot say, when construing the claim liberally and in the light most favorable to Thompson, that it lacks sufficient facts to support a cognizable legal theory.  Accordingly, US Bank's motion to dismiss Thompson's breach of contract claim should be denied.[4]

### 2.  Breach of the Covenant of Good Faith and Fair Dealing

Thompson alleges US Bank breached the covenant of good faith and fair dealing first when it failed to locate a check showing payment to the Gallatin County CIS department, and secondly when it failed to provide construction duration loan extensions, converted the payment terms and interest rate, and by misleading him in written responses to his communications with him about the loan terms.

The covenant of good faith and fair dealing is implied in every contract, and

---

[4] To the extent Thompson has claimed that the written loan agreement was altered by US Bank, he pleads no facts in support of that claim, and it is properly dismissed, subject to amendment.  The Court notes that neither party addressed this claim in briefing.

requires "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  Mont. Code Ann. § 28-1-211.  Under Montana law, the existence of a contract is a prerequisite for a claim of breach of the implied covenant of good faith and fair dealing.  *Morrow*, ¶ 31, citing *Knucklehead Land Co. v. Accutitle, Inc.*, 2007 MT 301, ¶ 18, 172 P.3d 116.

US Bank does not address Thompson's allegations regarding the breach of the covenant by Scott Blando's inability to find a check written by Thompson to secure the second address for the Blackbird Lane residence.  Thompson alleges that Blando violated the terms of a service agreement he had with US Bank when Blando did not find the check.  While Thompson has alleged the existence of an agreement, he provides no description or specificity about any terms in the service agreement that might have been violated by Blando's actions.  Thompson has not adequately alleged the terms of the service agreement, and in the absence of sufficient facts to support his legal theory, the Court recommends dismissal of Thompson's claim for breach of the covenant of good faith and fair dealing as it relates to Scott Blando, with leave to amend.

US Bank's argument regarding the remainder of Thompson's implied covenant claim is premised on its claim that Thompson did not adequately plead the existence of the loan contract and thus cannot bring a claim for breach of the implied covenant in the absence of a valid contract.  However, as noted above,

Thompson has adequately plead a breach of contract claim, and so US Bank's argument is not well-taken.  The Court cannot determine as a matter of law that Thompson's implied covenant claim, to the extent it is premised on the loan agreement, fails as a matter of law.

### B. Federal Law Claims

Thompson alleges that US Bank is part of the "ADU conspiracy," which he generally describes in the Amended Complaint as a conspiracy to prevent him from being allowed to use his property as he wished, specifically to construct an ADU on his property.  Thompson alleges this goal was accomplished by illegally changing the HOA documents, concealing the changes, and taking steps to prevent him from being able to either build the ADU or recover on a title insurance claim. As to US Bank, Thompson alleges that US Bank abetted the conspiracy by not locating and producing documents which would show the City of Bozeman was negligent in how it handled zoning documents.  (Doc. 9 at ¶ 196).

### 1.  42 U.S.C § 1983

Although it is not technically plead within the body of the First Amended Complaint, Thompson entitled the document "Title 42 Section 1983, 1985, 1986, 1988 Civil Rights Complaint with Alternative Pleading as Civil RICO Act Violations."  Thompson does not allege that he did, or intended to, bring federal civil rights claims, or a claim of conspiracy to violate federal civil rights, against

US Bank, so it is unclear to the Court whether such claims exist.[5]  Nevertheless, even if the Amended Complaint is construed liberally to incorporate such allegations, Thompson's civil rights claims are barred by the statute of limitations.

The statute of limitations for actions brought under 42 U.S.C. § 1983 is determined by looking to the forum state for the statute of limitations applicable to personal injury cases.  *Maldonado v. Harris*, 370 F.3d 945, 954 (9th Cir. 2004). Accrual of a civil rights claim is determined by federal law.  *Maldonado*, 370 F.3d at 955.  A federal civil rights claim "accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action."  *Maldonado*, 370 F.3d at 955 (citation omitted).  In Montana, the statute of limitations for personal injury actions is three years.  Mont. Code Ann. § 27-2-204.  Accordingly, Thompson had three years after he learned of, or had reason to know of, the injury which forms the basis of any civil rights claim under 42 U.S.C. § 1983.

Thompson alleges he asked Scott Blando, in April 2012, to search for a copy of a personal check written to the Gallatin County CIS department.  At that time, Blando could not find the check.  Thompson alleges Blando communicated with

_____

[5] The Court notes that Thompson would not be able to bring a claim under 42 U.S.C. § 1985, as such claims require a showing of racial or class-based animus, which has not been alleged.  *See Arres v. City of Fresno*, 2011 U.S. Dist. LEXIS 10425, * 28-29 (E.D. Cal. January 26, 2011).  In the absence of a § 1985 claim, Thompson cannot maintain a claim under 42 U.S.C. § 1986.  *Brown v. Contra Costa Cnty.*, 2012 U.S. Dist. Lexis 145431, * 28 (N.D. Cal. October 9, 2012).

co-conspirators and "chose to abet them by breaching his duty of good faith and fair dealing. . .by not putting forth the appropriate level of effort to find a copy of the check to GIS."  (Doc. 9 at ¶ 148).  By April 2012, when he asked for a copy of the check and did not receive it, Thompson knew of the facts giving rise to any potential ¶ 1983 claim.  Because he failed to bring his ¶1983 claim against US Bank within three years of that date, it is barred as a matter of law.

Thompson appears to argue that US Bank is responsible for actions long after its alleged conspiratorial act, and that because he alleges there is an ongoing conspiracy, his claim against US Bank is equitably tolled and should be allowed to proceed.[6]  This theory is inconsistent with Ninth Circuit law, which holds that "injury and damage in a civil conspiracy flow from the overt acts, not from 'the mere continuance of a conspiracy.'"  *Gibson v. U.S.*, 781 F.2d 1334, 1340 (9th Cir. 1984) (citing *Kadar Corp. v. Milbury*, 549 F.2d 230, 234 (1st Cir. 1977)).  Accordingly, "the cause of action runs separately from each overt act that is alleged to cause damage to the plaintiff."  *Gibson*, 781 F.2d at 1340.  As a result, "separate conspiracies may not be characterized as a single grand conspiracy for

---

[6] Thompson also appears to allege in his response that he believes a "bait and switch" was pulled by US Bank involving a different contract than the one he actually signed.  However, the contract signing was in 2008; even if those facts are true, Thompson signed the contracts in 2008 and knew, or should have known, if the contracts had been switched, resulting in damages to him via changed terms in payment obligations.

procedural advantage." *Gibson*, 781 F.2d at 1340 (citing *Fitzgerald v. Seamans*, 553 F.2d 220, 240 (D.C. Cir. 1977)).

Thompson alleges US Bank joined the ADU conspiracy when Scott Blando failed to locate the check written by Thompson for the second address at the Blackbird Lane property, thus preventing him from exposing irregularities in the City of Bozeman's zoning documentation.   The failure to locate the check ended in 2012 when Blando informed Thompson he could not locate the check.  To the extent Thompson alleges US Bank is part of the larger ADU conspiracy, there is just a continuation of the effects of any conspiracy attributable to it after April 2012.  Accordingly, Thompson was required to bring his § 1983 conspiracy claim against US Bank by April 2014 at the latest; because he did not, his claims is barred.  As Thompson cannot proceed on his § 1983 claim, any claim for attorney fees under 42 U.S.C. § 1988 is similarly precluded.

## 2.  RICO Conspiracy

The Racketeer Influenced and Corrupt Organizations Act authorizes a civil action for anyone who is injured in his business or property by a violation of RICO's criminal provisions.  18 U.S.C. § 1964(c).  To establish a RICO claim, a plaintiff must show "(1) conduct (2) of an 'enterprise' (3) through a 'pattern' (4) of racketeering activity (or 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'"  *Tanaka v. First Haw. Bank*, 104 F.Supp.2d 1243, 1245

(D. Haw. 2000).

The statute of limitations for bringing a RICO claim is four years. *Rotella v. Wood*, 528 U.S. 549, 552 (2000).  The Ninth Circuit follows the two-part "injury discovery rule," which provides that "the civil RICO limitations period 'begins to run when a plaintiff knows or should know of the injury that underlies his cause of action.'" *Grimmett v. Wood*, 75 F.3d 506, 510 (9th Cir. 1996) (citing *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 220 (4th Cir. 1987)). "The plaintiff need not discover that the injury is part of a 'pattern of racketeering' for the period to begin to run." *Grimmett*, 75 F.3d at 510 (citing *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992)).

Additionally, under the second, "separate accrual rule" of the injury discovery rule, "a new cause of action accrues for each new and independent injury, even if the RICO violation causing the injury happened more than four years before." *Grimmett*, 75 F.3d at 510 (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2nd Cir. 1988)).  For the statute of limitations to restart, there must be an action which is a "new and independent act that is not merely a reaffirmation of a previous act" and that act "must inflict new and accumulating injury on the plaintiff." *Grimmett*, 75 F.3d at 513.  A continuation of an allegedly fraudulent scheme does not restart the statute of limitations. *Lockwood v. Sheppard, Mullin, Richter & Hampton, LLP*, 2009 U.S. Dist. LEXIS 133046, *13

(C.D. Cal. Nov. 24, 2009).

Thompson contends that US Bank is part of a RICO conspiracy to commit fraud, resulting in his inability to build an ADU on his property.  The last overt act he alleges against US Bank in relation to the ADU conspiracy was in 2012, when Scott Blando failed to locate Thompson's check.[7]  Thompson knew of that inability to find the check, and knew that it prevented him from proving that he had paid for a second address at the Blackbird Lane property.  At that point, his RICO conspiracy claim against US Bank was both discovered and accrued under the injury discovery rule, and the four-year statute of limitations began to run. Accordingly, Thompson should have filed his RICO claim against US Bank and American Land Defendants by April 2016 at the latest.

Thompson argues that the RICO statute of limitations should be equitably tolled.  Equitable tolling, whether it is called fraudulent concealment or equitable estoppel, only applies when "the plaintiff shows that he neither knew, nor in the exercise of due diligence, could reasonably have known of the offense." *Tanaka*, 104 F.Supp.2d at 1252 (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997)).  In a case alleging fraud, there must be allegations of ". . . 'active conduct

---

[7] Thompson has not actually plead a RICO claim against US Bank based on John Thorn's oral statements to Thompson when he was securing the loan for the Blackbird property.  However, to the extent such a claim could be implied, those statements were in 2008.

by a defendant, *above and beyond the wrongdoing upon which the plaintiff's claim is filed*, to prevent the plaintiff from suing in time'. . . . Otherwise there would always be tolling in a case alleging fraud." *Tanaka*, 104 F.Supp.2d at 1253 (emphasis added) (citing *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1177 (9th Cir. 2000)).

Thompson had actual knowledge in April 2012 that he wanted to get a copy of a personal check to help him in his pursuit against the City of Bozeman, and he knew in April 2012 that Scott Blando could not locate that check.  Thompson knew that the failure by Blando to find that check prevented him from proving he had paid for the second address.  At that time, he had actual knowledge of the facts giving rise to any RICO claim against US Bank; accordingly, equitable tolling does not save his RICO claim.  Unlike a situation in which the alleged bad actor conceals the injury, thus lulling the plaintiff into sleeping on his rights, the fraud alleged by Thompson against US Bank is Scott Blando's alleged communication with co-conspirators and then unwillingness to put forth adequate effort to locate Thompson's check.  Thompson undisputedly knew about, or was on inquiry notice of, this claim by April 2012 at the latest.  Because Thompson cannot show that the US Bank fraudulently concealed its alleged bad acts, equitable tolling does not apply.

///

### C. Dismissal with Prejudice

A pro se plaintiff must be given leave to amend unless it is "absolutely clear that the deficiencies of the complaint cannot be cured by amendment." *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007).  Although leave to amend is liberally granted, dismissal with prejudice is appropriate where amendment would be futile. *Sharkey v. O'Neal*, 778 F.3d 767, 774 (9th Cir. 2015). Here, Thompson has already had one opportunity to amend his Complaint. The Court concludes that the pleading deficiencies set forth above cannot be cured by the allegation of additional facts, and it would be futile to permit Thompson to file a Second Amended Complaint as to the federal claims alleged against US Bank.  However, the Court also concludes that Thompson should be permitted to amend his claim that the loan agreement was altered under Mont. Code Ann. § 28-2-1703(1) and his claim for breach of the covenant of good faith and fair dealing in relation to the service agreement and Scott Blando's search for the missing check.

### IV.   Conclusion

For the reasons explained above, the Court concludes that the Amended Complaint fails to state a claim for relief against US Bank on all federal claims, that it states a claim for breach of contract and breach of the implied covenant of good faith and fair dealing, with the exception of breach based on alteration of contract and implied covenant based on the service agreement.  Accordingly,

IT IS RECOMMENDED that US Bank's Motion to Dismiss (Doc. 16) be GRANTED in part and DENIED in part, and Thompson's federal claims be dismissed with PREJUDICE.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 1st day of June, 2020.

_____
Kathleen L. DeSoto
United States Magistrate Judge